UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                     :

UNITED STATES OF AMERICA       :     S1 10 Cr.1217-JFK-HB

     v.                   :

                     :    Violations:    18 U.S.C. § 371

PETER GHAVAMI,        :                18 U.S.C. § 1343
    a/k/a "Peter Ghavamilahidji";  :              18 U.S.C. § 1349
GARY HEINZ; and        :                18 U.S.C. § 1512(b)
MICHAEL WELTY,        :
         Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: SEP 1 5 2011

## INDICTMENT

The Grand Jury charges:

## COUNT ONE – CONSPIRACY
### (18 U.S.C. § 371)

1.    PETER GHAVAMI, a/k/a "Peter Ghavamilahidji," GARY HEINZ,

and MICHAEL WELTY are hereby indicted and made defendants on the charge stated

below.

## THE RELEVANT PARTIES AND ENTITIES

2.    During all times relevant to the Indictment, Financial Institution A

was a corporation existing under the laws of Switzerland with its principal place of

1

business in Zurich, Switzerland. Financial Institution A maintained several wholly-owned subsidiaries in the United States, including a financial services company (hereinafter "FSC"). Financial Institution A and FSC's principal places of business in the United States are in New York, New York.

3.    Directly or through its subsidiaries, Financial Institution A marketed financial products and services to various municipalities throughout the United States, acting as a provider of investment agreements and other municipal finance contracts. Financial Institution A also served as a provider of financial transactions known as swaps related to investment agreements and other municipal finance contracts. In addition to serving as a provider, Financial Institution A and FSC acted as a broker for investment agreements and other municipal finance contracts. At all relevant times Financial Institution A was registered with the Federal Reserve as a financial holding company and was a financial institution that was a branch or agency of a foreign bank, within the meaning of Title 18, United States Code, Section 20. During the relevant period, FSC was registered as a broker-dealer and investment adviser with the United States Securities and Exchange Commission ("SEC").

4.    For purposes of this Count, Financial Institution A and FSC acted in their capacity as providers for investment agreements and municipal finance contracts.

5.    PETER GHAVAMI, a/k/a "Peter Ghavamilahidji," is a Belgian citizen and resident of Moscow, Russia. From April 1999 to March 2004, defendant GHAVAMI was employed by FSC and worked primarily in New York, New York, and

from March 2004 to November 2007, defendant GHAVAMI was employed by Financial Institution A and worked primarily in London, England.  From January 2001 to March 2004, defendant GHAVAMI was a managing director and the co-head of the municipal bond reinvestment and derivatives ("MRD") desk at FSC.  During that time, defendant GHAVAMI's compensation, including bonus, restricted stock awards and stock options, was based on, among other things, the amount of fees and revenue generated by the MRD desk and the number and profitability of investment agreements and other municipal finance contracts awarded to Financial Institution A.

6.     GARY HEINZ, a resident of Jersey City, New Jersey, was a vice president and a marketer on the MRD desk at FSC from February 2001 to April 2004, and reported to defendant GHAVAMI.  Defendant HEINZ's compensation, including bonus and restricted stock awards, was based on, among other things, the amount of fees and revenue generated by the MRD desk and the number and profitability of investment agreements and other municipal finance contracts awarded to Financial Institution A.

7.     MICHAEL WELTY, a resident of New York, New York, was a vice president and marketer on the MRD desk at FSC from January 1999 to April 2005, and reported to defendant GHAVAMI.  Defendant WELTY's compensation, including bonus and restricted stock awards, was based on, among other things, the amount of fees and revenue generated by the MRD desk and the number and profitability of investment agreements and other municipal finance contracts awarded to Financial Institution A.

3

8.     At all times relevant to this Indictment, Financial Institution C was registered with the Federal Reserve as a financial holding company headquartered in New York, New York, and was a member of the Federal Reserve System within the meaning of Title 18, United States Code, Section 20.  Financial Institution C acted as a provider of investment agreements and other municipal finance contracts for issuers and participated in the competitive bidding process to provide those agreements and contracts.

9.     At all times relevant to this Indictment, Financial Institution D was registered with the Federal Reserve as a financial holding company headquartered in Charlotte, North Carolina, and was a member of the Federal Reserve System within the meaning of Title 18, United States Code, Section 20.  Financial Institution D acted as a provider of investment agreements and other municipal finance contracts for issuers and participated in the competitive bidding process to provide those agreements and contracts.

10.     Whenever in this Count reference is made to any act, deed, or transaction of any corporation, such allegation shall be deemed to mean that the corporation engaged in such act, deed, or transaction by or through its officers, directors, agents, employees, or other representatives while they were actively engaged in the management, direction, control, or transaction of its business affairs.

11.     Various persons and firms, including Financial Institution A, FSC, Financial Institution C and Financial Institution D, not made defendants herein,

4

participated as co-conspirators in the offense charged herein and performed acts in furtherance thereof.

12.     The conduct alleged in this Count caused Financial Institutions A, C, and D to be susceptible to substantial risk of loss and caused actual loss to Financial Institutions A, C and D.

## BACKGROUND

13.     Municipal bonds are issued by government entities, such as states, counties, and cities, or quasi-governmental entities, such as public authorities and school, utility or water districts, to raise money for operating funds or for specific projects, such as the construction of public facilities, and to refinance outstanding municipal debt.  In some instances, the entity issuing the bonds turns the money over to a not-for-profit entity, such as a school or hospital, or an entity that will spend the money for a specific public purpose, such as the construction of low-cost housing or waste treatment facilities. Both the entities that issue municipal bonds, and the entities that receive and spend the money are, unless otherwise stated, collectively referred to herein as "issuers," "municipal issuers," or "municipalities."  In 2007 and 2008 combined, approximately $800 billion in municipal bonds were issued in the United States.

