UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                                            :
UNITED STATES OF AMERICA                                    :
                                                            :
            v.                                              :
                                                            :
PETER GHAVAMI,                                              :     1:10-cr-01217-KMW
(aka PETER GHAVAMILAHIDJI);                                 :
GARY HEINZ; and                                             :
MICHAEL WELTY,                                              :
                                                            :
            Defendants.                                     :
                                                            :
------------------------------------------------------------x


**REPLY MEMORADNUM OF LAW IN SUPPORT OF
GOVERNMENT'S MOTION *IN LIMINE* TO QUESTION COOPERATING
WITNESSES ABOUT CERTAIN RECORDED CONVERSATIONS**

DEIRDRE A. McEVOY                     KALINA M. TULLEY
Chief, New York Field Office          JOHN W. VAN LONKHUYZEN
Antitrust Division                    JENNIFER M. DIXTON
U.S. Department of Justice            MICHELLE O. RINDONE
                                      Trial Attorneys, Antitrust Division
                                      U.S. Department of Justice
                                      209 South LaSalle Street, Suite 600
                                      Chicago, IL 60604
                                      (312) 353-7530

The Government respectfully submits this Reply Memorandum of Law in support of its Motion *in limine* to allow lay witness opinion testimony about certain recorded conversations. Defendants' Opposition is premised on premature speculation about how the Government will lay a foundation for such testimony, and what the cooperators' testimony will relate to at trial.

## ARGUMENT

### 1. Non-participation in a particular recorded conversation does not foreclose personal knowledge concerning the transactions and matters that were discussed

Throughout Defendants' related motions they advance the proposition that if a cooperating witness was not a participant on a recorded conversation, he cannot possibly have personal knowledge about the contents of that conversation such that his lay opinion testimony would be proper. That proposition, however, has been rejected by the Second Circuit and district courts within this Circuit. *See United States v. Yannotti*, 541 F3d 112, 117-19 (2d Cir. 2008); *Rubin/Chambers, Dunhill Ins. Serv.*, 828 F. Supp. 698, 703 (S.D.N.Y. 2011) (citing *United States v. Kaplan*, 490 F.3d 110, 119 (2d Cir. 2007)). Defendants' argument might make sense if for each transaction at issue there was only one call made, and everything relevant to that transaction was discussed in that call and nowhere else – and there were no other transactions affected by the conspiracy or scheme in which the witness had participated. Such assumption, however, does not reflect the reality of how Defendants, the cooperating witnesses and other co-conspirators schemed beforehand and during a transaction to steer the outcome of certain bids.

The Government proposes to offer up to approximately 200 recorded conversations that relate to roughly 40 transactions. In many cases, a sequence of short

1

recorded conversations set out what Defendants, cooperating witnesses and other co-conspirators discussed leading up to and during a particular transaction. The Government expects to lay a proper foundation for the cooperating witness's testimony, which includes: his participation in the conspiracy being carried out through the transaction that is discussed on a call; his knowledge of the participants on that call; and his history of participating in similar conduct and using similar phrases with those very same call participants. Therefore, such lay opinion testimony should be admitted even if the cooperating witness is not on the recorded conversation in question.

> **2. Defendants' argument that the transactions at issue in this prosecution differ in certain respects from one another, so as to preclude personal knowledge and testimony by the witnesses, is nothing but an attempt to artificially distinguish *Yannotti*.**

Defendants reference the "many material differences in the transactions including, *inter alia*, the complex components of each particular product, their pricing and structure, and the identity of the companies and internal units involved." (Defs.' Opp'n at 7, n.3.) As a result, Defendants argue that any cooperator testimony based on other transactions with the same Defendants cannot be compared to a different transaction involving Defendants where the cooperating witness was not a participant on the recorded conversation. Even assuming that each of the 38 featured transactions is unique in its underlying financial details, it does not necessarily follow that the illegal bid-manipulation, *quid pro quo* agreements and fraudulent arrangements that Defendants engaged in, and about which the cooperating witnesses are expected to testify, must also be completely different from one another.

The Government's anticipated testimony will focus on the fraudulent conduct that is similar from transaction to transaction and not every technical detail that might

2

differentiate the underlying investment contracts.  In essence, the fraudulent conduct boils down to agreeing beforehand who should win a supposedly competitive bid, taking steps to gain that result, falsely certifying that the bidding process was competitive, and then the winning provider compensating in some manner the party or parties who helped achieve the pre-determined result.  The basic framework of the charged conduct is similar across the featured transactions.  It makes little difference whether the manipulated transaction was a (supposedly) competitively bid escrow, forward purchase agreement, or swap, or that the details of the underlying cash flow schedules differed.

