```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7-13-12
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

                - v. -                                10 Cr. 1217 (KMW)
                                                     **OPINION & ORDER**
PETER GHAVAMI, GARY HEINZ, and
MICHAEL WELTY

                        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

KIMBA M. WOOD, U.S.D.J.:

        Defendants Peter Ghavami ("Ghavami"), Gary Heinz ("Heinz"), and Michael Welty

("Welty") (collectively, "Defendants") are charged in a six-count Superseding Indictment

("Indictment") with engaging in various conspiracies and schemes to defraud municipal bond

issuers, the United States Department of the Treasury ("Treasury"), and the Internal Revenue

Service ("IRS") by manipulating the bidding process for municipal bond investment agreements

and other municipal finance contracts, in violation of 18 U.S.C. §§ 371, 1343, and 1349.

Defendants have jointly filed the following motions: (1) Motion for a Bill of Particulars; (2)

Motion to Dismiss Counts One Through Five as Untimely; (3) Motion for Relief as to Counts

One, Two, and Four as Multiplicitous; and (4) Motion to Dismiss Counts Two and Four Based

on the *Ex Post Facto* and Due Process Clauses. (*See* Dkt Nos. 98-101.) Additionally, Welty and

Ghavami move to sever Count Six, which charges only Heinz with witness tampering, in

violation of 18 U.S.C. § 1512(b). (*See* Dkt. Nos. 102-103.) For the following reasons, the Court

DENIES Defendants' motions.

1

## I. FACTUAL BACKGROUND

Municipal bonds are issued by governmental or quasi-governmental entities to raise money for operating funds or specific projects, or to refinance outstanding municipal debt. (Indictment ¶ 13.)  Municipal bond issuers typically invest some or all of the bond proceeds in investment products, which are sold to them by major financial institutions, including banks, investment banks, insurance companies, and financial services companies (collectively, "providers").  (*Id.* ¶¶ 15-16.)  The returns on municipal bonds are usually tax-exempt; to maintain tax-exempt status, an issuer will usually select a provider through a *bona fide* competitive bidding procedure that is designed to comply with federal tax law and Treasury regulations.  (*Id.* ¶ 17.)  An issuer will often hire a third-party broker to conduct the bidding process and ensure compliance with Treasury and IRS regulations.  (*Id.* ¶ 18.)

At all times relevant to the Indictment, Defendants were employed at a financial services company ("FSC") that served as both a provider and a broker of municipal investment products.[1] Ghavami served as a managing director and co-head of FSC's municipal bond reinvestment and derivatives ("MRD") desk, and Heinz and Welty were vice presidents and marketers on the MRD desk.

Counts One and Two charge all three Defendants with conspiracy to commit wire fraud in connection with FSC's role as a provider of investment agreements.  Count One alleges that the Defendants conspired to defraud municipal bond issuers, the Treasury, and the IRS by manipulating the bidding process for investment agreements and other municipal finance contracts by horizontally colluding with their counterparts at other providers, in violation of 18

---

[1] FSC is an unnamed co-conspirator in the Indictment, as is the financial institution that wholly owns the FSC, referred to in the Indictment as Financial Institution A.  All unnamed co-conspirators will be referred to in this Opinion & Order by the pseudonyms assigned to them in the Indictment.

U.S.C. § 371.  Count Two alleges that the Defendants conspired to defraud municipal bond issuers, the Treasury, and the IRS by vertically colluding with a third-party broker to manipulate and control the bidding process in exchange for kickback payments to that broker, in violation of 18 U.S.C. § 1349.

Counts Three through Five relate to FSC's role as a broker of investment agreements. Count Three is a substantive wire fraud charge against all three Defendants; it alleges that Defendants committed wire fraud by accepting a kickback, disguised as a hedge fee, from a certain provider, Financial Institution D, in exchange for steering an investment agreement (hereinafter, the "Mass I Transaction") to Financial Institution D, in violation of 18 U.S.C § 1343.  Count Four alleges that Heinz and Welty conspired to commit wire fraud by manipulating the bidding process for multiple investment agreements in favor of a certain provider, Provider B, in exchange for Provider B entering into hedging transactions, known as swaps, with Financial Institution A at inflated rates, in violation of 18 U.S.C. § 1349.  Count Five is a substantive wire fraud charge against Heinz only; it alleges that Heinz committed wire fraud by steering an investment agreement to Financial Institution C at an artificially determined price level, in violation of 18 U.S.C. § 1343.

Count Six is a witness tampering charge against Heinz only; it alleges that Heinz willfully obstructed an investigation into the Mass I Transaction—the  basis for the charge in Count Three—in violation of 18 U.S.C. § 1512(b)(1) and (3).

## II.  DEFENDANTS' MOTION FOR A BILL OF PARTICULARS

All three Defendants move the Court to order the Government to identify, with respect to each transaction related to Counts One, Two, and Four that is listed in the preliminary Bill of

3

Particulars already provided to Defendants by the Government[2] ("Draft BOP"): (1) the parties to

the alleged illegal agreements; (2) the substance of the alleged misrepresentation(s) made,

including details regarding when they were made and by whom; and (3) the actual harm suffered

by the municipal bond issuers, the IRS, and the Treasury.  (Mem. in Supp. of Defs.' Mot. for Bill

of Particulars ("Defs.' BOP Mem.") at 4-5.)

### A. **Applicable Law**

Pursuant to Federal Rule of Criminal Procedure 7(f), a defendant may move for a bill of

particulars.  A bill of particulars "is appropriate to permit a defendant to identify with sufficient

particularity the nature of the charge pending against him, thereby enabling [him] to prepare for

trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a

second time for the same offense." *United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir.

1988) (internal quotation marks omitted).  It is "required only where the charges of the

indictment are so general that they do not advise the defendant of the specific acts of which he is

accused." *United States v. Chen*, 378 F.3d 151, 163 (2d Cir. 2004) (internal quotation marks

omitted).  The test is whether the information sought is *necessary*, and not merely helpful, to the

defense. *See United States v. Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001) (McMahon, J.).

A bill of particulars "is not a discovery tool and is not intended to allow defendants a

preview of the evidence or the theory of the government's case." *United States v. Guerrerio*, 670

F. Supp. 1215, 1225 (S.D.N.Y. 1987) (Edelstein, J.) (citing *United States v. Andrews*, 381 F.2d

377, 377-78 (2d Cir. 1967) (per curiam)).  The Government is not obligated to disclose either the

manner in which it will attempt to prove the charges or the precise manner in which the

---

[2] On or about March 8, 2011, the Government produced to Defendants a document entitled
"Draft/Preliminary Voluntary Bill of Particulars (as of 3.8.11)," described *infra*.  (*See* Decl. of
Gregory L. Poe in Supp. of Mot. for Severance, Mot. for Relief as to Multiplicitous Counts, and
Mot. for Bill of Particulars (hereinafter "Poe Decl."), Ex. 1.)

4

defendant committed the crime charged. *See id.* Moreover, a bill of particulars "is not necessary where the government has made sufficient disclosures concerning its evidence and witnesses by other means." *Id.* (internal quotation marks omitted); *see also United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) ("[I]f the information sought by defendant is provided in the indictment or in some acceptable alternate form, no bill of particulars is required."). However, "the Government does not fulfill its obligation merely by providing mountains of documents to defense counsel who [a]re left unguided" as to the nature of the charges. *Bortnovsky*, 820 F.2d at 575.

