UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X

UNITED STATES OF AMERICA

vs.

PETER GHAVAMI, GARY HEINZ, and
MICHAEL WELTY,

          Defendants.

10 Cr. 1217 (KMW)

------------------------------------X


# DEFENDANTS' MEMORANDUM IN REPLY TO GOVERNMENT'S RESPONSE TO COURT ORDER OF JULY 18, 2013

BALLARD SPAHR STILLMAN &
FRIEDMAN, LLP
425 Park Avenue
New York, NY 10022
*Attorneys for Defendant Peter Ghavami*

BRACEWELL & GIULIANI LLP
1251 Avenue of the Americas
New York, NY 10020
*Attorneys for Defendant Gary Heinz*

POE & BURTON PLLC
The Executive Building
1030 15th Street, N.W.
Suite 580 West
Washington, D.C. 20005
*Attorneys for Defendant Michael Welty*

This memorandum is submitted on behalf of all defendants in reply to the government's response to the Court's July 18, 2013 Order. For all of the reasons we discuss below, it is respectfully submitted that the government's response again demonstrates its failure to identify any loss as to the transactions at issue in the Court's Order. Thus, it is not appropriate to substitute a gain analysis for those transactions, particularly with a flawed regression model lacking "sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a).

**Question 1: The Government Has Failed To Provide Evidence Of Loss**

The July 18 Order instructs the government to identify those specific escrow transactions as to which the government asserts the Treasury was deprived of the use of money because of the defendants' conduct. The Order asks for the "Government's evidence of loss to the Treasury with respect to each of these transactions." *See* July 18, 2013 Order.

After the government identifies the seven escrow transactions won by UBS at the "perfect" or lowest possible cost to the issuer (a list with which the Defendants agree),[1] it does not respond to the Court's next question in the following pages of its submission. Finally, at page five of its submission, the government acknowledges that "the Government does not have evidence of competitive roll-back dates for these deals, and thus cannot directly calculate the loss to the Treasury[.]" This admission by the government answers the Court's question. We submit that the Court need consider the issue no further.

The government, however, goes on to provide various quotations and transcript citations that do no more than describe something not in dispute -- the mechanism for deciding the winner when multiple bidders bid the "perfect" or lowest possible cost for an escrow

---

[1] As the government acknowledges, although not won by UBS, the Commonwealth of Massachusetts ("Mass I") escrow transaction underlying Count III also involved multiple bidders at the perfect cost and was awarded on the basis of the earliest termination date bid.

1

transaction. In that instance, the winner is typically determined by the shortest termination date, a point usually well into the future when remaining monies in an escrow become available for short-term use by the Treasury and cannot otherwise be used under the terms of the escrow.

The government's description of the bidding process is non-responsive to the Court's request. The government does not explain whether there was a loss to the Treasury as to any particular transaction, and, if so, what that loss to the Treasury amounted to as to any such transaction. As the government appears to acknowledge, it would need to present evidence concerning what the actual termination date bid <u>would</u> have been, but for any fraudulent conduct in the bidding process, to allow for an assessment of whether the Treasury would have been deprived of the use of escrow funds in any particular transaction. After more than a month of trial, testimony by numerous cooperators, and a year since trial within which the government has been able to prepare for sentencing, there is still no evidence before the Court as to any of the perfect cost transactions at issue showing what any termination date would have been for a putative winning bid in an uncorrupted deal. It was not the subject of any testimony put on by the government at trial, nor can it be found in any document or tape put into evidence at trial, nor in any material submitted to the Court by the government since trial. The reason -- as the government now concedes -- is that such evidence does not exist as to the seven transactions on its list (and the Mass I transaction).

The government tries to overcome this fundamental problem by quoting certain testimony and providing a chart (Table A) that includes a column labeled "Transcript Cites (Regarding Roll-back date or loss)." The citations in that column, however, do not correspond to any evidence that establishes the existence of a loss in any of the perfect cost transactions. The citations simply stand for the basic, undisputed notion that the winner in perfect cost transactions

2

was decided by a roll-back or termination date. That does not constitute evidence of loss in a given transaction on the government's list. Nor does it show what actually happened in the bidding process, how the termination date ultimately chosen resulted from some form of corrupt conduct, or how that date would have been different without that misconduct.