14.     Frequently, municipal bonds are tax-exempt, meaning that the investors who purchase these municipal bonds do not have to pay federal income tax on the interest earned on such bonds.  In order to obtain and maintain tax-exempt status for bonds, municipal issuers are required to follow certain statutes in the Internal Revenue

5

Code, as well as rules and regulations of the United States Department of the Treasury

and the Internal Revenue Service ("IRS"). The IRS is charged with enforcing

compliance with rules and regulations related to obtaining and maintaining the tax-

exempt status of the bonds of a municipal issuer.

15.    The money an issuer raises from a municipal bond offering ("bond

proceeds") is typically spent over a period of time, rather than immediately in one lump

sum. The issuer frequently invests some or all of bond proceeds in an investment product

(sometimes referred to as an "investment agreement"), which is designed for its specific

needs. Investment agreements vary in size from a few hundred thousand to several

hundred million dollars and in duration from as short as one month to as long as thirty

years.

16.    Major financial institutions, including banks, investment banks,

insurance companies, and financial services companies (collectively "providers") sell

investment agreements through their employees or agents ("marketers").

17.    Issuers usually select providers of investment agreements through

*bona fide* competitive bidding procedures that are designed to comply with federal tax

law and United States Department of the Treasury regulations relating to the tax-exempt

status of municipal bonds. Compliance with these regulations is monitored by the IRS,

which is entitled to receive a portion of the earnings from a municipality's investment

agreement under certain circumstances. Among other things, each provider submitting a

bid typically certifies that specific Treasury regulations have been followed, including

6

that the provider did not consult with any other potential provider about its bid and that all providers had an equal opportunity to bid, commonly referred to as the no "last looks" provision. Issuers are required to file with the IRS an IRS Form 8038 to provide information required by federal tax laws.

18.     Issuers often hire third parties ("brokers") to act as their agents in conducting a *bona fide* competitive bidding process and complying with the relevant Treasury regulations. The broker's fee for conducting a *bona fide* competitive bidding process is generally paid by the winning provider, which takes account of the cost of the broker's fee when calculating its bid and discloses the fee to the issuer.

19.     Brokers offer a variety of services, including offering suggestions about the availability and suitability of investment products, drafting bid specifications, and identifying the most competitive, qualified providers to be solicited as bidders. In some cases, the broker decides which providers will be solicited to bid without consulting with the issuer or any of the other professional representatives advising the issuer.

20.     Brokers typically are responsible for distributing the bid packages (specifications and bid forms) to providers selected to receive them, usually via e-mail; keeping in touch with the potential bidders to answer questions about the bid specifications; and conducting the bidding process, which typically involves receiving the providers' bids by telephone at a time identified in the bid specifications, followed by a confirming copy of the bid via facsimile. After reviewing the bids to ensure conformity with the specifications, brokers then inform the issuer of the outcome of the bid,

including the identity of the winning, qualified bidder and, if appropriate, any conditions that deviate from the specifications. Brokers are often required by the issuer to provide written certification that the bidding procedures complied with the relevant Treasury regulations.

21.    Depending on the structure of the bid, providers may be asked to quote only the interest rate to be paid on funds on deposit for the duration of the agreement or they may be asked to submit a bid in the form of a dollar amount or date (sometimes referred to as the "price" or "price level" of a bid). In a typical investment agreement, providers are asked to quote only an interest rate and, generally, the agreement is awarded to the provider quoting the highest rate.

22.    Many brokers that conduct *bona fide* competitive bidding for investment agreements subject to the Treasury regulations are also hired by municipalities and other quasi-government entities to conduct *bona fide* competitive bidding in connection with the award of other contracts involving public funds, even though those contracts are not subject to the Treasury regulations. These contracts (collectively, "other municipal finance contracts") include investment agreements for taxable municipal bonds; investment agreements for funds borrowed by entities in which the federal government or any municipal entity is a participant; and derivative contracts, which are contracts between a municipal issuer and a financial institution that are designed to manage or transfer some or all of the interest rate risk associated with a municipal bond issue. They do not include underwriting contracts.

8

## DESCRIPTION OF THE OFFENSE

23.     From at least as early as August 2001 until at least July 2002, the exact dates being unknown to the Grand Jury, in the Southern District of New York and elsewhere, PETER GHAVAMI, GARY HEINZ and MICHAEL WELTY, the defendants (collectively, the "FSC Defendants"), and co-conspirators, including Financial Institution A, FSC, Financial Institution C, Financial Institution D, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States of America, to wit, to violate Title 18, United States Code, Section 1343, all in violation of Title 18, United States Code, Section 371.

24.     It was a part and an object of the conspiracy that the FSC Defendants, and co-conspirators, including Financial Institution A, FSC, Financial Institution C, Financial Institution D, and others known and unknown, unlawfully, willfully and knowingly, would and did devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, which scheme to defraud affected a financial institution, namely, a scheme to defraud municipal issuers and the United States Department of the Treasury and the IRS by manipulating the bidding process for investment agreements and other municipal finance contracts by colluding with each other, and further to deprive the municipal issuers of the property right to control their assets by causing them to make economic decisions based on misleading and false information, and for the purpose of

9

executing such scheme and artifice, and attempting to do so, would and did transmit and cause to be transmitted by means of wire, radio or television communication in interstate or foreign commerce any writings, signs, signals, pictures or sounds, in violation of Title 18, United States Code, Section 1343.