Defendants' assertion that each investment transaction bears no relation to any other transaction is nothing more than an attempt to artificially distinguish the facts of this case from *United States v. Yannotti*.  In *Yannotti*, the cooperator testimony from DiDonato related to a call that DiDonato was not a participant on, and whose content related to collecting interest on a particular loan where there was no evidence that DiDonato had personal knowledge about or participated in that specific loan.  *See United States v. Yannotti*, 541 F3d 112, 117-19 (2d Cir. 2008).  What was persuasive to the Court was that DiDonato had worked with Yannotti, and assisted Yannotti as to other similar loansharking transactions:

> "DiDonato first testified about his participation, and assistance to Yannotti, in the loansharking conspiracy.  He then explained that individuals who received extortionate loans usually made weekly payments on the interest . . . and that the interest was usually termed "points" by those involved in loansharking."

*Id.* at 117.  The Court allowed DiDonato's testimony as to the meaning of particular words and phrases because DiDonato "acquired his understanding of the conversation through personal experience with loansharking" in the same corrupt enterprise that the

3

defendant was charged. *Id.* at 118. Likewise, the cooperating witnesses in this case are expected to testify "about [their] participation, and assistance to [defendants], in the [wire-fraud] conspiracy," *id.*, at 118, and that they manipulated bids for investment agreements to effectuate that conspiracy with Defendants and other co-conspirators. To cite the Defendants, this is "testimony based on knowledge acquired through experience in the specific alleged conduct." (Defs.' Opp'n at 5.) The Court should allow cooperating witnesses to offer testimony as to their understanding of the meaning of ambiguous or coded terms and phrases used in recorded conversations where they recognize the Defendants' voices, and where the basis for their personal knowledge and experience as to similar fraudulent conduct with Defendants has been established.

    **3. The key terms and phrases that cooperating witnesses will be asked to explain are neither highly technical or "esoteric," and their understanding of such terms is not based on specialized training or proven techniques such that their testimony falls under Rule 702**

Defendants claim that the cooperators' testimony will be concerned with "the meaning of established industry terminology." (Defs.' Opp'n at 4.) Defendants argue such testimony could only be based upon specialized knowledge and professional experience. Defendants further contend that this technical terminology is "language used every day by persons doing legitimate business in the municipal finance industry." *Id.* at 6. The Government disagrees. Providers who were legitimately competing for investment agreements did not speak to one another every day about "baking in Chambers" (a reference to co-conspirator broker CDR) when discussing additional costs factored into their bid amounts. *See id.*

As previously explained, the Government, especially at the beginning of the trial, will elicit general background testimony from the cooperating witnesses about the

4

investment of municipal bond proceeds. Such overview testimony will set out background facts that are necessary for the jury to understand the charged schemes, such as explaining the meaning of an escrow or a "Guaranteed Investment Contract" ("GIC"), or "LIBOR," which is an important benchmark for agreements involving interest rates. Once an overview of the industry has been elicited, however, the vast majority of the testimony that the Government seeks to offer will not be about technical terms in the municipal bonds industry. Instead, the expected testimony will focus on the ambiguous language used by Defendants, cooperating witnesses and other co-conspirators in manipulating transactions that were supposed to be competitively bid. For example, the following phrases are not highly technical terms of art: "I need a bid," "You're hanging out there," "Give me an indication," "I'll help you with the numbers," "I can save you some money here," "You need a number?" and "Who do you wanna see in this thing?" These are phrases that took on a special meaning in the context of the charged conspiracies and fraudulent schemes.

Additionally, Defendants object to Exhibit C attached to the Government's Memorandum of Law. Defendants quote, "plain vanilla LIBOR minus…16-ish," and contend that LIBOR is a well-established banking term, and not a "code" word. The Government does not dispute that LIBOR is a well-established banking term, however, Witness A, who is repeatedly referenced on these calls (even though he does not directly participate), is expected to testify about the *context* that phrase. Specifically, that a competing provider, namely, Defendant Ghavami, was feeding Witness A pricing information about the negotiated swap agreement for the City of Detroit. The purpose of Defendant Ghavami sharing that information was so that if the financial advisor for

5

Detroit called other providers, Witness A would know to say that the rate quoted by Defendant Ghavami was a reasonable market rate for that swap agreement.