### B. **Analysis**

The Government has already provided a considerable amount of particularized information, including:

(1) A 39-page Indictment that describes, in considerable detail, the nature of the conspiracy and wire fraud charges, including the relevant time periods, the means and methods by which the alleged schemes were carried out, specific overt acts taken in furtherance of those schemes, and the harm allegedly suffered by the issuers, IRS, and Treasury;

(2) A Draft BOP, in the form of a chart listing the 48[3] transactions that are, in aggregate, the subjects of the conspiracy and fraud charges. For each transaction, the chart lists the name and date of the deal, the product being sold, the broker handling the deal, the bidders on the deal, and the count with which the deal is associated;

(3) A "deal bucket" production, which contains audio recordings, draft transcripts, emails, and documents, such as bid specifications and certifications, organized by deal;

---

[3] The Government notes that, since producing the Draft BOP to Defendants, it has reduced the number of transactions it intends to present in its case-in-chief to 38 and has advised Defendants of which transactions it has eliminated.

(4) Identifying information for each of the unnamed financial institutions and individual unindicted co-conspirators referred to in the Indictment;

(5) Lists identifying each witness the Government intends to call at trial and every exhibit it intends to offer during its case-in-chief; and

(6) Disclosure of statements of co-conspirators, in the form of interview reports and consensual recordings, in satisfaction of the Government's *Brady* obligations and in early satisfaction of its *Giglio* and Jencks Act obligations.

(Govt.'s Mem. of Law in Opp. to Defs.' Mot. for a Bill of Particulars ("Govt.'s BOP Mem.") at 3, 5.)

Defendants argue that the materials provided by the Government do not adequately apprise them of the charges they face. They contend that the Draft BOP is insufficient in that it lists the allegedly corrupt transactions that form the basis for the Indictment, but does not identify, on a transaction-specific basis, the allegedly illegal agreements, parties to such agreements, or alleged fraudulent misrepresentations made in connection with each transaction. (Defs.' BOP Mem. at 7.) Defendants further argue that the Government has failed to sufficiently notify them as to how each transaction resulted in actual harm to the issuers, the IRS, and Treasury. (*Id.*)

However, the Indictment itself describes, in sufficient detail, the basis for the charges, including the alleged harm suffered by the issuers, IRS, and Treasury. For example, the Indictment alleges that Defendants' conduct, *inter alia*, caused municipal issuers to award investment agreements that would not otherwise have been awarded; enabled providers to perform certain contracts at artificially determined or suppressed rates, caused issuers to file inaccurate reports with the IRS, thereby jeopardizing the tax exempt status of the bonds; caused

issuers to fail to comply with Treasury regulations regarding the bidding process; and caused issuers to fail to give the IRS or Treasury money to which those entities were entitled. (Indictment ¶¶ 24(d)-(f), 35(f)-(i), 43, 52(f)-(j), 60.)

In addition to the Indictment, the Government has provided a significant amount of particularized discovery. Through its Draft BOP and "deal bucket" production, the Government has identified the universe of transactions that form the basis for the charges, and has provided, for each transaction, the relevant audio recordings, draft transcripts, emails, and other documents that it will use in its case-in-chief. It has further supplemented this material with lists of the witnesses it intends to call, the exhibits it intends to use at trial, and *Brady*, *Giglio*, and Jencks Act materials related to co-conspirators, whether or not the Government plans to call them as witnesses. Defendants' request that the Government identify precisely *which* documents or recordings form the basis for the fraudulent transactions, the exact misrepresentations allegedly made therein, when and by whom they were made, and the specific details of the harm caused thereby, is a request for "the very type of evidentiary minutiae that is not appropriate in a bill of particulars." *Mitlof*, 165 F. Supp. 2d at 569. Indeed, the information that Defendants seek "is in the nature of the 'wheres, whens and with whoms' that Courts have held to be beyond the scope of a bill of particulars." *Id.*; *see also United States v. Torres*, 901 F.2d 205, 233-34 (2d Cir. 1990) (affirming denial of request for bill of particulars that sought date defendant joined conspiracy, identities of co-conspirators, and precise dates and locations relating to overt acts involved in conspiracy).

The Government has provided Defendants with information sufficient to advise them of the nature of the charges against them, to enable them to prepare defenses, and to avoid unfair

surprise at trial.  Accordingly, Defendants' Motion for a Bill of Particulars is DENIED.  (Dkt.

No. 98.)

## III. DEFENDANTS' MOTION TO DISMISS COUNTS ONE THROUGH FIVE AS UNTIMELY

18 U.S.C. § 3282(a) provides for a five-year statute of limitations period for substantive

wire fraud offenses and conspiracies to commit wire fraud.[4]  However, "if the offense affects a

financial institution," the statute of limitations period is extended to ten years, pursuant to 18

U.S.C. § 3293(2).  With the exception of Count Four,[5] all of the conduct underlying the charges

is alleged to have occurred more than five years prior to December 9, 2010, the date on which

the original Indictment was filed and from which any applicable limitations period must be

measured.  *See United States v. Panebianco*, 543 F.2d 447, 454 (2d Cir. 1976) ("A superseding

indictment containing substantially the same charge as the superseded indictment should have no

effect on the initial tolling of the statute of limitations so long as the defendant is not

significantly prejudiced by the delay.").  The Government contends that the ten-year statute of

limitations period applies to Counts One Through Five because the charged conduct "affect[ed]"

---

[4] Where such an offense involves defrauding or attempting to defraud the United States, the limitations period is six years.  *See* 26 U.S.C. § 6531(1).  Because the Defendants contend that all of the alleged misconduct falls outside a six-year period from the date the Indictment was first filed, whether a five-year limitations period would apply to some counts and a six-year limitations period would apply to others is of no consequence to the instant motion.

[5] As to Count Four, the Indictment alleges that Provider B, the winning provider of the transaction underlying the count, made a scheduled payment to the municipal issuer on or about November 1, 2006, a date within the five-year statute of limitations period.  (Indictment ¶ 53(h)(iii).)  Defendants contend that the scheduled payment is part of the routine administration of an investment contract and is merely the result of a completed conspiracy that ended as early as 2004.  The Government argues that the payment is an act in furtherance of the conspiracy because it constitutes the receipt of an anticipated economic benefit of the conspiracy—*i.e.*, an increase in profits based on interest payments made at below-market rates.  Because the Court finds that the five-year statute of limitations period is extended to ten years based on the applicability of 18 U.S.C. § 3293(2), it need not decide whether Count Four is timely within the standard five-year limitations period.

certain financial institutions within the meaning of § 3293(2) by exposing them to the risk of financial loss and causing them to experience actual financial loss, in the form of civil monetary settlements with the Securities & Exchange Commission ("SEC") and other regulators, as well as attorneys' costs and fees associated with reaching resolutions of non-prosecution agreements with the Department of Justice Antitrust Division ("DOJ"). Defendants argue, *inter alia*, that: (1) Congress could not have intended § 3293(2) to apply where the negative "effect" on a financial institution was outweighed by any benefit it received as a result of the illegal conduct; (2) the settlements and non-prosecution agreements are insufficient to demonstrate a direct relationship between the charged conduct and the effects on the financial institutions that entered into those agreements; and (3) the admission of evidence that Defendants' employer entered into settlements and a non-prosecution agreement in relation to the circumstances underlying the Indictment would unfairly prejudice Defendants because it would cause a jury to improperly infer their guilt.