The Commonwealth of Massachusetts ("Mass I") escrow transaction underlying Count III provides a clear example of the failure of the government's proof on this point that applies just as squarely to the seven transactions on the government's list (*see* Gov't Response at 1-2, 7 n.1). Mass I involved multiple financial institutions that bid the perfect cost for the transaction. Notably, some of those bidders were not alleged by the government to have participated in a conspiracy and there is no evidence that they did participate in criminal conduct. The award was ultimately won by Bank of America, represented in the bidding process by Douglas Campbell, which bid the earliest termination date.[2]

The government points to testimony of Messrs. Zaino (Tr. 556-58) and Campbell (Tr. 2769-72) in its response to the Court's request for evidence of how the Treasury suffered a loss in the transactions identified by the government. But that testimony does not support the government. Those witnesses -- despite years of debriefing and months of trial preparation -- offered no testimony about the actual bidding that took place in the transaction, and in particular, neither Zaino nor Campbell said a word about how the termination date may have been affected by their corruption of the transaction. Again, their cited testimony simply explains the significance of a termination date in the award of a perfect cost transaction to a bidder. That is not evidence of loss to the Treasury.

---

[2]   Mr. Campbell was one of the government cooperators who testified about the transaction. UBS was the bidding agent on the transaction, and the bidding process was handled by Mark Zaino, another cooperating witness called by the government to testify at the trial. As the trial testimony showed, Mr. Campbell met over 100 times and Mr. Zaino met more than 40 times with the government during the course of their pretrial cooperation.

The only other testimony that the government cites with respect to the Mass I transaction was provided by Walter St. Onge, who served as bond counsel to the Commonwealth of Massachusetts on the transaction. The winning bid by Bank of America on the Mass I transaction included a termination date of April 1, 2010, more than two years before Mr. St. Onge's trial testimony. However, when Mr. St. Onge was asked whether, in fact, the escrow actually had been terminated in April 2010, Mr. St. Onge told the jury <u>he did not know</u>. Tr. 2774. Mr. St. Onge's testimony, like that of Messrs. Zaino and Campbell, highlights the government's failure of proof as to the existence of any loss to the Treasury on the perfect cost transactions.

The government's position suffers from a different, but no less fatal, failure of proof as to four of the seven perfect cost transactions involved in the Court's question: they have not yet reached their termination dates, so the Treasury has not suffered any loss. Those deals -- Centinela Valley, San Gabriel Unified School District, Pleasant Valley School District, and Vallejo City Unified School District -- have termination dates many years into the future. The Centinela Valley termination date is February 1, 2022; the San Gabriel termination date is August 15, 2022; the Pleasant Valley termination date is August 1, 2022; and the Vallejo City termination date is August 1, 2020. Thus, even if there were evidence showing how the rollback date was altered by wrongful manipulation, or what the rollback date would have been in an uncorrupted deal, the Treasury has suffered no loss for those transactions and its entitlement to the use of funds in those escrows would not even ripen for almost another decade, if at all.[3]

---

[3]  The remaining deals on the government's list of seven deals -- City of Bridgeport, the Municipality of Anchorage, and San Jose Evergreen Community College District -- had termination dates in 2010, although, like Mass I, there is no evidence in the record about whether those terminations actually occurred at that time. The government has never offered evidence from a Treasury Department or other witness to address, as to any of these

4

The length of time apparently left until the termination of many of these escrows demonstrates another problem with the government's argument. Any effort by the government to define a harm to the Treasury years into the future would, for example, require an assumption that the escrow transaction would remain in place through the termination date, as well as a guess as to the financial environment at the time the escrowed monies would be released to the Treasury. That is speculative at best and insufficient to support the calculation of a loss. For example, an intervening change in the tax law might result in a situation where the municipality did not earn the maximum it could under the arbitrage rules. In that circumstance, upon termination of the escrow, the monies could go back to the municipality -- not the Treasury -- so the municipality could invest them on the open market and earn a sufficient return to reach the allowable limit.[4]

In short, the government has failed to provide any evidence that the Treasury or (as we have demonstrated in our earlier submissions) any municipality suffered a loss from the escrow transactions at issue.

**Question 2 – The Government's Regression Analysis Remains Flawed And Useless**

In its response, the government -- presuming that it has adequately shown the existence of a loss to the Treasury that it otherwise cannot quantify (an assertion that we submit is demonstrably wrong) -- nevertheless argues that it should be allowed to use the "increased profit to the provider" as a substitute for loss because, in its view, "the gain to UBS is in concept

---

transactions whose termination dates have come and gone, what actually happened when the escrows were supposed to terminate.

[4]     We again note, as we have pointed out, that there was at least one (and at times more than one) bidder on each of the transactions on the government's list that the government has conceded were not part of conspiratorial conduct and that the evidence does not show were part of criminal conduct. That those arm's-length bids were nevertheless beaten by the winning bid on the deal further demonstrates the absence of loss in the transaction to any party.