### THE MANNER AND MEANS BY WHICH THE CONSPIRACY WAS CARRIED OUT

25.     For purposes of effectuating the aforesaid conspiracy, the FSC Defendants and co-conspirators, including Financial Institution C, Financial Institution D, and others known and unknown, did those things which they conspired to do, including among other things:

(a)     increasing the number and profitability of investment agreements and other municipal finance contracts awarded to Financial Institution A and FSC by telling co-conspirators at Financial Institution C and Financial Institution D what price or price level FSC intended to bid, discussing in advance the price at which Financial Institution C or Financial Institution D would bid for an investment agreement or municipal finance contract, and agreeing that Financial Institution A and FSC would be allocated the investment agreement or municipal finance contract;

(b)     agreeing that Financial Institution D would not bid against Financial Institution A and FSC in exchange for Financial Institution A and FSC purchasing securities from Financial Institution D;

(c)     agreeing that Financial Institution A and FSC would submit intentionally losing bids for investment agreements or other municipal finance contracts for which Financial Institution C was competing, in order to create the appearance that Financial Institution A and FSC were competing for agreements or contracts when, in fact, they were not;

(d)     falsely certifying that the bids submitted by Financial Institution A and FSC complied with relevant Treasury regulations or were otherwise competitive, and aiding and abetting the submission of corresponding false certifications by co-conspirators at Financial Institution C that the bidding process was *bona fide* and complied with relevant Treasury regulations or was otherwise competitive;

(e)     causing municipal issuers to award investment agreements and other municipal finance contracts to Financial Institution A and FSC, or to Financial Institution C, which agreements and contracts the municipal issuers would not have awarded to Financial Institution A and FSC, or Financial Institution C, if they had true and accurate information regarding the bidding process; and

(f)     causing municipalities not to file required reports with the IRS or to file inaccurate reports with the IRS, and to fail to give the IRS or the Treasury money to which it was entitled as a condition of the tax-exempt status of the underlying bonds.  This conduct jeopardized the tax-exempt status of the underlying bonds.

11

## OVERT ACTS

26.     In furtherance of the conspiracy and to effect the illegal object thereof, the FSC Defendants and their co-conspirators, including Financial Institution A, FSC, Financial Institution C, Financial Institution D, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

(a)     On numerous occasions, at or about the time the bid specifications stated that bids were due, the FSC Defendants and their co-conspirators at Financial Institution C participated in telephone calls during which the FSC Defendants and co-conspirators at Financial Institution C told each other what prices or price levels that Financial Institution A and FSC and Financial Institution C would or should submit as bids for investment agreements or municipal finance contracts.

(b)     With respect to an investment agreement for an urban water and sewer district:

(i)     On or about September 18, 2001, approximately a week before the bidding for an investment agreement, during a telephone call with a co-conspirator at Financial Institution C, defendant HEINZ stated that Financial Institution A and FSC wanted to be the winning bidder for the upcoming investment agreement and stated that he and the co-conspirator from Financial Institution C should provide each other with their respective bids and price information prior to the bids being submitted.

12

(ii)    On or about September 26, 2001, during a telephone call with a co-conspirator at Financial Institution C, defendant HEINZ made arrangements to exchange bid and price information later in the day before the bids were due, and HEINZ offered to help the co-conspirator come up with the price Financial Institution C should bid.

(iii)    On or about September 26, 2001, during a telephone call with a co-conspirator from Financial Institution C shortly before bids were due, defendant GHAVAMI asked what price Financial Institution C was going to bid and the co-conspirator from Financial Institution C told GHAVAMI the price Financial Institution C would bid.

(iv)    On or about September 26, 2001, defendant HEINZ signed and, via interstate facsimile from New York, New York to Los Angeles, California, submitted to the issuer's broker a bid certificate, that, among other things, falsely represented "that the bidder did not consult with any other potential provider about its bid," and that "the bidder did not have the opportunity to review other bids (i.e., a last look) before providing a bid."

(v)    On or about October 23, 2001, the issuer's broker executed and delivered to bond counsel a misleading broker's certificate that, among other things, falsely stated: "The [issuer] purchased the lowest cost, highest yielding Agreement for which a Qualifying Offer was made[,]" and that "[n]o bidder had an

13

opportunity to review other bids before bidding on the sale of the Agreement to the [issuer]."

(c)     With respect to an investment agreement for a state financing agency that was bid on June 20, 2002 and to be awarded to the provider bidding the lowest cost for a bundle of securities:

(i)     On or about June 19, 2002, defendant WELTY told a co-conspirator at Financial Institution D that Financial Institution A and FSC wanted to win the investment agreement, but that Financial Institution A and FSC might be willing to purchase securities from Financial Institution D needed to fulfill the investment agreement.  The co-conspirator from Financial Institution D subsequently agreed that Financial Institution D would not bid in competition with Financial Institution A and FSC in exchange for their agreeing to purchase securities from Financial Institution D after Financial Institution A and FSC was awarded the investment agreement.

(ii)     On or about June 20, 2002, during a telephone conversation, defendant HEINZ told a co-conspirator at Financial Institution C what price level at which Financial Institution A and FSC anticipated bidding for the investment agreement.  Later that day, during another telephone conversation, a co-conspirator at Financial Institution C told defendant HEINZ the price level Financial Institution C would be bidding for the investment agreement, which was a higher number than Financial Institution A and FSC planned to submit.

(iii)     On or about June 20, 2002, a co-conspirator from Financial Institution C signed and faxed to the issuer's broker the bid form of Financial Institution C, which falsely represented, among other things, that Financial Institution C "did not consult any other potential provider about its bid, [and] that the bid was determined without regard to any other formal or informal agreement that [Financial Institution C] ha[d] with . . . any other person."

(iv)     On or about June 20, 2002, defendant WELTY signed and faxed to the issuer's broker the bid form of Financial Institution A and FSC, which falsely represented, among other things, that it "did not consult with any other potential provider about its bid, [and] that the bid was determined without regard to any other formal or informal agreement that [Financial Institution A] ha[d] with . . . any other person."