Defendants omit the portion of the very same call that suggests that there is more to the conversation than mentioning the LIBOR benchmark apropos of nothing in particular:  PETER GHAVAMI:  "Good.  Can you relay a message to [Witness A]?"  Co-Conspirator:  "Sure."  PETER GHAVMAI:  "Okay.  This is cryptic but – and be discrete – we're at plain vanilla LIBOR minus . . . 16-ish."  If this is an everyday legitimate business conversation, Defendants offer no explanation for why Defendant Ghavami acknowledged on tape that his message for Witness A was "cryptic," or why he cautioned the other participant to "be discrete."  Witness A was not on the call, but he was the intended recipient of Ghavami's message and has personal knowledge as to which transaction Ghavami's message related.  This is exactly the sort of testimony that will assist the jury.

### 4. The Government does not intend to elicit lay witness testimony concerning the subjective intent, motivation, or knowledge of Defendants

Defendants agree that there is nothing improper about asking a cooperating witness about his own conduct as it relates to fraudulently giving or receiving "last looks" when bids were due, asking for or submitting intentionally losing bids, or steering contracts in exchange for future remuneration while working as a broker or provider.  (Defs.' Opp'n at 1, 3.)   Nor, according to Defendants' cited cases, is there anything improper about asking a cooperating witness factual questions about what he observed others, including Defendants, say and do with regard to the bidding process for particular transactions.  *See United States v. Rea*, 958 F.2d 1206, 1216 (2d Cir. 1992).  Defendants object to a cooperating witness offering testimony about Defendants' states of mind.

6

(Defs.' Opp'n at 1, 2.)  The Government does not intend to ask the cooperating witnesses such questions thus removing the risks discussed in *Kaplan* and *Rea*.

*Kaplan* concerned a cooperating witness's testimony about what the defendant in that matter had allegedly said, and then the witness's interpretation of that alleged statement *coupled with* his conclusion that the defendant "must have known" about the fraud.  The witness's opinion was not supported by any independent audio recordings of the alleged conversation, nor did his interpretation appear to be supported by any independent documentary evidence.  The defendant in that matter largely stayed away from the office and false paperwork that was at the center of the insurance fraud scheme. *See United States v. Kaplan*, 490 F.3d 110, 121 (2d Cir. 2007).  Moreover, it was the *first time* that the cooperating witness had had any substantial discussion with the defendant about the fraudulent scheme that was alleged.  *Id.* at 117.  There was no prior history of dealing between the cooperating witness and the defendant, nor was there any independent substantiation in the form of recorded conversations or business records.  In this case, however, there are independent audio recordings and business records, such as bid documents, that corroborate other occasions where similar language leading to similar bid results had been used by the cooperating witnesses and one or more Defendant.

The Government anticipates offering evidence showing that the cooperating witnesses dealt directly with Defendants, over many years in some cases.  This anticipated testimony will be corroborated by independent evidence.  *Cf. United States v. Schultz*, 333 F.3d 393, 415-16 (2d Cir. 2003) (noting that defendant's and his partner's communications "indicate[d] an awareness that there was great legal risk in what they were doing and that such awareness is reflected both in the content of the letters and in

7

[their] use of "veiled terms" and code). Here, some of the recorded conversations in this case reflect an acknowledgment of the risks of participation in the fraudulent conduct and the participants' frequent use of veiled language. Upon laying a proper foundation, the Court should allow the Government to question cooperating witnesses as to their lay witness opinion about their own understanding of the phrases and terms used by themselves and the other participants, including Defendants, on certain recordings.

## CONCLUSION

Defendants' arguments are premature. As long as the Government lays a proper foundation as set forth in Federal Rules of Evidence 701, the cooperating witnesses should be permitted to offer lay opinion testimony about the meaning of ambiguous or guarded words and phrases, even as to recorded conversations where they were not a direct participant.

Dated: July 9, 2012
       New York, New York

Respectfully submitted,

/s/ *Kalina M. Tulley*

| | |
|---|---|
| DEIRDRE A. McEVOY | KALINA M. TULLEY |
| Chief, New York Field Office | JOHN W. VAN LONKHUYZEN |
| Antitrust Division | JENNIFER M. DIXTON |
| U.S. Department of Justice | MICHELLE O. RINDONE |
| | Trial Attorneys, Antitrust Division |
| | U.S. Department of Justice |
| | 209 South LaSalle Street, Suite 600 |
| | Chicago, IL 60604 |
| | (312) 353-7530 |