### A. Applicable Law

In determining whether the ten-year statute of limitations period under § 3293(2) is applicable, the Second Circuit has broadly interpreted the statute's requirement that an offense "affect" a financial institution. *See United States v. Bouyea*, 152 F.3d 192, 195 (2d Cir. 1998). The statute's applicability is not limited to circumstances in which a financial institution is the object or victim of a scheme to defraud. *See United States v. Ohle*, 678 F. Supp. 2d 215, 228-29 (S.D.N.Y. 2010) (Sand, J.) (holding that financial institution was affected within meaning of § 3293 even where it was "active participant in the fraud"); *United States v. Daugerdas*, No. S3 09 Cr. 581, 2011 WL 6020113, at *1 (S.D.N.Y. Apr. 5, 2011) (Pauley, J.) ("[N]othing in [§ 3293(2)]'s language precludes its application to a financial institution that participated in the

9

fraud."); *see also United States v. Serpico*, 320 F.3d 691, 695 (7th Cir. 2003) ("[T]he mere fact

that participation in a scheme is in a bank's best interest does not necessarily mean that it is not

exposed to additional risks and is not 'affected' [under § 3293(2)] . . . .").

     Where a financial institution is exposed to a risk of loss and experiences actual loss as a

result of its participation in the offense, it is "affected" within the meaning of § 3293(2).  *See*

*Bouyea*, 152 F.3d at 195.  Although the Second Circuit has not addressed the issue, several

courts, including the Seventh and Tenth Circuits, have concluded that a financial institution is

also "affected" for purposes of § 3293(2) where it is exposed to the risk of loss, but does not

experience any actual loss.  *See Serpico*, 320 F.3d at 694-95 (upholding jury instruction that,

under § 3293(2) "[a] financial institution need not have actually suffered a loss in order to have

been affected by the scheme"); *United States v. Mullins*, 613 F.3d 1273, 1278 (10th Cir. 2010)

(holding that "a new or increased risk of loss is plainly a material, detrimental effect on a

financial institution, and falls squarely within the proper scope of [§ 3293(2)]") (internal

quotation marks omitted); *cf. United States v. Agne*, 214 F.3d 47, 52 (1st Cir. 2000) (without

deciding the issue, acknowledging the possibility that an increased risk of loss alone is sufficient

to establish the applicability of § 3293(2), provided that the risk is not too attenuated from the

fraudulent conduct).[6]

_____

[6] Also instructive is the treatment courts have given to 18 U.S.C. § 1344, which criminalizes
schemes to defraud financial institutions, and which is also subject to a ten-year statute of
limitations under § 3293(2).  In this Circuit and others, exposing a financial institution to a risk
of loss alone is enough to prove a scheme to defraud under that statute.  *See United States v.*
*Jacobs*, 117 F.3d 82, 93 (2d Cir. 1997) (citing *United States v. Stavroulakis*, 952 F.2d 686) (2d
Cir. 1992)); *Mullins*, 613 F.3d at 1279 (citing *United States v. Swanson*, 360 F.3d 1155, 1161
(10th Cir. 2004)); *United States v. Colton*, 231 F.3d 890, 907 (4th Cir. 2000); *United States v.*
*Longfellow*, 43 F.3d 318, 324 (7th Cir. 1994) (quoting *United States v. Hord*, 6 F.3d 276, 282
(5th Cir. 1993)).  As the Tenth Circuit observed in *Mullins*, "[i]t would be anomalous to say
exposing a financial institution to a risk of loss defrauds or 'victimizes' the institution, yet at the

The Court finds these decisions persuasive in light of the plain meaning and purpose of § 3293(2). "Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004) (quoting *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985)). 18 U.S.C. § 3293(2) provides that "[n]o person shall be prosecuted, tried, or punished for a violation of, or a conspiracy to violate . . . section 1343, if the offense affects a financial institution . . . unless the indictment is returned or the information is filed within 10 years after the commission of the offense." The most common meaning of the verb "affect" is "to produce an effect upon." Webster's Third New International Dictionary 35. The word is secondarily defined as "to produce a material influence upon or alteration in," and tertiarily defined as "to have a detrimental influence on." *Id.* Although Congress may have meant to use "affect" as the word is most commonly used—that is, "to produce an effect upon"—it could have intended to invoke the term's tertiary meaning, deterring *negative* effects upon financial institutions. However, there is no indication from the statute's language or legislative history that the detriment caused must be an *actual* financial loss, as opposed to a risk thereof. As the Tenth Circuit noted in *Mullins*, "whatever limits there may be, a new or increased risk of loss is plainly a material, detrimental effect on a financial institution, and falls squarely within the proper scope of the statute." 613 F.3d at 1278-79.

Moreover, interpreting § 3293(2) to cover conduct that exposes a financial institution to a new or increased risk of loss is also consistent with the statute's legislative purpose, which is "to protect financial institutions, a goal it tries to accomplish in large part by deterring would-be

---

same time doesn't 'affect' it. The latter term would seem to suggest a lesser standard pertains, and in any event certainly not a greater one." 613 F.3d at 1279 (internal citation omitted).

criminals from including financial institutions in their schemes." *Serpico*, 320 F.3d at 694. Deterrence is best served by a broad reading of the statute rather than a narrow one. As the Seventh Circuit noted, "[j]ust as society punishes someone who recklessly fires a gun, whether or not he hits anyone, protection for financial institutions is much more effective if there's a cost to putting those institutions at risk." *Id.*

Defendants contend that even where a wire fraud offense causes an actual financial loss, the loss must be offset against any benefit the financial institution may have derived from the conduct. (Mem. of Law in Supp. of Defs.' Joint Mot. to Dismiss Counts One Through Five of the Indictment as Untimely ("Defs.' SOL Mem.") at 23.) However, there is nothing in the statute or its history to support this interpretation. Indeed, reading such a requirement into the statute would create two untenable problems. First, limiting the statute's reach to cases in which financial institutions suffered a net loss would perversely incentivize financial institutions to participate in frauds in which they expect to earn a net benefit, which is behavior that the statute seeks to discourage. Second, determining whether a scheme ultimately resulted in a net benefit or a net loss for a financial institution would require a court to perform extremely complex and speculative calculations. In this case, for each Financial Institution, the Court would need to weigh the costs of reaching a non-prosecution agreement and multiple settlements, as well as any other financial losses that could be sufficiently traceable to the fraud, against the value added to the transactions as a result of the fraud, and which could include not only the value of the trades but also supplementary financial benefits, such as potential future transactions, that are impossible to value with any precision. Even assuming such calculations were feasible, it is doubtful that Congress intended for a court to undertake such a difficult and indefinite exercise. Indeed, in several cases where financial institutions participated in and received benefits from

12

schemes to defraud but also incurred actual losses, courts in this district have not required that

the loss exceed the benefits received. *See, e.g., United States v. Ohle* (holding that a bank was

"affect[ed]" under § 3293(2) by its employees' fraud, even where the fraud "generated

extraordinary fee income for [the bank], because it was "not only exposed to substantial risk but

experienced actual losses," including over $28 million in settlement costs and attorneys' fees);

*United States v. Rubin/Chambers, Dunhill Ins. Servs.* (*CDR*), 831 F. Supp. 2d 779 (S.D.N.Y.