5

directly related to the loss to the Treasury." Gov't Response at 5; *id.* at 4 ("increased profits represent a loss to the Treasury"); *id.* at 5 ("excess gain to UBS [based on the regression] is, in other words, an estimate of the cost to the Treasury of borrowing those funds for that amount of time"). The government also asserts that its regression analysis provides an appropriate basis to determine that increased profit (and that the regression analysis itself somehow corroborates that the Treasury suffered a loss). *Id.* at 5.

Aside from the fundamental problems we have identified with the regression analysis, the government's reasoning is not well-grounded. When the government first advised the defendants that it intended to use a regression analysis in an effort to prove gain as a substitute for loss (*see* Government February 12, 2013 letter at 2), it claimed that the alleged losses were "losses to municipalities," not the Treasury. After defense counsel pointed out in their initial sentencing memoranda that a municipality could never be harmed if a bid was won at the perfect cost, the government next asserted that the Treasury suffered a loss on those perfect cost transactions. The government, however, fails to (and cannot) explain how there is any correlation between profits earned by UBS on a transaction and the Treasury's entitlement to the use of remaining funds in a given escrow as a result of a termination date. The government offers nothing to show how, for example, the deprivation of the Treasury's use of certain funds 10 or 20 years in the future for some undefined period of time (which could be very short) equates to the alleged excess profit it claims that UBS received based on the government's flawed regression analysis. The reason is that there is no relationship between the two issues.

The final question in the Court's July 18 Order asks the government: "If the Court were to find that there is insufficient evidence to establish a loss to the Treasury in these transactions, how would this finding impact the validity or results of Dr. Woodward's analysis of

the remaining transactions?" The government's response that the regression would remain a valid tool, we submit, is not well-reasoned. It appears that the government bases its view on the notion that because it still characterizes the perfect cost deals as rigged, they belong in the regression analysis notwithstanding the government's failure to demonstrate a loss, and that the government would simply need to back its alleged gain numbers for those transactions out of the loss calculation.[5]

But that makes no sense. If a purpose of the regression -- as the government argues -- is to find that gain to UBS "directly related" to the loss to the Treasury, the government's inability to establish that a loss even exists for these transactions weighs directly against considering them as part of a regression analysis at all. More fundamentally, we have made the same point with respect to all of the 13 transactions underlying the government's regression analysis. Because the government has failed to show that any of them resulted in a loss, we respectfully submit that the Court should not consider the government's gain analysis for any of the 13 transactions. *See* U.S.S.G. § 2B1.1, application n. 3(B); *accord, e.g., United States v. Zafar*, 291 Fed. App'x 425, 429 (2d Cir. 2008) (sentencing guidelines permit courts to consider the "defendant's gains as an alternate measure of loss, albeit only if there is a loss but it reasonably cannot be determined") (internal quotes omitted).

---

[5] The government states (at 6-7) that certain broker fees and alleged kickbacks paid to CDR should be added into the loss calculation for the perfect cost deals if the alleged gains to UBS based on the regression analysis are backed out. For the reasons stated in our earlier sentencing submissions, defendants disagree that broker fees or alleged CDR kickbacks constitute loss for purposes of a sentencing guidelines calculation.

7

While the sentencing guidelines are only advisory, their application nevertheless must be predicated on real evidence as the defendants' liberty is at stake. The government has offered no such evidence here.

Dated: New York, New York
July 22, 2013

Respectfully submitted,

BALLARD SPAHR STILLMAN & FRIEDMAN, LLP

By _____
Charles A. Stillman
James A. Mitchell
Erik Zissu
Mary Margulis-Ohnuma

425 Park Avenue
New York, NY 10022
(212) 223-0200
*Attorneys for Defendant Peter Ghavami*


BRACEWELL & GIULIANI, LLP

By _____
Marc L. Mukasey
Jonathan N. Halpern
Philip J. Bezanson

1251 Avenue of the Americas,
49th Floor
New York, NY 10020
(212) 508-6100
*Attorneys for Defendant Gary Heinz*

POE & BURTON PLLC

By _[signature: Gregory Poe (JAM)]_____
    Gregory L. Poe (*admitted pro hac vice*)
    Preston Burton (*admitted pro hac vice*)
    Rachel S. Li Wai Suen

The Executive Building
1030 15th Street, N.W., Suite 580 West
Washington, DC 20005
(202) 583-2500
*Attorneys for Defendant Michael Welty*