(v)      On or about June 20, 2002, the issuer's broker awarded the investment agreement to Financial Institution A and FSC because it submitted the lowest bid.

(vi)     On or about June 27, 2002, via interstate facsimile, a representative of the Stamford, Connecticut, branch of Financial Institution A delivered to Financial Institution A's special outside counsel in Chicago, Illinois, a provider's certificate that, among other things, falsely represented that Financial Institution A "did not consult with any other potential provider about its bid, [and that] the bid was

determined without regard to any other formal or informal agreement that [Financial Institution A] ha[d] with . . . any other person."

   (vii) On or about June 27, 2002, the issuer's broker executed and delivered to the issuer's bond counsel a broker's certificate that was misleading and inaccurate because of the false representations contained in the bid certificates executed and submitted by Financial Institution A and FSC and Financial Institution C.

   (d) On or about August 16, 2001, with respect to a municipal finance contract for a municipal airport authority, defendant GHAVAMI agreed with a co-conspirator at Financial Institution C to submit and did submit an intentionally losing bid for the contract.

  (IN VIOLATION OF TITLE 18, UNITED STATES CODE, SECTION 371)

<u>COUNT TWO – CONSPIRACY TO COMMIT WIRE FRAUD</u>
(18 U.S.C. § 1349)

<u>THE RELEVANT PARTIES AND ENTITIES</u>

  The Grand Jury further charges:

  27. PETER GHAVAMI, a/k/a "Peter Ghavamilahidji," GARY HEINZ, and MICHAEL WELTY are hereby indicted and made defendants on the charge stated below.

16

28.     Paragraphs 2, 3, 5 through 7, 10, and 13 through 22 of Count One of this Indictment are repeated, realleged, and incorporated in Count Two as if fully set forth in this Count.

29.     During all times relevant to the Indictment, Rubin/Chambers, Dunhill Insurance Services, Inc., d/b/a Chambers, Dunhill Rubin & Co. and CDR Financial Products, Inc., and certain of their employees (collectively "CDR"), located in Beverly Hills, California, marketed financial products and services, including services as a broker and advisor to various municipal issuers throughout the United States.

30.     For purposes of this Count, Financial Institution A and FSC acted in their capacity as a provider of investment agreements and other municipal finance contracts.

31.     Various persons and firms, not made defendants herein, participated as co-conspirators in the offense charged herein and performed acts in furtherance thereof, including Financial Institution A, FSC, CDR, and co-conspirators at CDR.

32.     The conduct alleged in this Count caused Financial Institution A to be susceptible to substantial risk of loss and caused actual loss to Financial Institution A.

<u>DESCRIPTION OF THE OFFENSE</u>

33.     From at least as early as March 2001 until at least November 2004, the exact dates being unknown to the Grand Jury, in the Southern District of New York and elsewhere, PETER GHAVAMI, GARY HEINZ and MICHAEL WELTY, the defendants (collectively, the "FSC Defendants"), and co-conspirators, including Financial

Institution A, FSC, CDR, and others known and unknown, unlawfully, willfully; and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States of America, to wit, to violate Title 18, United States Code, Section 1343, all in violation of Title 18, United States Code, Section 1349.

      34.    It was a part and an object of the conspiracy that the FSC Defendants, and co-conspirators, including Financial Institution A, FSC, CDR, and others known and unknown, unlawfully, willfully and knowingly, would and did devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, which scheme to defraud affected a financial institution, namely, a scheme to defraud municipal issuers and the United States Department of the Treasury and the IRS by paying kickbacks to CDR in exchange for CDR's manipulation and control of the bidding process for investment agreements and other municipal finance contracts, and further to deprive the municipal issuers of the property right to control their assets by causing them to make economic decisions based on false and misleading information, and for the purpose of executing such scheme and artifice, and attempting to do so, would and did transmit and cause to be transmitted by means of wire, radio or television communication in interstate or foreign commerce any writings, signs, signals, pictures or sounds, in violation of Title 18, United States Code, Section 1343.

## THE MANNER AND MEANS BY WHICH THE
## CONSPIRACY WAS CARRIED OUT

35.     For purposes of effectuating the aforesaid conspiracy, the FSC

Defendants and co-conspirators, including CDR and others known and unknown, did

those things which they conspired to do, including among other things:

(a)     discussing and agreeing with CDR which of Financial

Institution A's competitors should and should not be solicited to submit bids for a

particular investment agreement or municipal finance contract;

(b)     obtaining from CDR information about the prices, price

levels, rates, conditions or other information related to competing providers' bids,

including, in some instances, the exact price, price level, or rate of competing providers'

bids;

(c)     determining Financial Institution A and FSC's bids after

obtaining information from CDR about the prices, price levels, rates, conditions, or other

information related to competing providers' bids;

(d)     submitting intentionally losing bids for certain investment

agreements and other municipal finance contracts brokered by CDR to make it appear

that Financial Institution A and FSC had competed for those agreements or contracts

when, in fact, they had not;

(e)     agreeing to pay and arranging for kickback payments to be

made to CDR in the form of fees that were inflated, relative to the services performed, or

unearned.  These payments were made in exchange for CDR's assistance in controlling

and manipulating the competitive bidding process and were not disclosed to the

municipal issuers that hired CDR, or to the IRS;

(f)     misrepresenting to municipal issuers or bond counsel that the

bidding process was *bona fide* and in compliance with Treasury regulations or was

otherwise competitive;

(g)     certifying, causing to be certified, and forwarding

certifications to municipal issuers or bond counsel stating that the bidding process for

certain investment agreements or other municipal finance contracts was *bona fide* and in

compliance with Treasury regulations or was otherwise competitive, when, in fact it was

not;

(h)     causing municipal issuers to award investment agreements

and other municipal finance contracts to Financial Institution A and FSC, which

agreements and contracts the municipal issuers would not have awarded to Financial

Institution A and FSC if they had true and accurate information regarding the bidding

process; and

(i)     causing municipal issuers not to file required reports with the

IRS or to file inaccurate reports with the IRS, and, on occasion, to fail to give the IRS or

the United States Treasury money to which it was entitled as a condition of the tax-

exempt status of the underlying bonds.  This conduct jeopardized the tax exempt status of

the underlying bonds.