2011) (Marrero, J.) (applying § 3293(2) to similar (and partially overlapping) scheme to defraud

as that alleged in the Indictment in this case on ground that co-conspirator financial institutions

incurred losses in the form of settlement payments and attorneys' fees despite benefitting from

the fraudulent transactions). Therefore, the Court finds that, for purposes of 18 U.S.C.

§ 3293(2), a wire fraud offense may be deemed to "affect[] a financial institution" where it

exposes such institution to a new or increased risk of loss, even if there is no actual or net loss.

Whether an offense affected a financial institution is a question of fact for a jury to

decide. *See CDR*, 831 F. Supp. 2d at 875. Therefore, the Court must determine whether the

evidence the Government intends to submit would be sufficient to permit a jury to find that the

conduct alleged in the Indictment affected a financial institution within the meaning of

§ 3293(2).

**B. Analysis**

The Indictment alleges that several co-conspirator financial institutions (Financial

Institutions A, C, and D) were made susceptible to loss and suffered actual loss as a result of the

conduct alleged in Counts One through Five. (Indictment ¶¶ 12, 32, 44, 49, 58.) To establish

that the charged conduct affected these financial institutions, the Government intends to

introduce evidence that Financial Institutions A, C, and D, and Provider B, entered into civil

13

settlements with the SEC and other regulators (collectively, the "Settlement Agreements"), and

evidence that Financial Institutions A and C, and Provider B, entered into non-prosecution

agreements with the DOJ (collectively, the "Non-Prosecution Agreements"), which each related

to the participation of those institutions' employees in bid-rigging activity in the municipal

derivatives market, which included the actions with which the Defendants are charged in the

instant case. The Government intends to submit as evidence the documents underlying the

Settlement Agreements and Non-Prosecution Agreements, as well as live testimony regarding

those Agreements from representatives of the Financial Institutions. The Court briefly reviews

the substance of the Agreements before analyzing whether they constitute evidence sufficient to

permit a jury to find that the charged conduct "affected" a financial institution under § 3293(2).

### 1. *Settlement Agreements*

On or about May 6, 2011, Financial Institution A simultaneously entered into settlement

agreements with the SEC, IRS, and 25 state attorneys general. The settlement agreements

required Financial Institution A to pay a total of $160 million to the IRS and various

municipalities affected by the conduct. (Govt.'s Mem. of Law in Opp. to Defs.' Joint Mot. to

Dismiss Counts One Through Five of the Indictment as Untimely ("Govt.'s SOL Mem.") at 11.)

The settlement agreement that the SEC reached with Financial Institution A is expressly intended

to compensate the Government for losses it experienced as a result of approximately 105

transactions, (Govt.'s SOL Mem., Ex. B), 38 of which will be the subject of this trial.[7]

---

[7] As noted in Part II, *supra*, the Government listed 48 transactions on its Draft BOP that it
initially intended to use in its case-in-chief; it now intends to use only 38 of those transactions.
In support of its contention that the Defendants' conduct affected a financial institution by
causing it to pay restitution and civil penalties, the Government submits that of the original 48
transactions, 41 are referenced in Financial Institution A's settlement agreement with the SEC,
and together represent approximately $18.4 million of the total settlement sum.

On or about July 8, 2011, Financial Institution C entered into settlement agreements with the SEC, IRS, OCC, the Federal Reserve, and 25 state attorneys general. The settlement agreements required Financial Institution C to pay a total of $228 million to the IRS and various municipalities affected by the conduct. (Govt.'s SOL Mem. at 12.) The settlement agreement that the SEC reached with Financial Institution C is expressly intended to compensate the Government for losses it experienced as a result of, *inter alia*, at least three transactions that form the basis for the charges in Count One, which together represent approximately $4.7 million of the total settlement sum. (*Id.* at 12-13; Govt.'s SOL Mem., Ex. D.)

On December 7, 2010, Financial Institution D entered into settlement agreements with the SEC, IRS, OCC, and 20 state attorneys general. The settlement agreements required Financial Institution D to pay a total of $137.3 million to the IRS and various municipalities affected by the conduct. (Govt.'s SOL Mem. at 13.) The settlement agreement that the SEC reached with Financial Institution D is expressly intended to compensate the Government for losses it experienced as a result of, *inter alia*, at least one transaction that forms the basis for the charges in Count One, and the transaction at issue in Count Three, which together represent approximately $7.1 million of the total settlement sum. (*Id.* at 13; Govt.'s SOL Mem., Ex. F.)

On January 23, 2012, Provider B entered into settlement agreements with the SEC, IRS, and 25 state attorneys general. The settlement agreements required Provider B to pay a total of $70 million to the IRS and various municipalities affected by the conduct. (Govt.'s Mem. of Law in Opp. to Defs.' Mot. in Limine to Preclude Evidence of Settlements By Financial Institutions With Govt. Authorities ("Govt.'s Mot. in Limine") at 2 n.1.) The settlement agreement that the SEC reached with Provider B is expressly intended to compensate the Government for losses it experienced as a result of, *inter alia*, at least eight transactions that form

15

the basis for the charges in Counts One through Five, which together represent approximately $1.4 million of the total settlement sum. (*Id.*; Govt.'s Mot. in Limine, Ex. B.)

Provider B and Financial Institutions A, C, and D entered into the above-described Settlement Agreements without admitting or denying the allegations of the underlying complaints.

### 2. *Non-Prosecution Agreements*

On May 4, 2011 and July 6, 2011, Financial Institutions A and C, respectively, entered into near-identical Non-Prosecution Agreements with the DOJ related to the conduct charged in the Indictment. As part of the Agreements, each Financial Institution expressly stipulated that it "admits, acknowledges and accepts responsibility for the conduct of its former employees," which was defined as "enter[ing] into unlawful agreements to manipulate the bidding process and rig bids on certain relevant municipal contracts, and made payments and engaged in other activities in connection with those agreements, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and certain sections of Title 18 of the United States Code." (Govt.'s SOL Mem., Exs. A, C.)

On December 23, 2011, Provider B entered into a Non-Prosecution Agreement with the DOJ related to the conduct charged in the Indictment. As part of the Agreement, Provider B expressly stipulated that it "admits, acknowledges and accepts responsibility for . . . certain former traders who bid on municipal contracts on behalf of the company [who] entered into unlawful agreements to manipulate the bidding process on certain relevant municipal contracts, and caused [Provider B] to make payments and engage in other related activities in connection with those agreements . . . in violation of certain sections of Title 18 of the United States Code." (Govt.'s Mot. in Limine, Ex. A.)

16

### 3. Sufficiency and Admissibility of Evidence Relating to the Settlements and Non-Prosecution Agreements

Defendants' primary argument is that evidence of the Settlement Agreements and Non-Prosecution Agreements is insufficient to establish that the Financial Institutions were affected by the conduct charged in the Indictment, because financial institutions settle civil claims and criminal charges for a variety of reasons, such as purely economic considerations or the desire to avoid negative publicity, even if they believe they are not liable for any wrongdoing. (Defs.' SOL Mem. at 22.) Therefore, Defendants assert, due process and the Confrontation Clause require that Defendants be able to probe, through supplemental discovery and cross-examination, the Financial Institutions' intent behind entering into the Settlement Agreements and Non-Prosecution Agreements, so that they may establish that the Financial Institutions did so not because of the charged conduct, but for other business reasons. (*Id.* at 22-23.) Defendants contend that this process "would create impossible trial-within-a trial problems," including the need for evidentiary hearings and additional discovery. (*Id.* at 22.) Defendants further argue that the Court should also exclude the evidence because Defendants would be extremely and unfairly prejudiced by proof that their employer, Financial Institution A,[8] entered into settlements and a non-prosecution agreement related to the misconduct of its employees in the municipal bond division at the same time that Defendants worked there. (*Id.* at 25.)