## OVERT ACTS

36.    In furtherance of the conspiracy and to effect the illegal object thereof, the FSC Defendants and their co-conspirators, including Financial Institution A, FSC, CDR, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

(a)    On numerous occasions, after an issuer hired CDR to broker an investment agreement, the FSC Defendants and their co-conspirators participated in interstate telephone calls between California and New York, New York, during which the FSC defendants expressed a desire to win the investment agreement.

(b)    On numerous occasions, at or about the time the bid specifications stated that bids were due, the FSC Defendants and their co-conspirators participated in interstate telephone calls or other wire transmissions between California and New York, New York, during which the FSC Defendants and their co-conspirators at CDR exchanged information about the prices, price levels, or conditions of bids from other providers, which the FSC Defendants then used that information to determine FSC's bid.

(i)    On or about April 23, 2004, with respect to an investment agreement for a community college district, during an interstate telephone call between California and New York, New York, at about the time bids were due to be submitted, CDR provided defendant WELTY with the price levels and bids being

submitted by other providers so that defendant WELTY could adjust his bid and submit the winning bid on behalf of FSC, which he did via an interstate facsimile.

(ii)     On or about May 18, 2004, with respect to an investment agreement for a second community college district, during an interstate telephone call between California and New York, New York, at about the time bids were due to be submitted, CDR provided defendant WELTY with the price levels and bids being submitted by other providers so that defendant WELTY could adjust his bid and submit the winning bid on behalf of FSC, which he did via an interstate facsimile.

(c)     On numerous occasions, prior to taking bids for certain investment agreements or other municipal finance contracts, certain of the FSC Defendants and co-conspirators participated in interstate telephone calls or other wire communications between California and New York, New York, during which they made arrangements for CDR to receive kickbacks in the form of purported swap fees that were not disclosed to the municipality.  For example, on or about June 5, 2002, after being awarded an investment agreement for a school district, defendant GHAVAMI caused another co-conspirator at FSC to contact a trader with Financial Institution A in Stamford, Connecticut, and arrange for the payment of a $65,000 kickback to CDR disguised as a swap fee, which was wired from the London, England branch of Financial Institution A to CDR in Los Angeles, California, on or about June 7, 2002.

(d)     On numerous occasions, the FSC Defendants, at the request of CDR, forwarded intentionally losing bids to CDR in order to create the appearance

22

that Financial Institution A and FSC were competing for agreements or contracts, when in fact they were not. For example, on or about August 16, 2002, with respect to an investment agreement for an municipal airport authority, defendant HEINZ signed and delivered to CDR, via an interstate facsimile from New York, New York to Beverly Hills, California, an intentionally losing bid for an investment agreement for a municipal issuer.

      (e)    On numerous occasions, the FSC Defendants falsely certified or aided and abetted the false certification that the bidding process complied with Treasury regulations or was otherwise competitive and forwarded bids and certifications via interstate wire communications between New York and California. For example,

      (i)    With respect to an to an investment agreement for a community college district, on or about May 13, 2004, CDR forwarded a broker's certificate to bond counsel that, among other things, falsely represented that "[a]ll bidders had an equal opportunity to bid and no bidder was given the opportunity to review other bids."

      (ii)    With respect to an investment agreement for another community college district, on or about June 2, 2004, CDR forwarded a broker's certificate to bond counsel that, among other things, falsely represented that "[a]ll bidders had an equal opportunity to bid and no bidder was given the opportunity to review other bids."

(IN VIOLATION OF TITLE 18, UNITED STATES CODE, SECTION 1349)

## COUNT THREE – WIRE FRAUD
### (18 U.S.C. § 1343)

### THE RELEVANT PARTIES AND ENTITIES

The Grand Jury further charges:

37.    PETER GHAVAMI, a/k/a "Peter Ghavamilahidji," GARY HEINZ and MICHAEL WELTY are hereby indicted and made defendants on the charge stated below.

38.    Paragraphs 2, 3, 5 through 7, 9, 10, and 13 through 22 of Count One of this Indictment are repeated, realleged, and incorporated in Count Three as if fully set forth in this Count.

39.    For purposes of this Count, Financial Institution A and FSC acted in their capacity as a broker for investment agreements and other municipal finance contracts.

40.    Various persons and firms, not made defendants herein, participated in the offense charged herein and performed acts in furtherance thereof, including Financial Institution A, FSC, Financial Institution D, and an employee from Financial Institution D who was a marketer of investment agreements and other municipal finance contracts.

41.    The conduct alleged in this Count caused Financial Institutions A and D to be susceptible to substantial risk of loss and caused actual loss to Financial Institutions A and D.