The Court rejects Defendants' contention that the evidence the Government intends to introduce at trial is insufficient to establish that the alleged conduct, if proved, "affected" a financial institution. The Settlement Agreements and Non-Prosecution Agreements illustrate that the alleged conduct created an increased risk of loss for Provider B and Financial Institutions

---

[8] As noted in Part I, *supra*, Defendants are employees of FSC, which is a wholly owned subsidiary of Financial Institution A.

17

A, C, and D in the form of exposure to restitution payments, civil penalties, and criminal

prosecution, a risk that was ultimately realized—in the form of restitution payments and civil

penalties—when those entities entered into the Settlement Agreements and Non-Prosecution

Agreements.  Moreover, the Government intends to have representatives of the Financial

Institutions and Provider B testify that those entities entered into the Agreements in part because

of the conduct alleged in the Indictment.  Because the documentary evidence and testimony

would be sufficient to establish that alleged conduct caused the exposure to, and realization of,

the risk of loss, Defendants need not inquire into other potential reasons that may have motivated

the Financial Institutions' decision to enter into those agreements, thereby eliminating the need

for supplemental discovery and cross-examination of the representatives into such collateral

issues as to how financial institutions interact with regulators and arrive at settlement decisions,

which could potentially confuse the jury.

      Defendants next contend that the Government's evidence is extremely prejudicial

because a jury will infer that, if Defendants' employer, Financial Institution A, entered into

settlement agreements and non-prosecution agreements for conduct related to defendants'

prosecution, that Defendants must be guilty of that conduct.  (Defs.' SOL Mem. at 25.)

However, the Non-Prosecution Agreements acknowledge guilty conduct by only "certain then-

employees [from 2001 to 2006] at its municipal reinvestment and derivatives desk and related

and/or predecessor desks."  The Agreements do not mention any particular employee by name or

description, and there is no acknowledgement that the Defendants in this case engaged in the

conduct that led (at least in part) to the Agreements.  Moreover, the Government's presentation

of evidence will be limited to what is necessary to establish that financial institutions were

exposed to the risk of loss as a result of the conduct alleged in the Indictment.  The Court will

18

provide an instruction that the evidence is to be used for that purpose only, and not as evidence of Defendants' guilt.[9]

The Court will therefore admit the Non-Prosecution Agreements, Settlement Agreements, and related testimony for the limited purpose of establishing the applicability of § 3293(2). Because the Court finds that the Government has admissible and sufficient evidence to permit a jury to find that Defendants' conduct "affect[ed] a financial institution" within the meaning of 18 U.S.C. § 3293(2), thereby extending the statutory limitations period from five years to ten years, it DENIES Defendants' Motion to Dismiss Counts One through Five as Untimely.[10]  (Dkt. No. 99.)

## IV. DEFENDANTS' MOTION FOR RELIEF AS TO COUNTS ONE, TWO, AND FOUR AS MULTIPLICITOUS

Defendants contend that the Indictment violates the Double Jeopardy Clause of the United States Constitution because it erroneously charges Counts One, Two, and Four as three separate and distinct conspiracies when they instead charge conduct that would comprise a single, overarching conspiracy of industry-wide bid rigging in the municipal bond investment

---

[9] The Court notes that if the parties were to agree to stipulate that the alleged conduct affected a financial institution, the potential for prejudice would be eliminated because admission of the Non-Prosecution Agreements, Settlement Agreements, and related testimony would be unnecessary.

[10] In reaching its decision, the Court has also considered Defendants' letter of June 22, 2012 and rejects the argument made therein.  The Government is not precluded from arguing for the applicability of § 3293(2) merely because, in the plea agreements and colloquies for several cooperating witnesses who pled guilty to, *inter alia*, violations of 18 U.S.C. § 1343, it did not argue for a 30-year maximum period of incarceration, which is the statutory maximum for wire fraud offenses that "affect[] a financial institution." 18 U.S.C. § 1343. First, the various informations and indictments to which those cooperating witnesses pled did not contain allegations that the conduct affected a financial institution.  Second, to the extent that those documents contain language that could be interpreted to allege the applicability of § 3292(2), *see CDR*, 831 F. Supp. 2d at 786, Federal Rule of Criminal Procedure 11(c)(1)(A) specifically contemplates plea agreements in which defendants plead guilty to lesser or fewer charges than they might have faced had they proceeded to trial.

business. Defendants argue that the Court must dismiss the offending counts, compel the Government to prosecute only one of the counts at trial, or require the Government to redraft the Indictment to allege a single conspiracy. The Government responds that the three counts each allege a different conspiracy, and that procedurally, Second Circuit law precludes pre-trial relief because the question of whether the Government has proven one or multiple conspiracies is a factual question to be decided by a jury.

### A. Applicable Law

"'An indictment is multiplicitous when it charges a single offense as an offense multiple times, in separate counts, when in law and fact, only one crime has been committed.'" *United States v. Kerley*, 544 F.3d 172, 178 (2d Cir. 2008) (quoting *United States v. Chacko*, 169 F.3d 140, 145 (2d Cir. 1999)). A multiplicitous indictment violates the Double Jeopardy Clause of the Fifth Amendment because it would subject a defendant to punishment for the same crime more than once. *See* U.S. Const. amend. V (providing that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb"). "Where . . . separate counts of a single indictment allege that [a] defendant participated in more than one conspiracy in violation of the same statutory provisions, but allege that the conspiracies existed for different—albeit overlapping—periods of time, and that the defendant, in each alleged conspiracy, had different groups of coconspirators, the question of whether one, or more than one, conspiracy has been proven is a question of fact for a properly instructed jury." *United States v. Jones*, 482 F.3d 60, 72 (2d Cir. 2006); *see also Ohle*, 678 F. Supp. 2d at 222 n.5 ('The Second Circuit has repeatedly emphasized that the determination of whether a single conspiracy or multiple conspiracies exists is a question of fact for the jury."). Furthermore, where an indictment alleges more than one conspiracy in violation of different statutory provisions, "the Double Jeopardy Clause does not

20

protect against simultaneous prosecutions for the same offense, so long as no more than one punishment is eventually imposed." *United States v. Josephberg*, 459 F.3d 350, 355 (2d Cir. 2006). "If the jury convicts on more than one multiplicitous count, the defendant's right not to suffer punishments for the same offense will be protected by having the court enter judgment on only one of the multiplicitous counts." *Id.*

**B. Analysis**

As described in detail in Part I, *supra*, Count One alleges a conspiracy to commit wire fraud in violation of 18 U.S.C. § 371, and Counts Two and Four allege conspiracies to commit wire fraud in violation of 18 U.S.C. § 1349. Defendants contend that the Government has improperly "subdivide[ed] an overarching conspiracy into ostensibly different crimes by alleging different sets of overt acts and naming different co-conspirators in different counts." (Mem. of Law in Supp. of Defs.' Mot. for Relief as to Counts One, Two, and Four as Multiplicitous at 11.) However, insofar as Counts Two and Four allege more than one conspiracy in violation of the same statutory provision, "the question of whether one, or more than one, conspiracy has been proven is a question of fact for a properly instructed jury." *Jones*, 482 F.3d at 72. To the extent that the Indictment alleges more than one conspiracy in violation of different statutory provisions (*i.e.*, 18 U.S.C. § 371 and 18 U.S.C. § 1349), Defendants' multiplicity challenge is premature. *Josephberg*, 459 F.3d at 355 ("Where two statutory sections operate independently of one another, there is no bar to the Government's proceeding with prosecution simultaneously under the two statutes.") (internal quotation marks omitted). Should the jury convict Defendants on

what the Court ultimately determines to be multiplicitous counts, the Court will enter judgment on only one of the multiplicitous convictions.[11]  *Id.*

Accordingly, the Court DENIES Defendants' Motion for Relief as to Counts One, Two, and Four as Multiplicitous.  (Dkt. No. 100.)