24

## DESCRIPTION OF THE OFFENSE

42.     From at least as early as October 18, 2001 until at least February 15, 2002, the exact dates being unknown to the Grand Jury, in the Southern District of New York and elsewhere, PETER GHAVAMI, GARY HEINZ and MICHAEL WELTY, the defendants (collectively, the "FSC Defendants"), and others known and unknown, unlawfully, willfully, and knowingly devised and intended to devise a scheme and artifice to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, which scheme to defraud affected a financial institution, namely, a scheme to deceive a municipal issuer that was a state, and the United States Department of the Treasury and the IRS, by causing the municipal issuer to award an investment agreement at an artificially determined price, and further to deprive the municipal issuer of the property right to control its assets by causing it to make economic decisions based on misleading information, and for the purpose of executing such scheme and artifice, and attempting to do so, the FSC Defendants and others known and unknown, would and did transmit and cause to be transmitted by means of wire, radio or television communication in interstate or foreign commerce writings, signs, signals, pictures or sounds, in violation of Title 18, United States Code, Section 1343, including the following:

43.     Among other things, in furtherance of this scheme and artifice, on or about February 15, 2002, via interstate wire transfer from Charlotte, North Carolina to New York, New York, an individual at Financial Institution D caused Financial

Institution D to wire $100,000 to Financial Institution A and FSC, which was an undisclosed kickback, disguised as a hedge fee, paid in exchange for the FSC Defendants steering the investment agreement to Financial Institution D, which was awarded to Financial Institution D at an artificially determined price through the control and manipulation of the bidding process by the FSC Defendants. As a result, the municipal issuer awarded Financial Institution D the investment agreement at an artificially determined price, which the municipal issuer would not have done if it had true and accurate information regarding the bidding process, and accordingly, the FSC Defendants caused the municipal issuer not to file required reports with the IRS or to file inaccurate reports with the IRS, and to fail to give the IRS and the Treasury money to which it was entitled as a condition of the tax-exempt status of the underlying bonds. This conduct jeopardized the tax-exempt status of the underlying bonds.

(IN VIOLATION OF TITLE 18, UNITED STATES CODE, SECTION 1343)

## COUNT FOUR – CONSPIRACY TO COMMIT WIRE FRAUD
(18 U.S.C. § 1349)

### THE RELEVANT PARTIES AND ENTITIES

The Grand Jury further charges:

44.     GARY HEINZ and MICHAEL WELTY are hereby indicted and made defendants on the charge stated below.

45.     Paragraphs 2, 3, 6, 7, 10, and 13 through 22 of Count One of this Indictment are repeated, realleged, and incorporated in Count Four as if fully set forth in this Count.

46.     For purposes of this Count, Financial Institution A and FSC acted in their capacity as a broker for investment agreements and other municipal finance contracts.

47.     Provider B was a group of separate financial services companies located in New York, New York, and was owned or controlled by a company headquartered in Fairfield, Connecticut.  Provider B sold investment agreements and other municipal finance contracts to municipalities, state and local authorities and other parties located throughout the United States.

48.     Various persons and firms, not made defendants herein, participated as co-conspirators in the offense charged herein and performed acts in furtherance thereof, including Financial Institution A and FSC.

49.     The conduct alleged in this Count caused Financial Institution A to be susceptible to substantial risk of loss and caused actual loss to Financial Institution A.

<u>DESCRIPTION OF THE OFFENSE</u>

50.     From at least as early as January 2002 until at least November 2006, the exact dates being unknown to the Grand Jury, in the Southern District of New York and elsewhere, GARY HEINZ and MICHAEL WELTY, the defendants, and co-conspirators, including Financial Institution A, FSC, a co-conspirator at Provider B,

27

Provider B, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States of America, to wit, to violate Title 18, United States Code, Section 1343, in violation of Title 18, United States Code, Section 1349.

51.     It was a part and an object of the conspiracy that GARY HEINZ and MICHAEL WELTY, the defendants, and co-conspirators, including Financial Institution A, FSC, a co-conspirator at Provider B, Provider B, and others known and unknown, unlawfully, willfully and knowingly would and did devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, which scheme to defraud affected a financial institution, namely, a scheme to deceive municipal issuers and the United States Department of the Treasury and the IRS by manipulating the bidding process for multiple investment agreements and other municipal contracts to favor Provider B, occasionally in exchange for Provider B entering into hedging transactions, known as swaps, with Financial Institution A at inflated rates, and further to deprive municipal issuers of the property right to control their assets by causing them to make economic decisions based on misleading information, and for the purpose of executing such scheme and artifice, and attempting to do so, defendants HEINZ and WELTY would and did transmit and cause to be transmitted by means of wire, radio or television communication in interstate or foreign commerce any writings, signs, signals, pictures or sounds, in violation of Title 18, United States Code, Section 1343.

28

## THE MANNER AND MEANS BY WHICH THE
## CONSPIRACY WAS CARRIED OUT

52.     For purposes of effectuating the aforesaid conspiracy, GARY

HEINZ and MICHAEL WELTY, the defendants, and the co-conspirator at Provider B,

and others known and unknown, did those things which they conspired to do, including

among other things:

(a)     discussing and agreeing with Provider B which competitors

of Provider B should and should not be solicited to submit bids for a particular

investment agreement or other municipal finance contract;

(b)     providing to Provider B information about the prices, price

levels, rates, conditions or other information related to competing providers' bids,

including, in some instances, the exact price, price level or rate of competing providers'

bids;

(c)     determining Provider B's bids after providing information

about the prices, price levels, rates, conditions, or other information rated to competing

providers' bids;

(d)     arranging for Provider B to submit intentionally losing bids

for certain investment agreements or other municipal finance contracts brokered by

Financial Institution A and FSC to make it appear that Provider B had competed for those

agreements or contracts, when, in fact, it had not;

(e)     arranging for Provider B to pay kickbacks to Financial

Institution A and FSC, whereby Provider B entered into swaps with Financial Institution

A at inflated rates, thereby generating increased revenue for Financial Institution A and

FSC.  These kickbacks were in exchange for defendants HEINZ's and WELTY's

assistance in controlling and manipulating the competitive bidding process and were not

disclosed to the municipal issuers that hired FSC as a broker, or to the IRS;

(f)     misrepresenting to municipal issuers or bond counsel that the

bidding process was *bona fide* and in compliance with Treasury regulations or was

otherwise competitive;