## V.  DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND FOUR BASED ON THE *EX POST FACTO* AND DUE PROCESS CLAUSES

Counts Two and Four of the Indictment charge two separate conspiracies to commit wire fraud in violation of 18 U.S.C. § 1349, which provides that a defendant convicted of conspiring or attempting to violate an offense under Chapter 63 of Title 18 (relating to fraud offenses) "shall be subject to the same penalties" prescribed for the substantive offense that was the object of the conspiracy.[12]  Prior to the statute's enactment on July 30, 2002, conspiracy (or attempt) to commit the fraud offenses in Chapter 63 was governed by the basic conspiracy statute, 18 U.S.C. § 371, which provides for a maximum incarceration period of five years.  Following the enactment of 18 U.S.C. § 1349, a defendant convicted of conspiracy to commit wire fraud would

---

[11] Citing *United States v. Reed*, 639 F.2d 896, 904 (2d Cir. 1981) for the proposition that the submission of multiplicitous counts "may improperly prejudice a jury by suggesting that a defendant has committed not one but several crimes," Defendants argue that waiting until after trial to determine whether the counts are multiplicitous will unfairly prejudice Defendants by making it appear to the jury that they have engaged in more than one conspiracy.  (Reply Mem. in Supp. of Defs.' Mot. for Relief as to Counts One, Two, and Four as Multiplicitous at 2-3.) Although the Second Circuit may have at one time voiced this concern, it was not sufficient to keep that court from recently concluding in *Josephberg* that the pre-trial dismissal of potentially multiplicitous counts is premature (nor was it even mentioned in the decision).  *See United States v. Jahedi*, 681 F. Supp. 2d 430, 437 n.49 (S.D.N.Y. 2009) (rejecting, in light of *Josephberg*, defendant's argument that *Reed* compelled pre-trial resolution of multiplicity challenge).

[12] Count Two alleges that, in relation to FSC's role as a provider, all three Defendants conspired to defraud municipal bond issuers, the Treasury, and the IRS by vertically colluding with a third-party broker to manipulate and control the bidding process in exchange for kickback payments to that broker.  Count Four alleges that, in relation to FSC's role as a broker, Defendants Heinz and Welty conspired to commit wire fraud by manipulating the bidding process for multiple investment agreements in favor of a certain provider, Provider B, in exchange for Provider B entering into hedging transactions, known as swaps, with Financial Institution A at inflated rates.

22

be subject to a maximum incarceration term of 20 years, or 30 years if the conduct "affects a financial institution." *See* 18 U.S.C. § 1343.

The conspiracies charged in Counts Two and Four are alleged to have begun prior to the statute's enactment date, and to have continued thereafter. Count Two is alleged to have extended from "as early as March 2001 to at least November 2004." (Indictment ¶ 33.) Count Four is alleged to have occurred from "as early as January 2002 to at least November 2006." (Indictment ¶ 50.) The Government intends to present 18 transactions in its case-in-chief for Count Two, 10 of which were completed pre-enactment; and 10 transactions for Count Four, 6 of which were completed pre-enactment. (Govt.'s Mem. of Law in Opp. to Defs.' Joint Mot. to Dismiss Counts Two and Four of the Indictment Based on the Ex Post Facto and Due Process Clauses ("Govt.'s Ex Post Facto Mem.") at 4.) Defendants argue that the Court should dismiss Counts Two and Four because those counts rely substantially on transactions that were completed prior to the statute's enactment. They contend that the charges violate the Ex Post Facto and Due Process Clauses of the United States Constitution because a jury will be unable to distinguish between pre- and post-enactment transactions, and might therefore convict Defendants based exclusively upon pre-enactment conduct. (Mem. of Law in Supp. of Defs.' Joint Mot. to Dismiss Counts Two and Four of the Indictment Based on the Ex Post Facto and Due Process Clauses ("Defs.' Ex Post Facto Mem.") at 4-5.) Defendants further argue that if the Court declines to dismiss the counts, it should prohibit the Government from introducing evidence of pre-enactment transactions at trial. (*Id.*)

### A. **Applicable Law**

The Ex Post Facto Clause prohibits Congress from passing a law that: "(1) makes an act a crime that was legal when committed; (2) makes a crime greater than it was when it was

23

committed; (3) increases the punishment for a crime after it has been committed; or (4) deprives the accused of a legal defense that was available at the time the crime was committed." *United States v. Harris*, 79 F.3d 223, 228 (2d Cir. 1996) (citing *Collins v. Youngblood*, 497 U.S. 37, 41-42 (1990)). Although the Ex Post Facto Clause constrains the legislative branch, "its protections have been extended to the application of judicial precedent by the courts under the Due Process Clause of the Fifth Amendment." *Id.* at 229. With respect to statutes governing continuing offenses, such as conspiracy, the law is clear that "the Ex Post Facto clause is not violated by application of a statute to an enterprise that began prior to, but continued after, the effective date of the statute." *Id.* at 229 (internal quotation marks and alteration omitted). However, conduct that occurred prior to the date of the charging statute's enactment is admissible for limited purposes only. "When it is shown that a conspiracy straddled the enactment of a statute, the government may introduce pre-enactment evidence to demonstrate the conspiracy's genesis, its purpose, and its operation over time." *United States v. Monaco*, 194 F.3d 381, 386 (2d Cir. 1999). Pre-enactment evidence is also admissible "to prove the intent and purpose of the conspirators' later acts." *United States v. Ferrara*, 458 F.2d 868, 874 (2d Cir. 1972). A conviction for a conspiracy that straddles a statute's enactment date "will not run afoul of the Ex Post Facto clause unless it was possible for the jury, following the court's instructions, to convict *exclusively* on pre-enactment conduct." *Monaco*, 194 F.3d at 386 (internal quotation marks omitted).