(g)     certifying, causing to be certified, and forwarding

certifications to municipal issuers or bond counsel stating that the bidding process for

certain investment agreements and other municipal finance contracts was *bona fide* and in

compliance with Treasury regulations or was otherwise competitive, when, in fact, it was

not;

(h)     causing municipal issuers to award investment agreements

and other municipal finance contracts to Provider B, which agreements and contracts the

municipal issuers would not have awarded to Provider B if they had true and accurate

information regarding the bidding process;

(i)     enabling Provider B to perform investment agreements and

other municipal finance contracts at artificially determined or suppressed rates that

deprived and will continue to deprive municipal issuers of money and property; and

30

(j)    causing municipal issuers not to file required reports with the IRS or to file inaccurate reports with the IRS and, on occasion, to fail to give the IRS or the United States Treasury money to which it was entitled as a condition of the tax-exempt status of the underlying bonds.  This conduct jeopardized the tax-exempt status of the underlying bonds.

## OVERT ACTS

53.    In furtherance of the conspiracy and to effect the illegal object thereof, GARY HEINZ and MICHAEL WELTY, the defendants, and their co-conspirators, including Financial Institution A, FSC, the co-conspirator at Provider B, Provider B, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

(a)    On numerous occasions, at or about the time bids were due, defendants HEINZ and WELTY and a co-conspirator at Provider B participated in telephone calls during which defendants HEINZ and WELTY gave Provider B information about the prices, price levels, conditions or other information related to competing providers' bids.  Provider B used this information to determine Provider B's bids.  On some occasions, defendants HEINZ and WELTY told Provider B the exact prices, price levels, rates conditions or other information related to competing providers' bids, and Provider B used that information to lower Provider B's bid and still win the contract.  As a result of this control and manipulation of the bidding process, Provider B was awarded, has performed, and is scheduled to perform investment agreements and

other municipal finance contracts at artificially determined or suppressed levels that deprived and will continue to deprive municipal issuers of money and property.

(b)     On numerous occasions, at or about the time bids were due, defendants HEINZ and WELTY and a co-conspirator at Provider B participated in telephone calls or other wire transmissions during which Provider B agreed to submit, and did submit, intentionally losing bids for investment agreements and other municipal finance contracts.  Defendants HEINZ and WELTY sometimes provided Provider B with prices, price levels, rates, conditions, or other information related to the competing providers' bids to assist Provider B in preparing such intentionally losing bids.

(c)     On occasion, defendants HEINZ and WELTY and a co-conspirator at Provider B participated in telephone calls or other wire transmissions during which they discussed, made or sought to make arrangements for Provider B to pay kickbacks to Financial Institution A and FSC.

(d)     On numerous occasions, defendants HEINZ and WELTY and a co-conspirator at Provider B misrepresented to municipal issuers or their bond counsel the circumstances under which the investment agreements and other municipal finance contracts were bid.

(e)     On numerous occasions, defendants HEINZ and WELTY and a co-conspirator at Provider B certified, caused to be certified, and forwarded certifications to municipal issuers or their bond counsel stating that the bidding process for certain investment agreements or other municipal finance contracts was *bona fide* and

in compliance with Treasury regulations or was otherwise competitive, when, in fact, it was not.

(f)    On numerous occasions, Provider B performed investment agreements and other municipal finance contracts and made payments to municipal issuers via wire transfer at artificially determined or suppressed rates.  Provider B continues to perform some of those agreements and contracts.

(g)    With respect to the award and performance of an investment agreement for a state housing mortgage and finance corporation, defendants HEINZ and WELTY and Provider B committed the following overt acts, among others:

(i)    On or about March 5, 2002, the day bids were due, during a telephone call between a co-conspirator at Provider B and defendant WELTY, WELTY suggested to a co-conspirator at Provider B that he could submit a bid with rates lower than the co-conspirator had previously stated he was willing to submit and Provider B could still be awarded the contract.

(ii)    On or about March 5, 2002, a co-conspirator at Provider B submitted a bid to Financial Institution A and FSC for the investment agreement for the state housing mortgage and finance corporation in accordance with defendant WELTY'S suggestion.

(iii)    On or about March 26, 2002, defendant WELTY, via an interstate facsimile from New York, New York, to Providence, Rhode Island, delivered to the issuer a broker's certificate that falsely represented, among other things,

33

that "all potential bidders were given an equal opportunity to bid, and no potential bidder was given the opportunity by [FSC] of reviewing other bids before submitting its own bid."

(iv)    On or about March 5, 2002, minutes after Provider B was awarded the investment agreement with the state housing mortgage finance corporation, a co-conspirator at Provider B and defendant HEINZ arranged for Provider B to enter into and did enter into a swap with the Stamford, Connecticut and London, England branches of Financial Institution A, at an inflated rate paid to Financial Institution A, in exchange for Financial Institution A and FSC manipulating and controlling the bidding for the investment agreement for the state housing mortgage finance corporation.

(v)    On or about March 6, 2002, via international facsimile from New York, New York, to London, England, the co-conspirator at Provider B caused an executed swap confirmation to be delivered from Provider B to a representative of the London, England branch of Financial Institution A.

(h)    With respect to the award and performance of an investment agreement for a state educational assistance foundation, defendant WELTY and Provider B, committed or caused to be committed the following overt acts, among others:

(i)    On or about December 5, 2002, during a telephone call, defendant WELTY suggested to a co-conspirator at Provider B the rates Provider B

could bid and still be awarded the contract, while still paying a fee to Financial Institution A and FSC that amounted to $10,000;

    (ii)  On or about December 5, 2002, a co-conspirator at Provider B submitted Provider B's bid in accordance with defendant WELTY's suggestion and Provider B was awarded the contract; and

    (iii)  Provider B made scheduled payments via interstate wire transfer to a state educational assistance foundation at artificially determined and suppressed rates, including a payment of approximately $43,442.04 on or about November 1, 2006.