## B. **Analysis**

Defendants concede that the Government has properly charged the alleged conspiracies at issue, because the Indictment alleges that the conspiracies began before 18 U.S.C. § 1349 was enacted and continued thereafter. *See Harris*, 79 F.3d at 229 ("It is well-settled that when a

24

statute is concerned with a continuing offense, the Ex Post Facto clause is not violated by application of a statute to an enterprise that began prior to, but continued after, the effective date of the statute."); *United States v. Duncan*, 42 F.3d 97, 104 (2d Cir. 1994) ("[A]ccording to our precedent, continuing offenses such as conspiracy or bank fraud do not run afoul of the *Ex Post Facto* Clause if the criminal offenses continue after the relevant statute becomes effective."). Defendants argue that the Court must nevertheless dismiss Counts Two and Four because, despite any instructions the Court would give as to the limited evidentiary value of pre-enactment conduct, a jury would be unable to differentiate between pre- and post-enactment transactions, and would instead simply rely on the pre-enactment transactions as to which there is more evidence than there is as to post-enactment transactions. However, Defendants have not offered, nor is the Court aware of, any legal support for the proposition that dismissal of properly alleged charges is the appropriate remedy for the risk that a jury will be unable to understand or abide by a court's limiting instructions.

As an alternative to dismissal, Defendants argue that evidence of pre-enactment transactions must be excluded in order to prevent the jury from ignoring the Court's instructions and reaching a conviction based exclusively on that conduct. To support this assertion, Defendants indirectly invoke the principles underlying Federal Rule of Evidence 403, which permits a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Defendants argue that the pre-enactment transactions have limited probative value because each transaction is a "self-contained" and "essentially independent" event that has little or no bearing on any other transaction, (Defs.' Ex Post Facto Mem. at 4-5), and that any probative value is substantially outweighed by the

likelihood that jurors will be unable to differentiate between pre- and post-enactment transactions, despite any limiting instructions given by the Court. (Defs.' Ex Post Facto Mem. at 3.)

Carefully crafted limiting instructions are a court's first line of defense against the risk of unfair prejudice. Where pre-enactment evidence is introduced, limiting instructions are routinely used to mitigate the risk that a jury will convict based solely upon pre-enactment conduct. *See, e.g.*, *Monaco*, 194 F.3d at 386 (no Ex Post Facto violation where "the jury was soundly instructed on the proper evidentiary value of pre-enactment conduct, and was reminded of the post-statute date range of the charge"). Moreover, "[a]bsent evidence to the contrary, [a court] must presume that juries understand and abide by a district court's limiting instructions." *United States v. Downing*, 297 F.3d 52, 59 (2d Cir. 2002). The presumption is abandoned only "where there is an overwhelming probability that the jury will be unable to follow the court's instructions and the evidence is devastating to the defense." *United States v. Williams*, 585 F.3d 703, 709 (2d Cir. 2009); *see also United States v. Becker*, 502 F.3d 122, 130-31 (2d Cir. 2007) ("[W]e have found it inappropriate to presume that a district court's limiting instructions were obeyed when such instructions required jurors to perform mental acrobatics.") (internal quotation marks omitted).

Defendants' contention that the jury will have to "perform mental gymnastics" in order to differentiate between pre-enactment evidence and post-enactment evidence is speculative and unsupported, particularly in light of their argument that the transactions are discrete, independent events. (Reply Mem. of Law in Supp. of Defs.' Joint Mot. to Dismiss Counts Two and Four of the Indictment Based on the *Ex Post Facto* and Due Process Clauses ("Defs.' Ex Post Facto Reply Mem.") at 3.) Therefore, the Court will permit the Government to seek to introduce of

26

pre-enactment evidence in order to show the alleged conspiracies' geneses, purposes, or operations over time, *Monaco*, 194 F.3d at 386, or the intent and purpose of the conspirators' later acts, *Ferrara*, 458 F.2d at 874, and will admit such evidence only pursuant to appropriate limiting instructions.  The Court will further instruct the jury that to convict, it must find that the conspiracy continued after July 30, 2002, during the post-enactment periods alleged in the Indictment.  *See Monaco*, 194 F.3d at 386.  Because the Court has no reason to believe that the jury will be unable to follow these instructions, Defendants' Motion to Dismiss Counts Two and Four Based on the *Ex Post Facto* and Due Process Clauses is DENIED.  (Dkt. No. 101.)

## VI.  DEFENDANTS HEINZ AND WELTY'S MOTION TO SEVER COUNT SIX

Count Six charges only Heinz with witness tampering in violation of 18 U.S.C. § 1512(b)(1) and (3).  The Indictment alleges that after becoming aware of the grand jury investigation in this case, Heinz attended a luncheon on November 26, 2006 with Welty and two other colleagues from FSC, one of whom was cooperating with the Government ("CW1").  At the luncheon, Heinz allegedly discussed the Mass I Transaction—the investment agreement at issue in Count Three—with CW1, who was FSC's primary broker on the transaction.  Heinz is alleged to have told CW1 to "forget that deal," and to have instructed CW1 to meet with another cooperating witness ("CW2") who was CW1's counterpart at Financial Institution D (with whom FSC allegedly colluded), "so that they could get their story straight regarding a payment [CW2] caused Financial Institution D to make to Financial Institution A and FSC in exchange for FSC steering an investment agreement to Financial Institution D."  (Indictment ¶ 64.)  Defendants Ghavami and Welty move to sever Count Six from the trial of the remaining counts, on the ground that evidence of the witness tampering alleged against Heinz will prejudice them as to the other counts, particularly Count Three.

27

### A. **Applicable Law**

Pursuant to Federal Rule of Criminal Procedure 14 ("Rule 14"), the Court has discretion

to sever properly joined charges where joinder would result in undue prejudice to a

defendant.[13],[14]  Fed. R. Crim. P. 14(a); *see also United States v. Rittweger*, 524 F.3d 171, 179 (2d

Cir. 2008).  However, "for reasons of economy, convenience and avoidance of delay, there is a

preference in the federal system for providing defendants who are indicted together with joint

trials." *United States v. Feyrer*, 333 F.3d 110, 114 (2d Cir. 2003).  "Acknowledged in this policy

is the inevitable tolerance of some slight prejudice to codefendants, which is deemed outweighed

by the judicial economies resulting from the avoidance of duplicative trials." *United States v.*

*Cardascia*, 951 F.2d 474, 482 (2d Cir. 1991).  Therefore, severance should be granted "only if

there is a serious risk that a joint trial would compromise a specific right of one of the

defendants, or prevent the jury from making a reliable judgment about guilt or innocence."

*Zafiro v. United States*, 506 U.S. 534, 539 (1993).  "Such a risk might occur when evidence that

the jury should not consider against a defendant and that would not be admissible if a defendant

were tried alone is admitted against a codefendant." *Id.*  However, "the fact that evidence may

be admissible against one defendant but not another does not necessarily require a severance."

---

[13] Federal Rule of Criminal Procedure 8(a) permits joinder of offenses against a single Defendant if the charged offenses "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan."  Federal Rule of Criminal Procedure 8(b) allows joinder of two or more defendants "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions, constituting an offense or offenses."  There is proper joinder of all three Defendants because they are alleged to have participated in the conspiracies and wire fraud charged in Counts One through Three, and Count Six is properly joined with the remaining counts because it alleges witness tampering in order to conceal the misconduct alleged in Count Three.

[14] Rule 14 provides, in relevant part: "If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a).

*United States v. Carson*, 702 F.2d 351, 367 (2d Cir. 1983). Even in cases where there is a high risk of prejudice, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." *Zafiro*, 506 U.S. at 539. Indeed, "limiting instructions to the jury have emerged as the preferred device for curing any prejudicial spillover that may result from a multi-defendant, multi-count trial." *United States v. Santiago*, 174 F. Supp. 2d 16, 22 (S.D.N.Y. 2001) (Marrero, J.)