  (IN VIOLATION OF TITLE 18, UNITED STATES CODE, SECTION 1349)


## COUNT FIVE – WIRE FRAUD

### (18 U.S.C. § 1343)

### THE RELEVANT PARTIES AND ENTITIES

  The Grand Jury further charges:

  54.  GARY HEINZ is hereby indicted and made a defendant on the charge stated below.

  55.  Paragraphs 2, 3, 6, 8, 10, and 13 through 22 of Count One of this Indictment are repeated, realleged, and incorporated in Count Five as if fully set forth in this Count.

56.     For purposes of this Count, Financial Institution A and FSC acted in their capacity as a broker for investment agreements and other municipal finance contracts.

57.     Various persons and firms, not made defendants herein, participated in the offense charged herein and performed acts in furtherance thereof, including Financial Institution A, FSC, and Financial Institution C.

58.     The conduct alleged in this Count caused Financial Institutions A and C to be susceptible to substantial risk of loss and caused actual loss to Financial Institutions A and C.

## DESCRIPTION OF THE OFFENSE

59.     From at least as early as June 12, 2002 until at least June 20, 2002, the exact dates being unknown to the Grand Jury, in the Southern District of New York and elsewhere, GARY HEINZ, the defendant, and other persons known and unknown, unlawfully, willfully, and knowingly devised and intended to devise a scheme and artifice to defraud a municipal issuer to obtain money and property from the municipal issuer by means of false and fraudulent pretenses, representations, and promises, which scheme to defraud affected a financial institution, namely, a scheme to deprive the municipal issuer of money and property by manipulating in favor of Financial Institution C the bidding process for a single municipal finance contract that was to be awarded to the provider submitting the lowest bid, and further to deprive the municipal issuer of the property right to control its assets by causing it to make an economic decision based on false and

36

misleading information; and for the purpose of executing such scheme and artifice, and attempting to do so, defendant HEINZ and others known and unknown, would and did transmit and cause to be transmitted by means of wire, radio or television communication in interstate or foreign commerce writings, signs, signals, pictures or sounds, in violation of Title 18, United States Code, Section 1343, including the following:

60.    Among other things, in furtherance of this scheme and artifice, on or about June 20, 2002, via interstate wire transfer from New Jersey to New York, New York, the issuer paid Financial Institution C approximately $138,600 for the municipal finance contract brokered by defendant HEINZ and awarded to Financial Institution C at an artificially determined price level through the control and manipulation of the bidding for the contract by defendant HEINZ, and as a result, the municipal issuer was deprived of money to which it would have otherwise been entitled.

(IN VIOLATION OF TITLE 18, UNITED STATES CODE, SECTION 1343)

COUNT SIX – WITNESS TAMPERING
(18 U.S.C. § 1512(b)(1), (3))

THE RELEVANT PARTIES AND ENTITIES

The Grand Jury further charges:

61.    GARY HEINZ is hereby indicted and made a defendant on the charge stated below.

62.    Paragraphs 2, 3, 6, 9, 10, and 13 through 22, of Count One, and paragraphs 42 through 43 of Count Three of this Indictment are repeated, realleged, and incorporated in Count Six as if fully set forth in this Count.

DESCRIPTION OF THE OFFENSE

63.    On or about April 2006, a federal grand jury in the United States District Court for the Southern District of New York opened an investigation into the brokering of and bidding for investment agreements and other municipal finance contracts.

64.    On or about November 24, 2006, in the Southern District of New York and elsewhere, GARY HEINZ, the defendant, unlawfully, willfully, and knowingly did attempt to corruptly persuade another person, with intent to influence the testimony of a person in an official proceeding, and to hinder, delay, or prevent the communication to a law enforcement officer information relating to the commission or possible commission of a Federal offense, to wit, HEINZ, after becoming aware of the grand jury investigation, directed a cooperating witness ("CW1") to "forget that [brokered

38

investment agreement] deal," and for CW1 to meet with another cooperating witness ("CW2") so that they could get their story straight regarding a payment CW2 caused Financial Institution D to make to Financial Institution A and FSC in exchange for FSC steering an investment agreement to Financial Institution D.

(IN VIOLATION OF TITLE 18, UNITED STATES CODE, SECTION 1512(b))

Dated:   9/15/11

SHARIS A. POZEN
Acting Assistant Attorney General

SCOTT D. HAMMOND
Deputy Assistant Attorney General

MARC SIEGEL
Chief Counsel, Criminal Litigation

By:
Acting United States Attorney
Pursuant to 28 C.F.R. §0.136
PREET BHARARA
United States Attorney
Southern District of New York

A True Bill

Foreperson

DEIRDRE A. McEVOY
Chief, New York Office

KALINA M. TULLEY
NEVILLE S. HEDLEY
JENNIFER M. DIXTON
Trial Attorneys
U.S. Department of Justice
Antitrust Division
209 South LaSalle Street, Suite 600
Chicago, IL 60604
(312) 353-7530

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**UNITED STATES OF AMERICA**

- v -

**PETER GHAVAMI**
**(aka PETER GHAVAMILAHIDJI);**
**GARY HEINZ; and**
**MICHAEL WELTY**

**Defendants.**

## INDICTMENT

10 Cr.

18 U.S.C. § 371
18 U.S.C. § 1343
18 U.S.C. § 1349
18 U.S.C. § 1512(b)

PREET BHARARA
United States Attorney.

**A TRUE BILL**

Foreperson.

9/15/11  Filed Indictment.
WG

Peck
U.S.M.J