### B. Analysis

Ghavami and Welty argue that the evidence introduced to support Count Six will unfairly associate them with Heinz's alleged witness tampering and will imply that they were part of an alleged attempt to cover up the Mass I Transaction that is the basis for Count Three. Specifically, they contend that the mere existence of the obstruction count prejudices them in defending against the substantive wire fraud charge in Count Three, because if the jury convicts Heinz of obstruction, it will inevitably infer that the Mass I Transaction involved unlawful conduct and would improperly convict based on that inference instead of independently assessing the legality of the underlying financial transactions. (Mem. of Law in Supp. of Def. Michael Welty's Mot. to Sever Count Six ("Welty Severance Mem.") at 2; Mem. of Law in Supp. of Def. Peter Ghavami's Mot. to Sever Count Six ("Ghavami Severance Mem.") at 1.) They contend that this risk is particularly acute because the financial transactions at issue are so complex and unfamiliar to jurors that the jury is more likely to forego analyzing them and instead improperly rely on evidence of witness tampering. (Welty Severance Mem. at 11; Ghavami Severance Mem. at 2.) In addition, Welty argues that the risk of unfair prejudice is compounded by the weakness of the evidence against him on Count Three, and by the fact that he was present at the luncheon with Heinz. (Welty Severance Mem. at 7, 10.) He further

29

contends that he will also suffer prejudice with respect to Count Four, because the conspiracy charged in Count Four "resembles in some respects" the illegal conduct alleged in Count Three and overlaps in time with the obstruction alleged against Heinz in Count Six.[15]   (*Id.* at 8.)

The risk that Ghavami and Welty will be unfairly prejudiced by joinder of the witness tampering count is insufficiently severe to overcome the strong presumption against severance. Joinder of obstruction charges in multiple defendant trials, in which some but not all defendants are charged with obstruction, is commonplace.  *See, e.g.*, *United States v. Hernandez*, 85 F.3d 1023, 1029-30 (2d Cir. 1996); *United States v. Teitler*, 802 F.2d 606, 617 (2d Cir. 1986); *United States v. Upton*, 856 F. Supp. 727, 737-38 (E.D.N.Y. 1994) (Glasser, J.).  The propriety of joinder in these cases rests on the presumptions that a jury will capably review and compartmentalize the evidence, and will follow limiting instructions from the court to consider each count separately.

In the case at bar, there is no reason to believe that a limiting instruction will not effectively mitigate any potential prejudice caused by the introduction of obstruction evidence on Count Six.  *See Zafiro*, 506 U.S. at 539.  Defendants contend that a jury would disregard the Court's limiting instruction because the nexus between Counts Three and Six is too close to ignore, and because the temptation to avoid assessing the legality of the complex transactions underlying Count Three is too great.  Welty adds that a jury is even more likely to make improper inferences in his case because he was present at the luncheon where Heinz allegedly

---

[15] Count Four charges Welty and Heinz only.  The Indictment alleges that the conspiracy charged in that Count continued "[f]rom at least as early as January 2002 until at least November 2006," the latter month being the month in which Heinz's alleged obstruction occurred.  (Indictment ¶ 50.)

engaged in obstruction.[16]   However, "juries are presumed to follow their instructions," *Zafiro*,

506 U.S. at 540-41, and Defendants' contention that a jury would be incapable or unwilling to do

so is too speculative to warrant abandoning that presumption.  The Court will provide

appropriate instructions to the jury with respect to the differences in the nature of the charges

against each defendant, what evidence can and cannot be considered against a particular

defendant, and the need to consider the evidence against each defendant individually for each

count.  *See, e.g.*, *Rittweger*, 524 F.3d at 179 (rejecting claim of prejudicial spillover where "the

district court gave limiting instructions throughout the trial explaining when evidence could not

be considered against a particular defendant, and the jury charge carefully explained that the

jurors must consider the case against each defendant separately"); *United States v. Salameh*, 152

F.3d 88, 116 (2d Cir. 1998) (finding risk of prejudicial spillover mitigated by district court's

"repeated admonitions to the jury that each defendant's guilt had to be separately and

individually considered"); *United States v. Hernandez*, 85 F.3d at 1030 (same).  The Court will

also instruct the jury that a defendant need not be engaged in criminal conduct in order to be

found guilty of witness tampering under 18 U.S.C. § 1512.[17]

---

[16] Welty also argues that the risk of unfair prejudice is further increased because the evidence
against him as to Count Three is weak.  To support the proposition that the strength of the
evidence on Count Three is a factor the Court should consider, he relies on case law that
addresses retroactive misjoinder, which requires a defendant to show "compelling prejudice,"
such as "prejudicial spillover from evidence used to obtain a conviction subsequently reversed
on appeal."  *United States v. Hamilton*, 334 F.3d 170, 181 (2d Cir. 2003).
    The key to the retroactive misjoinder test is "whether the jury was able to distinguish
between counts or between defendants, and to assess separately the evidence pertinent to each."
*Id.* at 183.  As discussed *supra*, there is no reason to doubt that the jury will be able to follow the
Court's instructions to assess separately the evidence against each Defendant on each count.
[17] For the same reasons, the Court rejects Welty's argument that he is also unfairly prejudiced
with respect to Count Four because it somewhat resembles Count Three.  His argument that
unfair prejudice results from the slight overlap in time with the misconduct alleged against Heinz
in Count Six is insufficient to overcome the presumption that the jury will be able to differentiate

Considerations of judicial economy further counsel in favor of jointly trying all six counts of the Indictment. The parties estimate that a joint trial will take four to six weeks. Defendants argue that a separate trial as to Count Six would by contrast be "brief and uncomplicated" because it "involves only a single alleged conversation during a single lunch relating to a single transaction." (Welty Severance Mem. at 11; Reply Mem. in Supp. of Def. Michael Welty's Mot. to Sever Count Six at 7.) However, a separate trial on Count Six would require the expenditure of substantial resources from the Court, the parties, the witnesses, and jurors. Although the Government would not have to prove that Heinz engaged in the underlying alleged criminal conduct that is the object of the obstruction charge, evidence of that underlying conduct is relevant and necessary to explain the background of the charge. Therefore, much of the same evidence, including testimony from the same witnesses, would have to be introduced at a separate trial of Count Six.

Because the Court finds that the risk of prejudice is not "sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials," *Cardascia*, 951 F.2d at 482, Ghavami and Welty's Motions to Sever Count Six are DENIED. (Dkt. Nos. 102, 103.)

## VII. CONCLUSION

For the foregoing reasons, the Court DENIES Defendants' jointly filed (1) Motion for a Bill of Particulars; (2) Motion to Dismiss Counts Two and Four Based on the *Ex Post Facto* and Due Process Clauses; (3) Motion for Relief as to Counts One, Two, and Four as Multiplicitous; and (4) Motion to Dismiss Counts One Through Five as Untimely. (Dkt Nos. 98-101.) The

---

between counts and between defendants, and to consider separately the evidence against each defendant on each count.

Court also DENIES Defendants Welty and Ghavami's Motions to Sever Count Six.  (Dkt. Nos.

102-103.)

       SO ORDERED.

Dated: New York, New York
      July 12, 2012

                                     KIMBA M. WOOD
                          United States District Judge