UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

              vs.

PETER GHAVAMI
GARY HEINZ
MICHAEL WELTY,

              Defendants.

No. 10 Cr. 1217 (KMW)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## SENTENCING MEMORANDUM ON BEHALF OF MICHAEL D. WELTY

Gregory L. Poe
Preston Burton
Rachel S. Li Wai Suen
Poe & Burton PLLC
The Executive Building
1030 15th Street, N.W., Suite 580 West
Washington, D.C. 20005
(202) 583-2500

*Counsel for Michael D. Welty*

## TABLE OF CONTENTS

PAGE

INTRODUCTION ...........................................................................................................1

DISCUSSION ................................................................................................................2

I.      Mr. Welty's History and Characteristics (18 U.S.C. § 3553(a)(1)). ................................2

II.     The Nature and Circumstances of the Offense (18 U.S.C. § 3553(a)(1)) ...........................20

        A.      The Acquittal on Count Three ...............................................................21

        B.      The Offenses of Conviction ...................................................................21

                1.      Count One ........................................................................23

                2.      Count Two ........................................................................25

                3.      Count Four .......................................................................26

        C.      Evidence Concerning Financial Motive ..................................................28

        D.      Conduct Preceding the Period Charged in the Indictment ...........................28

III.    The Government's Guidelines Calculations (18 U.S.C. § 3553(a)(4)) and
        Restitution Calculations Are Inaccurate .........................................................29

        A.      Overview ...........................................................................................30

        B.      The Government's Loss Calculations Are Erroneous ................................31

# TABLE OF CONTENTS
## (continued)

PAGE

1.  Counts 1 and 2 ...................................................................................31

    a.  Gain.................................................................................32

    b.  Broker Fees .....................................................................33

    c.  Swap Payments/Kickbacks ............................................34

2.  Count 4...............................................................................................34

    a.  Broker Fees .....................................................................35

    b.  Fraudulently Lowered Interest Rates .............................36

    c.  Swap Payments ...............................................................39

C.  The Government Has Failed to Substantiate a Two-Level Upward
    Adjustment for More Than 10 Victims Under U.S.S.G. § 2B1.1(b)(2)(A)...........39

D.  A Two-Level Upward Adjustment Under U.S.S.G. § 2B1.1(b)(10)(C)
    for Using Sophisticated Means Should Not Be Applied to Mr. Welty.................40

E.  A Two-Level Upward Adjustment Under U.S.S.G. § 3B1.3 for
    Abusing a Position of Private Trust Should Not Be Applied to Mr. Welty..........41

F.  The Government's Restitution Calculations Are Unsubstantiated .......................42

IV.  A Guideline Sentence Would Disserve the Goals of Sentencing and a
     Substantial Variance Under Section 3553(a) Is Appropriate...............................43

     A.  The Government's Loss Calculation Overstates the Seriousness of
         the Offense and Its Overlapping Guideline Calculations Are Excessive .............45

         1.  Overstated Loss...............................................................................45

         2.  Overlapping Enhancements ........................................................46

# TABLE OF CONTENTS
## (continued)

**PAGE**

B.  A Substantial Variance Under Section 3553(a) Is Appropriate
Regardless of the Otherwise Applicable Guideline Range ....................................46

  1.  Mr. Welty's History and Characteristics ....................................................47

  2.  The Nature and Circumstances of the Offense Conduct............................48

  3.  The Need to Avoid Unwarranted Sentencing Disparities..........................49

   a.  Sentencing Disparity as to Other Defendants.................................49

   b.  Avoiding Unwarranted Nationwide Sentencing Disparities ...........52

  4.  The "Parsimony" Provision In Section 3553(a) Would Be
Well-Served By a Substantial Variance......................................................53

   a.  A Lengthy Prison Sentence Is Unnecessary to
Achieve Deterrence ........................................................................53

    (i)  Specific Deterrence ...........................................................53

    (ii)  General Deterrence ............................................................54

   b.  Incapacitation of Mr. Welty Is Not Necessary to
Protect the Public...........................................................................55

   c.  Seriousness of the Offense; Promoting Respect for
the Law; and Just Punishment for the Offense...............................55

CONCLUSION...................................................................................................................57

# TABLE OF AUTHORITIES

**Federal Cases**                                                                                                      **Page**

*Nelson* v. *United States*, 556 U.S. 350 (2009) .............................................................................29

*Ozsusamlar* v. *United States*, No. 09 Civ. 3501,
  2010 WL 69106 (S.D.N.Y. Jan. 7, 2010) ...............................................................43

*Rita* v. *United States*, 551 U.S. 338 (2007)......................................................... 29-30, 55

*Stinson* v. *United States*, 508 U.S. 36 (1993)........................................................... 36-37

*United States* v. *Abiodun*, 536 F.3d 162 (2d Cir. 2008)........................................... 39-40

*United States* v. *Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) ...................... 45-46, 54

*United States* v. *Amer*, 110 F.3d 873 (2d Cir. 1997). ....................................................53

*United States* v. *Booker*, 543 U.S. 220 (2005)................................................................2

*United States* v. *Broderson*, 67 F.3d 452 (2d Cir. 1995) ......................................... 41-42

*United States* v. *Cavera*, 550 F.3d 180 (2d Cir. 2008) .................................................30

*United States* v. *CDR, et al.*, No. 09-cr-1058,
  2011 WL 5116745 (S.D.N.Y. Oct. 21, 2011) ........................................................41

*United States* v. *Emmenegger*, 329 F. Supp. 2d 416 (S.D.N.Y. 2004) .........................45

*United States* v. *Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008).................................. 54-55

*United States* v. *Gordon*, No. 03CR1115-03 (RWS)
  2006 WL 1675921 (S.D.N.Y. June 16, 2006) ........................................................52

*United States* v. *Gupta*, No. 11 CR. 907 (JSR),
  2012 WL 5246919 (S.D.N.Y. Oct. 24, 2012) .........................................................47

*United States* v. *Hernandez*, No. 03CR1257 (RWS),
  2005 WL 1242344 (S.D.N.Y. May 24, 2005) ................................................... 53-54

*United States* v. *Jimenez-Beltre*, 440 F.3d 514 (1st Cir. 2006) ...................................44

*United States* v. *Jolly*, 102 F.3d 46 (2d Cir. 1996) ......................................................41

## TABLE OF AUTHORITIES
### (continued)

**Federal Cases (continued)**                                                    **Page**

*United States* v. *Lauersen*, 362 F.3d 160 (2d Cir. 2004),
   *vacated on other grounds*, 542 U.S. 1097 (2005)................................30, 46

*United States* v. *Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008).....................45

*United States* v. *Pedragh*, 225 F.3d 240 (2d Cir. 2000) ...........................36

*United States* v. *Preacely*, 628 F.3d 72 (2d Cir. 2010)..........................3, 47

*United States* v. *Pugh*, 515 F.3d 1179 (11th Cir. 2008).............................55

*United States* v. *Robles*, 562 F.3d 451 (2d Cir. 2009) .............................23

*United States* v. *Stock*, 685 F.3d 621 (6th Cir. 2012) .............................53

*United States* v. *Thurston*, 456 F.3d 211 (1st Cir. 2006) ..........................54

*United States* v. *Tin Yat Chin*, 371 F.3d 31 (2d Cir. 2004)........................40

*United States* v. *Wills*, 476 F.3d 103 (2d Cir. 2007)..................3, 49, 52, 55

*United States* v. *Zangari*, 677 F.3d 86 (2d Cir. 2012) ............................42

*United States* v. *Zillgitt*, 286 F.3d 128 (2d Cir. 2002) ..........................22

**Statutes, Rules, and Guidelines**

18 U.S.C. § 3553(a) .......................................................... *passim*

26 C.F.R. § 1.148-5, 62 F.R. 25507 (1997) ...............................33, 35, 41

U.S.S.G. § 1B1.2................................................................23

U.S.S.G. § 2B1.1............................................................ *passim*

U.S.S.G. § 3B1.3................................................................41

U.S.S.G. § 6A1.3.........................................................32, 38, 39

**TABLE OF AUTHORITIES**
**(continued)**

**Secondary Sources**                                                              **Page**

Montesquieu, *Spirit of Liberty* (see www.constitution.org/cm/sol_19.htm) ................................44

C. Beccaria, *Of Crimes and Punishments* (1764)
    (see www.constitution.org/cb/crim_pun.htm) .........................................................44

N. Morris, *The Future of Imprisonment* (1974).............................................................44

R. Frase, *Punishment Purposes*, 58 Stan. L. Rev. 67 (2005).........................................44

D. McCullough, *John Adams* (2001) ..........................................................................44

G. Wills, *Inventing America* (1979)............................................................................44

M. Braun and B. Van Voris, "Ex-UBS Executives Go To
    Trial in Bond Bid-Rigging Case*, Bloomberg*,
    July 30, 2012, *available at* http://www.bloomberg.com) .........................................54

R. Slavin, "Muni World Comments on Guilty Verdicts in UBS Bid-Rigging Case,"
    *The Bond Buyer*, Aug. 31, 2012, *available at* http://www.bondbuyer.com ..........54

"3 Ex-UBS Bankers Found Guilty of Rigging Bids,"
    *The New York Times*, Aug. 31, 2012,
    *available at* http://www.nytimes.com.....................................................................54

M. Taibbi, "The Scam Wall Street Learned From the Mafia,"
    *Rolling Stone*, June 21, 2012, *available at* http://www.rollingstone.com ..............54

R. Verdi, "More UBS Indictments in Muni-Bond Scandal,"
    *The 46 Blog* (Dec. 9, 2010, 8:55 p.m.),
    *available at* http://www.46in08.blogspot.com.........................................................54


**Miscellaneous**

Department of Justice, Antitrust Division,
    Workload Statistics for Fiscal Years 2002-2011, *available at*
     http://www.justice.gov/atr/public/workload-statistics.html
    (site last visited April 22, 2013).................................................................................52

## TABLE OF AUTHORITIES
### (continued)

**Miscellaneous (continued)**                                                   **Page**

Federal Sentencing Commission, 2012 Sourcebook of
Federal Sentencing Statistics, Table 13, *available at*
http://www.ussc.gov/Data_and_Statistics/Annual_Reports_and_Sourcebooks/2012/
Table13.pdf (site last visited April 22, 2013). ......................................................................52

<u>SENTENCING MEMORANDUM ON BEHALF OF MICHAEL D. WELTY</u>

Defendant Michael D. Welty, through counsel, respectfully submits this sentencing memorandum to assist the Court in the sentencing process. Mr. Welty's sentencing hearing is set for May 22, 2013, at 11:00 a.m. We submitted comments on and objections to the first disclosure of the presentence investigation report on behalf of Mr. Welty on April 12, 2013. Disclosure of the final report to the Court is pending. We are currently unaware of the sentencing recommendation that the Probation Office will make to the Court.

<u>INTRODUCTION</u>

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ Mr. Welty understands that the Court must sentence him in accordance with the jury verdict. But the general verdict on the multiple-object conspiracy counts and the trial evidence are themselves telling because they reflect Mr. Welty's relatively minor status in key respects. The evidence does not show that Mr. Welty participated in high-level meetings with others to form illegal agreements or hatch corrupt plans. Mr. Welty was acquitted on the single substantive count against him. The evidence on the conspiracy counts of which he was convicted shows that the part he played within the context of industry-wide corruption going back to the mid-1980s was relatively narrow. The Antitrust Division prosecutor who has led the government's longstanding investigation of the municipal bond industry (and who was not at counsel table during trial) *herself* characterized Mr. Welty as

1

a "grunt" in a December 10, 2007 meeting with two of the lawyers who tried the case on behalf of Mr. Welty.

This sentencing memorandum is divided into several sections. Part I addresses Mr. Welty's history and characteristics. Part II addresses the nature and circumstances of the offenses of conviction. Part III addresses the government's erroneous calculations under the Sentencing Guidelines (loss, number of victims, sophisticated means, and abuse of a position of trust) and its erroneous restitution calculations. And Part IV explains why we believe that a substantial variance under 18 U.S.C. § 3553(a) is appropriate for Mr. Welty regardless of what the properly calculated guideline range may be. First, even if a 20-level adjustment for loss were accurate (and it is not), the loss amount would substantially overstate the seriousness of the offense. Second, especially in light of the sentences imposed in related cases by Judge Harold Baer, Jr., "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" under Section 3553(a)(6) is squarely implicated in this case. Third, Mr. Welty's relative culpability under the government's own approach to this case, and his history and characteristics, themselves justify a variance. For the reasons discussed below, we respectfully ask that the Court impose the least punitive sentence on Mr. Welty that is sufficient but not greater than necessary to meet the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2).

## DISCUSSION

I.    Mr. Welty's History and Characteristics (18 U.S.C. § 3553(a)(1)).

2







































II.    The Nature and Circumstances of the Offense (18 U.S.C. § 3553(a)(1)).

Although Mr. Welty respectfully disagrees with the jury verdict, he understands and respects the fact that he must be sentenced in accordance with it. The Superseding Indictment

(Dkt. 30) charged Mr. Welty with committing wire fraud (Count 3) and participating in three separate multiple-object conspiracies to commit wire fraud (Counts 1, 2, and 4).  Mr. Welty was acquitted on the wire fraud count.  The nature and circumstances of the conspiracy offenses involve important nuances in a case as complex as this one.  Mr. Welty's role in the offenses of conviction themselves, and his lack of participation in earlier criminal corruption in the municipal bond industry (as reflected in the testimony of David Rubin, Mark Zaino, Doug Campbell, and others), are important considerations under Section 3553(a)(1) for purposes of post-*Booker* sentencing.

A.   <u>The Acquittal on Count Three.</u>  The substantive wire fraud charge concerned the "Mass I" escrow transaction in October 2001 in which Mark Zaino of UBS acted as the bidding agent, and Doug Campbell (at Bank of America) won the award.  Mr. Zaino testified that UBS later received payments from Bank of America in return for the award.  That testimony did not relate to Mr. Welty.  According to Mr. Zaino's testimony, the Mass I transaction was also the subject of discussion at the so-called Thanksgiving lunch in November 2006.  The evidence at trial does not implicate Mr. Welty in any secret corrupt agreement relating to the Mass I transaction.   (7/31/12 Tr. 616-17.)   The jury acquitted Mr. Welty on the wire fraud count. (8/31/12 Tr. 4864.)

B.   <u>The Offenses of Conviction.</u>  The jury convicted Mr. Welty on each of the three conspiracy counts.  Count 1 charged a multiple object conspiracy under 18 U.S.C. § 371 to defraud municipal issuers out of money and property, deprive municipal issuers of the right to control their assets, and defraud the United States Treasury and the Internal Revenue Service. (Dkt. 30 at 9-11.)  The transactions at issue in Count 1 involved different brokers.  UBS and its employees acted in a bidding capacity with respect to the Count 1 transactions.   The trial

21

evidence on Count 1 concerning Mr. Welty focused on two particular escrow transactions. Count 2 charged the same type of multiple object conspiracy except under 18 U.S.C. § 1349. (*Id.* at 17-20.)   CDR acted as the broker in all of the Count 2 transactions.   UBS and its employees acted in a bidding capacity with respect to the Count 2 transactions.   Count 4 charged the same type of multiple object conspiracy under Section 1349 except that UBS acted in the capacity of bidding agent on Count 4.   (*Id.* at 27-31.)

While Mr. Welty must be sentenced on the three conspiracy convictions, of course, several important background considerations apply to sentencing in the conspiracy context. First, the jury returned only a general verdict.  (8/31/12 Tr. 4864-65.)  That is not necessarily equivalent to a determination by the jury that Mr. Welty intended to achieve every conspiratorial object charged in the indictment or corruptly participated in (or should be deemed responsible for) every transaction that was the subject of evidence implicating him at trial.  Cf. *United States* v. *Zillgitt*, 286 F.3d 128, 135-36 (2d Cir. 2002) (where jury returns a general verdict on a conspiracy count involving more than a single controlled substance, but does not identify the controlled substance on which its verdict is based, the substance carrying the most lenient prescribed sentence for which the evidence was sufficient to support a conviction is assumed to be the basis for the verdict).

Second, particular caution is required with respect to the scope of a defendant's responsibility for conspiratorial conduct.  For loss calculation purposes under Section 2B1.1, as a general rule, a defendant is, of course, responsible for "reasonably foreseeable pecuniary harm[,]" which "means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense."   U.S.S.G. § 2B1.1, Application Note 3(A)(iv).  And under Section 1B1.3, a defendant is ordinarily responsible for

"reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense[.]"  At the same time, however, Section 1B1.2(d) states: "A conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit."  The Guidelines caution that "[p]articular care must be taken in applying subsection (d) because there are cases in which the verdict or plea does not establish which offense(s) was the object of the conspiracy. In such cases, subsection (d) should only be applied with respect to an object offense alleged in the conspiracy count if the court, were it sitting as a trier of fact, would convict the defendant of conspiring to commit that object offense."  U.S.S.G. § 1B1.2, Application Note 4; see *United States* v. *Robles*, 562 F.3d 451, 455 (2d Cir. 2009) (discussing application note).

1.      Count One.  With respect to Count 1, the evidence at trial reflected a number of unrelated transactions involving disparate participants.  JP Morgan, for example, was one of the co-conspirator institutions in Count 1.  Alex Wright and Jim Hertz, both former JP Morgan employees, testified at trial for the government as cooperating witnesses concerning Count 1 transactions.  Neither of them had anything incriminating to say about Mr. Welty.  Mr. Wright testified only that he met Mr. Welty once in a restaurant or bar where "a bunch of people were having drinks after work."  (8/19/12 Tr. 1897.)  Mr. Hertz testified only that he knew Mr. Welty in his role as a bidding agent at PaineWebber before the UBS merger.  (8/21/12 Tr. 3580.)

The two transactions in Count 1 that *did* focus on Mr. Welty were June 2002 escrows that occurred two days apart and involved different brokers.  In the first one, the Rhode Island

Tobacco Corporation was the issuer.  The government's theory was that Bank of America declined to bid on that transaction because it had a side deal with UBS to sell securities to UBS if Bank of America stayed out of the bidding process and UBS won.  The government did not argue that the broker in the deal (Michael Marz at First Southwest) was involved in corrupt bidding.  The evidence at trial showed that Bank of America had no duty to submit a bid to the issuer.  (8/15/12 Tr. 2693; 8/14/12 Tr. 2542; GX-143553 (audio recording of June 20, 2002 call between Doug Campbell and Jay Saunders.)  The evidence also showed that there is nothing inherently illegal or improper about an entity choosing to supply securities to another bidder instead of bidding on a transaction.  As Mr. Campbell acknowledged, there is nothing wrong with a provider lining up a source of securities for an escrow in advance of winning the bid. (8/14/12 Tr. 2525.)   In the same time period, the evidence showed, Mr. Welty was communicating with a representative of HSBC, another provider of securities, concerning the Rhode Island Tobacco transaction. See DX-W-7-4 (June 20, 2002 email from Welty to Pierre Bourassa of HSBC); 8/8/12 Tr. 1612 (Zaino testimony that Bourassa was an "excellent" source of securities).  Three other potential providers submitted bids for the Rhode Island Tobacco transaction along with UBS.  (DX-W-7-18: Wachovia, JP Morgan, and Bear Stearns.)

The second Count 1 transaction involving Mr. Welty was the Municipality of Anchorage deal in June 2002.  The Anchorage transaction actually involved two different escrows (Series A and Series B) with two different bid awards.  The government's apparent theory, relying on testimony by Messrs. Zaino and Campbell, was that UBS won the awards because Doug Campbell submitted losing bids at the behest of Mr. Welty (through Mr. Zaino) and that Alex Wright submitted losing bids at the behest of Gary Heinz.   Wachovia also bid on the transactions.  See DX-W-6-16 (bid results for Anchorage, Series A); GX-22-21 (bid results for

Anchorage, Series B).   No witness testified that Wachovia submitted corrupt bids and the government did not argue that Wachovia submitted corrupt bids.   The government did not argue that the broker (Bill Chao at LPL Financial) was involved in corrupt bidding.

2.   Count Two.   For the Count 2 transactions, in which CDR acted as the broker, David Rubin testified that he reached an agreement in 2001 with UBS personnel to steer deals to UBS if CDR was chosen as the broker on deals in which UBS acted as underwriter.   (8/20/12 Tr. 3245-48.)   The evidence at trial showed that Mr. Welty never traveled to Los Angeles to meet with Mr. Rubin and did not participate in the formation of any agreement with him.   (*Id.*; 8/1/12 Tr. 855-60 (Zaino).)   With respect to Mr. Welty, the most that Mr. Rubin could say was that he "knew of Mr. Welty as an employee of PaineWebber and UBS."   (8/17/12 Tr. 3192-93.) According to Mr. Zaino's testimony, Mr. Welty had been targeted at the time (unbeknownst to Mr. Welty) for termination.   (8/8/12 Tr. 1576-77.)   In short, the evidence shows that Mr. Welty did not strike any illegal agreement with CDR in 2001, just as it shows that he did not strike any illegal agreement with Doug Campbell in October 2001.

Mr. Zaino did not testify that Mr. Welty was even *aware* in 2001 of any such putative illegal agreement with CDR.   With respect to Count 2, Mr. Zaino (along with Douglas Goldberg and Matthew Rothman from CDR) *did* testify regarding later transactions in 2002 and 2004 in which Mr. Welty acted as a bidder on behalf of UBS.   Even the trial testimony by those cooperators, however, included statements that were mitigating as to Mr. Welty.   For instance, with respect to the September 2002 Georgia Baptist transaction, Mr. Zaino testified that he told Mr. Welty that "CDR setting up the bid is what allowed the profitability of the transaction" and that Mr. Welty responded that "it was more with respect to the work at the UBS desk."   (8/1/12 Tr. 929-30.)

At trial, the government also introduced evidence (largely through Mr. Zaino) concerning swap transactions involving CDR, FSA, and UBS.  As discussed in Part III below, the government is attempting in these sentencing proceedings to include profits associated with those transactions in the loss calculation.  But the trial record shows that those sums, whatever else they may mean, are not properly attributable to Mr. Welty under any view of loss in this case. (There are other reasons, as discussed below, why those figures are not properly included in a loss calculation.)  The government stated at trial that it was "not alleging Mr. Welty was involved in these swaps with Mr. [Steve] Goldberg."  (8/21/12 Tr. 3501-02.)  Mark Zaino and Doug Goldberg testified that Mr. Welty was not involved in swap transactions with CDR and FSA.  (8/8/12 Tr. 1621, 3182.)  The government also argued at trial that CDR received a $200,000 kickback from UBS via another provider (Trinity, a General Electric subsidiary). (8/27/12 Tr. 4353-54.)  Whatever the testimony and other evidence may prove as to others on that issue, it does not show that Mr. Welty was involved in discussions or other communications relating to that payment.

3.  <u>Count Four.</u>  The third and final conspiracy of which Mr. Welty was convicted was charged in Count 4.  At trial, the government argued that Mr. Welty, working for UBS in its capacity as a bidding agent, steered transactions (guaranteed investment contracts known as GICs) to Peter Grimm at Trinity (a subsidiary of General Electric).  With respect to the bid awards, the evidence at trial on this count consisted largely of audio recordings of conversations between participants (including Mr. Grimm and Mr. Welty), testimony by Mark Zaino concerning those recordings, and the testimony of an issuer representative, Elwood Farber, with respect to one of the transactions.  The government's theory was that Mr. Welty (and in one instance, Mark Zaino) fed numbers to Mr. Grimm that were less favorable to the issuers than

26

they otherwise would have received from Mr. Grimm.  (The trial evidence also showed that every one of the other bidders on all of the Count 4 transactions won by Mr. Grimm offered rates less favorable to the issuers than the rates at which Mr. Grimm was awarded the bid.)

The government also argued with respect to the conspiracy charged in Count 4 that Mr. Grimm and UBS conducted several hedging transactions after UBS awarded the bid to Mr. Grimm that caused harm to the issuers.  As discussed above, the trial evidence showed that Mr. Welty bid on escrows (Counts 1 and 2) and bid out GICs for UBS (Count 4).  Doug Goldberg, Jeff Ziglar (a defense witness), and Mark Maroney (a defense witness) testified that Mr. Welty was not involved in *conducting* hedging or swap transactions in 2001 or 2002.  (8/17/12 Tr. 3182 (Goldberg); 8/22/12 Tr. 3851 (Ziglar); 8/23/12 Tr. 3968 (Maroney).)   The government did introduce evidence concerning Mr. Welty's *knowledge* in 2002 that hedging transactions with Trinity were conducted by others after UBS had awarded GICs to Trinity.  But it did not successfully accomplish even *that* with respect to the first transaction chronologically in the entire trial and the most significant hedging transaction in the government's loss calculation – the Commonwealth of Puerto Rico deal in October 2001.  Mr. Zaino made clear on his redirect examination (after testifying differently on direct, 8/2/12 Tr. 1048-49) that he did not even know whether Mr. Welty was aware of it.  (8/9/12 Tr. 1812-13 ("That I remember with Mr. Welty was more that UBS was acting as bid agent. I don't remember much more substance beyond that.").)  Mr. Zaino's testimony on redirect is consistent with an October 10, 2001 audio recording that was introduced into evidence.  On that recording, Mr. Heinz states to an interested third party, Frank Postiglione, who worked for BLB: "Um, Mark mentioned that you might be willing – wanting to straight out a swap?"  Mr. Postiglione replies affirmatively.  Mr. Heinz responds, "Okay, perfect. Just so you know, from our, from our desk perspective, there is a separation of

duties here.  Mike Welty has been focusing and will be focusing on the reinvest. . . . And then

Zaino and I are separate[.]"  (DX-H-A-735702.)

C.   <u>Evidence Concerning Financial Motive.</u>

The government argued at trial that Mr. Welty had a financial motive to engage in

criminal conduct because his bonus depended in part on transactions that he closed.  (8/27/12 Tr.

4287.)   As Jeff Ziglar testified, however, a range of factors determined bonuses, including, "how

the whole firm did globally in terms of . . . its total earnings . . . ; how the municipal securities

department did, did we meet our budget . . . ; how the group did, did we meet our budget, not

meet our budget; [and] . . . individual performance, did you do well, and that was measured both

by the amount of deals you won and a . . . peer-review process."  (8/23/12 Tr. 3921.)  Mr. Zaino

himself agreed that a desk employee could be compensated more highly in a given year than the

previous year even if his or her own production had diminished in the latter year.  (8/8/12 Tr.

1662-63.)  That is in fact exactly what happened to Mr. Welty in 2002 and 2003 (during the

period at issue in the indictment).  The Access database on which the government has relied lists

local and professional profits on transactions for which Mr. Welty is identified as the trader as

approximately $8.4 million in 2002 and approximately $3.8 million in 2003.  (GX 50-21.)  But

Mr. Welty, as the government's evidence also shows, was paid *more* in 2003 than he was in 2002

despite the 55% decrease in his own personal production.  (See 8/22/12 Tr. 3842 (Rooney); GX-

55-3 (salary and bonus chart).)

D.   <u>Conduct Preceding the Period Charged in the Indictment.</u>

The evidence at trial did not show that Mr. Welty was involved in any criminal conduct

before the period charged in the indictment.   Mr. Zaino, who pleaded guilty to criminal conduct

going back to 1998, testified that he spoke with potential providers every day when he worked at

CDR (from 1997 to 2001), and acknowledged that he did not speak with Mr. Welty any of those times.  (8/8/12 Tr. 1593.)  Mr. Zaino agreed that he bid out more than 100 transactions while he worked at CDR and that none of them involved Mr. Welty as a potential provider.  (*Id.* at 1592-93.)  Mr. Zaino also testified that he had a vague memory of knowing from one of his bosses at CDR that Mr. Welty did not like CDR.  (*Id.* at 1593.)  See 20120123-Wolmark-GHW-R007/11 (interview memorandum stating that Stewart Wolmark told government agents in January 2012 that "Mike Welty at UBS didn't like CDR and he would always tell them that he was too busy to bid on a transaction or that he couldn't help").

For his part, Doug Campbell (who pleaded guilty, as Mr. Zaino did, to criminal conduct going back to 1998) did not identify any transaction before the period charged in the indictment in which Mr. Welty was improperly involved.  Although Mr. Campbell attempted to implicate Mr. Welty in the October 2001 meeting that relates to the Mass I transaction charged in Count 3, the jury acquitted Mr. Welty on that count, leaving only the June 2002 Rhode Island Tobacco and Anchorage transactions discussed above.  Jim Hertz and Alex Wright, the former JP Morgan employees, had nothing of substance to say about Mr. Welty at all.

III.     The Government's Guidelines Calculations (18 U.S.C. §
         3553(a)(4)) and Restitution Calculations Are Inaccurate.

According to the government, the Court should conclude that Mr. Welty's total adjusted offense level under the guidelines is 33.  That translates into a guideline rage of 135-168 months – 11 years, five months at the bottom, and 14 years at the top.  As we show below, the government's view is not substantiated under the guidelines.  Even if it were, however, a guideline sentence in this case would not be appropriate.  According to the Supreme Court, the Guidelines are "not to be *presumed* reasonable."  *Nelson* v. *United States*, 555 U.S. 350, 351-52 (2009) (per curiam) (emphasis in original); accord *Rita* v. *United States*, 551 U.S. 338, 351

(2007).   After *Booker*, the sentencing guidelines, which must be considered under Section 3553(a)(4), are simply a "starting point" in a sentencing determination that must take into consideration *all* of the factors under Section 3553(a).   See *United States* v. *Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*) (quoting *Gall* v. *United States*, 552 U.S. 38 (2007)).

As we also show below in Part IV, even if the guideline calculations were correct, and even if this case existed in a pre-*Booker* environment, departures under Section 5K2.0 would be appropriate because the loss amount would substantially overstate the seriousness of the offense, U.S.S.G. § 2Bl.l, Application Note 19(C), and the guideline adjustments would be substantially overlapping.   See *United States* v. *Lauersen*, 362 F.3d 160, 164 (2d Cir. 2004), *vacated on other grounds*, 543 U.S. 1097 (2005).   In the end, we respectfully submit that a substantial variance under Section 3553(a) from the otherwise applicable guideline range is appropriate to achieve the purposes of sentencing.

A.      Overview.   As we show below, the guideline and restitution calculations that the government provided to the Probation Office are inaccurate in numerous ways.   First, the government's claim that Mr. Welty is responsible for a "loss" equivalent of $7,664,620.31 under U.S.S.G. §2B1.1(b)(1) (a 20-level increase from the base offense level), is wrong in numerous respects.[3]   Second, the assertion that the offense conduct involved more than 10 victims (U.S.S.G. §2B1.1(b)(2)(A)), resulting in a two-level upward adjustment, is unsubstantiated.   Third, the two-level upward adjustment under U.S.S.G. §2B1.1(b)(10)(C) for using sophisticated means should not apply to Mr. Welty under the circumstances (although we recognize the

---

[3]  On February 12, 2013, the government informed counsel for Mr. Welty that its loss calculation as to Mr. Welty was $6,566,220.31 (which would correspond to an 18-level upward adjustment). That is the information originally provided by the government to the Probation Office.  On March 21, 2013, the government informed counsel for Mr. Welty that it had revised its loss calculation with respect to Mr. Welty – increasing it approximately 15% (by $1,098,400.00) to $7,664,620.31 (which would correspond to a 20-level upward adjustment).

breadth of that provision and the contrary argument on this particular enhancement).  Fourth, the two-level upward adjustment under U.S.S.G. §3B1.3 for abusing a position of private trust should not apply to Mr. Welty either (although, again, we recognize the breadth of that provision and the contrary argument on this particular enhancement).  And fifth, the government has failed to substantiate its restitution calculations.

      B.      <u>The Government's Loss Calculations Are Erroneous.</u>

As shown in the sentencing materials concerning loss that have been submitted by counsel for Peter Ghavami (which Mr. Welty adopts concerning Counts 1 and 2), and Gary Heinz (which Mr. Welty adopts concerning Counts 1, 2, and 4) and for the reasons discussed below with respect to Counts 1, 2, and 4, the government's loss calculation falls far short of the proof standards necessary to justify such an adjustment.  Although we recognize the logic of the argument that actual loss exists with respect to four bid awards to Peter Grimm at Trinity in Count 4 transactions where UBS acted as a bidding agent (falling in the government's category labeled "fraudulently lowered interest rates"), the government has not substantiated its actual loss figures even with respect to *those* four transactions.  Accordingly, no upward adjustment for loss should apply at all.

      1.      <u>Counts 1 and 2.</u>

According to the government, the total amount attributable to Mr. Welty for loss calculation purposes in Counts 1 and 2 is $5,660,360.00.  For Count 1, the government does not claim that any entity suffered an actual loss, but asserts that the sum of $2,164,284.00, which is entirely constituted by alleged gain based on a regression model used by the government and the gain to UBS on the Rhode Island Tobacco transaction, should apply to the loss calculation.  For Count 2, the government asserts that $2,397,676.00 in alleged gain, based on the same regression

model, should apply to the loss calculation.   In addition, the government argues that the loss calculation for Count 2 should include (1) $203,800.00 in broker fees; (2) $694,600.00 in swap payments; and (3) a $200,000.00 "kickback" payment to CDR from UBS via Trinity (the so-called conference payment).   None of those figures are properly included in a loss calculation for Mr. Welty.

     a.    <u>Gain.</u>

The government's effort to add $4,561,960 in ostensible "gain" to the loss calculation based on a regression model for 13 transactions in Counts 1 and 2 (and on a simple assertion of gain to UBS on the Rhode Island Tobacco deal) fails for several reasons.   Most fundamentally, the government does not claim (and, as counsel for Mr. Ghavami has pointed out, the evidence does not show) that an actual but not reasonably determinable loss within the meaning of Section 2B1.1 exists for those transactions.   See U.S.S.G. Section 2B1.1(b)(1), Application Note 3(B) ("The court shall use the gain that resulted from the offense as an alternative measure of loss *only* if there is a loss but it reasonably cannot be determined." (emphasis added)).   Accordingly, there is simply no predicate for *turning* to gain as an alternative measure.

Even if a basis existed for using gain, however, the government's regression model is so fundamentally flawed that the $4,561,960.00 figure that the government has presented to the Court is meaningless.   Under the Guidelines, the government bears the burden of proving that the amount of gain is based on "sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3.   For the reasons discussed in the materials submitted by counsel for Mr. Ghavami, and as shown by the report of Dr. Alan Salzberg that is included in that submission, the government has failed to meet that proof standard even if a basis for using gain as an alternative measure existed in the first place.

b.    Broker Fees.

The government argues that broker fees totaling $203,800.00 that were paid to CDR constitute actual losses to issuers that should be included in the loss calculation as to Count 2. That claim is wrong.  At the outset, we note that only $85,000.00 of the $203,800.00 figure is based on Count 2 transactions that were the subject of evidence at trial: Columbia College (6/19/01; $2,500); CIEDB/J. David Gladstone (10/23/01; $5,000); and Allegheny County Airport (8/16/02; $77,500).   The remaining $118,800.00 is based on CDR-brokered transactions for which the government has failed to present evidence of corruption at all in this proceeding.

The crucial point, however, is that the broker fees, regardless of whether the figure is $85,000.00 or $203,800.00, do not constitute actual losses to issuers within the meaning of Section 2B1.1.  The government has not shown that the broker fees, which are the subject of Department of Treasury regulations, 26 C.F.R. § 1.148-5, 62 F.R. 25507 (1997), were undisclosed or excessive.  The government has not shown that the issuers failed to receive value in those transactions, or that services were not actually provided in the transactions, or that the transactions did not result in the anticipated public benefit, or that a failure of performance somehow caused an actual loss.  The issuers would have paid such broker fees in any transaction. Those fees thus cannot be characterized as actual loss that otherwise would have remained in the pockets of the issuers in non-corrupt transactions.  See also Application Note 3(E) to U.S.S.G. § 2B1.1 ("[l]oss shall be reduced by . . . (i) . . . the fair market value of . . . the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected").  The government's argument is tantamount to saying that issuers should have been able to gain the benefit of valuable transactions without incurring any broker-related cost to them.  That position should be rejected.

33

c.      Swap Payments/Kickbacks.

For the reasons described in the sentencing materials submitted on behalf of Messrs. Ghavami and Heinz, the swap payments associated with Count 2 that have been identified by the government ($694,600.00), and the so-called conference payment from Trinity to CDR that the government identifies as a kickback ($200,000.00), do not constitute "loss" within the meaning of Section 2B1.1(b).   Even if the government is otherwise deemed to have established those amounts as properly included in the loss calculation, however, they should not be included as to Mr. Welty because there is insufficient evidence, even by a preponderance, that they constitute "reasonably foreseeable pecuniary harm" as to him within the meaning of Application Note 3(A)(iv) to Section 2B1.1.   As explained above (at 26), the government stated at trial that it was "not alleging Mr. Welty was involved in these swaps with Mr. [Steve] Goldberg" (8/21/12 Tr. 3501-02), and Messrs. Zaino and Goldberg testified that Mr. Welty was not involved in swap transactions with CDR and FSA.  (8/8/12 Tr. 1621, 3182.)  As for the $200,000.00 payment, the testimony and evidence on that issue do not implicate Mr. Welty and do not even show that the payment was reasonably foreseeable to him.   Accordingly, none of the $894,600.00 in this category should be attributed to Mr. Welty.

2.      Count 4.

The Count 4 transactions relate to UBS's role as a bidding agent for GICs.  The heart of the Count 4 evidence at trial concerning Mr. Welty was audio recordings of Mr. Welty speaking with Peter Grimm at Trinity.  Mr. Welty conducted the bidding agent activities on behalf of UBS for a number of the transactions at issue in Count 4.

a.    Broker Fees.

The government argues that broker fees for six Count 4 transactions totaling $556,250.00 should be included in the loss calculation: Commonwealth of Puerto Rico (10/10/01; $400,000.00); Colorado Health Facilities (1/28/02; $25,000.00); Rhode Island Housing (3/5/02; $6,250.00); MEFA (3/5/02; $96,000.00); Corona-Norco Unified School District (9/26/02; $19,000.00); and New Mexico Education Assistance Foundation (12/5/02; $10,000). None of those fees constitute a "loss" within the meaning of U.S.S.G. § 2B1.1 for the reasons discussed above (at 33) with respect to the broker fees for Count 2.[4]

The largest bidding agent fee by far – $400,000 for the Commonwealth of Puerto deal – is an excellent illustration of why the government's loss theory on broker fees falls short. The notional value of the Puerto Rico transaction was close to $1.3 billion; Mr. Zaino agreed that it was a "huge transaction." (GX-50-21 at 7; 8/8/12 Tr. 1682-83.) Mr. Zaino *himself* testified that the fee was "[n]othing unusual with respect to the size of the deal." (8/8/12 Tr. 1683.) The fee was fully disclosed in the bid specifications and the bidding agent's certificate (GX-8-1; GX-8-10); bond counsel was required to sign off on the transaction (see 7/31/12 Tr. 840-41 (Zaino), 8/8/12 Tr. 1680-81 (Zaino), 8/15/12 Tr. 2703-04 (St. Onge)); and the Treasury Department's safe harbor regulations, 26 C.F.R. § 1.148-5, governed the transaction. Moreover, the fee resulted from UBS, the bidding agent, taking only 1 basis point (instead of the customary 5 basis points). (GX-8-1; GX-8-10.) The $400,000 figure, at bottom, is nothing more than the mathematical

---

[4]   Mr. Grimm at Trinity won all of those transactions except for Corona-Norco. Even if one accepts at face value the government's loss theory concerning broker fees, and even on the premise that all of the transactions won by Mr. Grimm were the result of corruption, there is no articulable basis for including the Corona-Norco fee. Three other disinterested providers – BLB, CDC, and Ambac – submitted bids in that deal. (GX-30-4.) CDC won the award. (*Id.*) The government did not seek to introduce into evidence the provider or bidding agent certificates for the Corona-Norco transaction. Nor has it explained how the issuer in that deal ostensibly was harmed.

result of multiplying the notional value of the transaction by 0.01 and discounting the resulting number to present value by taking into account the term of the transaction.  In short, in the Commonwealth of Puerto Rico deal and the other Count 4 deals in which UBS acted as bidding agent, the evidence fails to show that UBS's bidding agent fees resulted in funds coming out of the issuers' pockets that the issuers would not otherwise have paid in untainted deals. Accordingly, there is no basis for including such fees in the loss calculation.

       b.     <u>Fraudulently Lowered Interest Rates.</u>

      The government argues that four issuers suffered a total of $373,010.31 in losses as a result of fraudulently lowered interest rates in four Count 4 transactions.  They are: Colorado Health Facilities (1/28/02; $78,455.31); Rhode Island Housing (3/5/02; $224,362.00); MEFA (3/5/02; $56,673.00); and the New Mexico Education Assistance Foundation (12/5/02; $13,520.00).  Although we recognize the logic of the government's argument that Peter Grimm at Trinity won these deals at rates less favorable to the issuers than they otherwise might have received, the government's approach is nonetheless deficient for purposes of a loss calculation under Section 2B1.1.

      To begin with, we note the textual sweep of Application Note 3(D) to Section 2B1.1. That provision states: "Loss shall *not* include the following: (i) Interest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, or other similar costs" (emphasis added).  The monies at issue in the four Count 4 transactions, for loss purposes, are "amounts based on an agreed-upon return or a rate of return."   The application note is plain on its face and does not conflict with the guideline.  Accordingly, it should control. See *United States* v. *Pedragh*, 225 F.3d 240, 244 (2d Cir. 2000) (application notes are "part and parcel" of the guideline they interpret); *Stinson* v. *United States*, 508 U.S. 36, 38 (1993)

("commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline").

Even if the application note did not apply, the government's calculation should be rejected because its methodology is fundamentally flawed. According to the government, the loss calculation is based on the spread between the rate at which Mr. Grimm won the award and the last rate (as reflected in the audio recordings concerning each of these transactions) provided by Mr. Grimm in the communications leading to the bid award. (See February 12, 2013 Letter from Government, Exhibit F.) That approach is wrong because it conflates *indications* with *bids* and results in a calculation that is too speculative under Sections 2B1.1 and 6A1.3.

Consider the New Mexico deal. Mr. Grimm won the award on two funds (note and acquisition) at 9 basis points less than the benchmark rate (LIBOR) applicable to the transaction. (GX-32-6.) The government argued at trial that Mr. Welty fed that number (LIBOR minus nine) to Mr. Grimm. (8/27/12 Tr. 4352.) An audio recording that was admitted into evidence reflects that the last number Mr. Grimm provided to Mr. Welty was LIBOR minus 8 for both funds. (GX-411634.) On that call, Mr. Welty states, "[T]he banker's called and wants a rough, rough, rough indication," and Mr. Grimm replies, "Say, somewhere around LIBOR less 8 for both?" *Id.* The difference of 1 basis point between Mr. Grimm's last indication and the rate at which the transaction was awarded is the basis for the government's $13,520.00 loss figure on the two funds ($789.00 on one fund and $12,731.00 on the other) – representing interest payments not received over a period of approximately ten years. (See February 12, 2013 Letter from Government, Exhibit F.)

The government's approach inaccurately assumes that Mr. Grimm's *indication* was a *bid*. The evidence at trial showed only that Mr. Grimm had provided an indication of LIBOR minus 8 until he was awarded the bid at LIBOR minus 9.  As the evidence at trial also showed, indications are non-binding estimates provided in a moving market and do not constitute a commitment that a provider will in fact submit a bid at that rate.  See 8/23/12 Tr. 3898-3900 (Ziglar); accord 8/8/12 Tr. 1654-57 (Zaino).  Numerous witnesses testified concerning market volatility.  Jeff Ziglar stated that bond prices "move[] every second[.]" (8/23/12 Tr. 3898-99.) Elwood Farber, the issuer representative in the New Mexico transaction, agreed that there is "lots of market movement and interest rate movement in connection with the treasury markets." (8/9/12 Tr. 1864.)   Doug Campbell testified that the "market moves throughout the day." (8/14/12 Tr. 2524.)  Mark Zaino recognized the same point.  (8/8/12 Tr. 1617-19.)  On an audio recording admitted into evidence at trial, Stewart Wolmark of CDR stated, "I'm watching those ticks."  (Audio GX-694936D.)  Mr. Zaino agreed that Mr. Wolmark's statement "was an example in real time of somebody watching a screen and watching the market move[.]"  (8/8/12 Tr. 1618-19.)

The basic error in the government's approach is the assumption that Mr. Grimm, if he had been the last speaker instead of Mr. Welty, would have submitted a bid at the same rate as the last indication that Mr. Grimm had provided.  Put another way, the number that Mr. Grimm would have bid instead of the number that Mr. Welty stated on the audio recording is unknown. Given the market volatility of prices that move "every second," the government's assumption is simply speculative.  Because there are not "sufficient indicia of reliability" to support the "probable accuracy" of the government's assumption concerning the indication provided by Mr. Grimm on the New Mexico deal, see U.S.S.G § 6A1.3, the government's premise concerning the

interest rate spread for purposes of the loss calculation should be rejected.  The same analysis applies equally to all of the Count 4 transactions in which Mr. Welty acted as bidding agent on behalf of UBS.  For all of the reasons stated in this subsection, therefore, the government's loss analysis concerning fraudulently lowered interest rates on Count 4 should be rejected.

      c.   <u>Swap Payments.</u>

Finally, the government argues that payments of $635,000 and $300,000 made by Trinity to UBS in an October 2001 hedging transaction that relates to the Commonwealth of Puerto Rico deal (in which Mr. Grimm won two GIC awards with Mr. Welty acting as the bidding agent in the underlying transaction), along with $140,000 in payments relating to a March 2002 hedging transaction that relates to the MEFA deal, were "kickbacks" to UBS that constitute a loss to the issuers in those deals.  For the reasons stated in the sentencing memorandum submitted on behalf of Mr. Heinz, the government has failed to show that these payments constitute losses to the issuers.  See U.S.S.G § 6A1.3 (requiring that application of a disputed sentencing factor must have "sufficient indicia of reliability to support its probable accuracy").  Even if they were, the $935,000 sum relating to the Commonwealth of Puerto Rico hedging transaction is not properly attributable to Mr. Welty in the loss calculation.  For the reasons discussed above (at 27-28), there is insufficient evidence, even by a preponderance, to show that those payments constitute "reasonably foreseeable pecuniary harm" as to Mr. Welty within the meaning of Application Note 3(A)(iv) to Section 2B1.1.

      C.    The Government Has Failed to Substantiate a Two-Level Upward
              <u>Adjustment for More Than 10 Victims Under U.S.S.G. §2B1.1(b)(2)(A))</u>

Under the Guidelines, the term "'[v]ictim' means (A) any person [which includes entities] who sustained any part of the actual loss determined under subsection (b)(1)[.]" U.S.S.G. §2B1.1, Application Note 1; accord *United States* v. *Abiodun*, 536 F.3d 162, 169 (2d

Cir. 2008) (victim enhancement must be based on actual loss calculation under Section 2B1.1)). As demonstrated above, the government has failed to show an actual loss by 10 or more persons. Accordingly, the two-level upward adjustment does not apply.

> D.      A Two-Level Upward Adjustment Under U.S.S.G. §2B1.1(b)(10)(C)
>         for Using Sophisticated Means Should Not Be Applied to Mr. Welty

The government maintains that a two-level upward adjustment for using "sophisticated means" applies to Mr. Welty under U.S.S.G. §2B1.1(b)(10)(C).   According to the draft presentence investigation report, the government argues that Mr. Welty made "efforts to conceal" fraud by "having kickback payments disguised as swap fees and by having a swap counter-party, rather than the provider, make kickback payments to the broker[.]"   (Draft PSR ¶ 105.)   As explained above (at 27-28), that description inaccurately characterizes Mr. Welty's conduct with respect to swap transactions.

That leaves the submission of false certifications as the potential basis for a "sophisticated means" adjustment as to Mr. Welty.   Application Note 8(B) to Section 2B1.1 defines "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."   Although we recognize the general breadth of the sophisticated means adjustment, the submission of false certifications does not rise to the level of "especially complex or especially intricate."   See, *e.g.*, *United States* v. *Tin Yat Chin*, 371 F.3d 31, 41-42 (2d Cir. 2004) (concluding that district court should not have imposed a two-level enhancement for "sophisticated concealment" on tax evasion counts under analogous provision in tax guideline (see § 2T1.1(b)(2), Application Note 4) allowing adjustment for "especially complex or especially intricate offense conduct in which deliberate steps are taken to make the offense, or its extent, difficult to detect").   At trial, the government *itself* emphasized the simplicity of the conduct.   (7/30/12 Tr. 378 (opening statement: "the fraud here is really quite

simple"); 8/27/12 Tr. 4366 (opening summation: "it's not that complicated"); 8/28/12 Tr. 4668

(rebuttal summation: "misrepresentations . . . are really quite simple").)   Accordingly, the

sophisticated means enhancement should be rejected as to Mr. Welty.

>   E.   A Two-Level Upward Adjustment Under U.S.S.G. §3B1.3 for
>        Abusing a Position of Private Trust Should Not Be Applied to Mr. Welty

Although we recognize the general breadth of the adjustment for abusing a position of

private trust, the government's reliance on the enhancement is unwarranted in this case.   First,

the government conceded in the CDR matter that a broker is not inherently a fiduciary.   See

*United States* v. *CDR, et al.*, No. 09-cr-1058, 2011 WL 5116745, *3 (S.D.N.Y. Oct. 21, 2011)

(Marrero, J.).   A fiduciary relationship is typically required for the enhancement to apply.

*United States* v. *Jolly*, 102 F.3d 46, 48 (2d Cir. 1996) ("in the nature of a fiduciary relationship").

That requires a fact-dependent inquiry.   As *Jolly* makes clear, the adjustment applies "only where

the defendant has abused discretionary authority entrusted to the defendant by the victim."   *Id.*;

see also Application Note 1 to Section 3B1.3 ("This adjustment, for example, applies in the case

of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's

fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise

of an examination.").

The types of contractual relationships between UBS and issuers, and the extensive

regulatory overlay governing relationships in the industry and the duties of bidding agents, see

26 C.F.R. § 1.148-5, do not involve the types of fiduciary concepts that ordinarily ground the

application of the adjustment.   See, *e.g.*, *United States v. Broderson*, 67 F.3d 452, 455-56 (2d

Cir. 1995) (holding that adjustment for abuse of trust did not apply in fraud case involving

contract with NASA that defendant negotiated for his employer).   As the court of appeals put it

in *Broderson*, "whatever 'trust' NASA placed in [defendant] was based strictly on the explicit

commands of [the applicable statutes,]" *id.* at 456, which made the enhancement inapplicable. Here, the bid specifications themselves, for instance, made the authority of the issuer clear.  See, *e.g.*, GX-8-1 (Commonwealth of Puerto Rico bid specifications stating in part: "Bids will be accepted on the escrow fund on a fixed basis.  The [issuer] reserves the right to reject bids for any reason and to waive any irregularities.").   Furthermore, the fact that issuers required detailed certifications (which were the lynchpin of the government's fraud theory) is in tension with the concept of a trust relationship.  Because a similar analysis should apply to Mr. Welty's conduct, an upward adjustment for abuse of trust should not be applied.

     F.     <u>The Government's Restitution Calculations Are Unsubstantiated.</u>

The government asserts that restitution should be ordered in the total amount of $674,298.75.  That figure is made up of four components: $343,655.01 (Hospital Authority of Forsyth County (Georgia Baptist Healthcare System, Inc.); $252,878.62 (City of Stamford); $17,765.12 (Centinela Valley Unified School District); and $60,000 (North Carolina Educational Facilities Finance Authority).  Restitution, however, is appropriate only based on *actual losses* suffered by a victim within the meaning of 18 U.S.C. §§ 3663A, 3664.  *United States* v. *Zangari*, 677 F.3d 86, 92 (2d Cir. 2012) ("There is no provision in the Guidelines or in the MVRA itself that allows the defendant's gain to be substituted for the victim's loss for purposes of calculating restitution").

The government has failed to show actual loss necessary for an order of restitution.  The Georgia Baptist number ($343,655.01) does not qualify because it represents only putative *gain* based on the government's faulty regression model.  The Stamford number ($252,878.62) does not qualify for the same reason (and, moreover, the government did not attempt to prove at trial that the Stamford transaction was corrupt).  The North Carolina Educational Facilities Finance

Authority number ($60,000), which apparently corresponds to a broker fee paid by that entity, does not qualify either because the government has failed to show that the transaction, which was not the subject of evidence at trial, was corrupt.  Moreover, broker fees do not constitute actual loss for the reasons discussed above (at 33).   And, finally, the government has failed to substantiate the Centinela Valley Unified School District number ($17,765.12).   Accordingly, no restitution order should be entered in this case.

IV.   A Guideline Sentence Would Disserve the Goals of Sentencing
        and a Substantial Variance Under Section 3553(a) Is Appropriate

As this Court has stated, it must first determine the applicable guideline range before deciding whether a guideline departure or a variance under Section 3553(a) is appropriate. *Ozsusamlar* v. *United States*, No. 09 Civ. 3501, 2010 WL 69106, *4 (S.D.N.Y., Jan. 7, 2010) (Wood, J.) (citing *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005)).  If the Court determines that some loss amount is attributable to Mr. Welty, and that the other disputed enhancements apply to him, we respectfully request that the Court decline to impose a sentence within the otherwise-applicable guideline range.  In Part A below, we discuss why the government's loss calculation overstates the seriousness of the offense and why the overlapping enhancements in the government's guideline calculation make a departure appropriate even under pre-*Booker* case law.  In Part B below, we discuss why a downward variance under Section 3553(a) is appropriate in any event under the circumstances of this case given (1) Mr. Welty's history and characteristics; (2) the nature and circumstances of the offense conduct; (3) the need to avoid unwarranted sentencing disparities; and (4) the statutory command that a sentence must be

"sufficient, but not greater than necessary" to comply with the purposes of sentencing set forth in Section 3553(a)(2).[5]

The "sufficient, but not greater than necessary" rule, which is both the fundamental and ultimate precept in the statutory scheme, is rooted in the principle of parsimony.   "All punishment which is not derived from necessity," wrote Montesquieu, "is tyrannical." Montesquieu, *Spirit of Liberty*, 19.14 (see www.constitution.org/cm/sol_19.htm).   Relying on Montesquieu, Cesare Beccaria made the same point in time to influence Enlightenment thinkers like the Framers. See Beccaria, *Of Crimes and Punishments* (1764), Chapter 2 (see www.constitution.org/cb/crim_pun.htm); Garry Wills, *Inventing America* 95 (1979) (discussing impact of Beccaria on Jefferson); David McCullough, *John Adams* 66-67 (2001) (discussing John Adams's use of Beccaria's ideas). Given that pedigree, it is not surprising that Congress saw fit to make the principle of parsimony foremost in Section 3553(a). See Richard Frase, *Punishment Purposes*, 58 Stan. L. Rev. 67, 82-83 (2005) ("Section 3553(a) begins with a statement of the parsimony principle[.] . . . [F]ederal trial and appellate courts should interpret section 3553(a) . . . subject to the overall requirement of parsimony"); *United States* v. *Jimenez-Beltre*, 440 F.3d 514, 525 n. 8 (1st Cir. 2006) ("Commentators note that this provision, which was originally part of the House sentencing reform bill and was later added to the Senate resolution and adopted in committee, 'is not just another 'factor' to be considered along with others set forth in Section 3553(a) . . . . – it sets an independent limit on the sentence a court may impose.'"). See also Norval Morris, *The Future of Imprisonment* 59-62 (1974).

---

[5]  Under 18 U.S.C. § 3553(a)(7), the Court must consider the "need to provide restitution to any victims of the offense."  For the reasons stated in Part III (F) above, the government has failed to show a basis for a restitution order in this case.

A.    The Government's Loss Calculation Overstates the Seriousness of
the Offense and Its Overlapping Guideline Calculations Are Excessive

1.  Overstated Loss.  As many courts have pointed out, "The Guidelines place undue weight on the amount of loss involved in the fraud. . . . In many cases, . . . [loss] is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence."  *United States* v. *Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (Lynch, J.).  The Sentencing Guidelines place "inordinate emphasis" on "the amount of actual or intended financial loss[.]" *United States* v. *Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) (Rakoff, J.).  An "utter travesty of justice . . . sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense."  *Id.* at 512.  See also *United States* v. *Parris*, 573 F. Supp. 2d 744, 755 (E.D.N.Y. 2008) (Block, J.) (criticizing "one-shoe-fits-all" approach of the Guidelines).

According to the government, Mr. Welty should be held responsible for $7,664,620.31 in a loss calculation under Section 2B1.1.  Even if the government's guideline calculation were correct (and it is not), it would reflect only a "fetish with abstract arithmetic."  *Adelson*, 441 F. Supp. 2d at 512.  One example suffices to illustrate the point.  The government has not claimed that the defendants in this case conspired to commit crimes by targeting high-value transactions.  To the contrary, as the draft PSR notes, the government's position is that the defendants "corrupted the bidding process *indiscriminately*."  Draft PSR ¶ 40 (emphasis added).  The government's loss calculation under Section 2B1.1, in other words, is arbitrarily related to the size of the deals and lacks any correlation with the scope of Mr. Welty's actual conduct, his intent to harm others, or his motives.  "[W]here, as here, the calculations under the guidelines have run so amok that they are patently absurd on their face," the Court should "place greater reliance on the more general considerations set forth in § 3553(a), as carefully applied to the

45

particular circumstances of the case and of the human being who will bear the consequences." *Adelson*, 441 F. Supp. 2d at 515.

2.  <u>Overlapping Enhancements.</u>  Along with the overstated loss amount, the government's guideline calculations, if accepted, would result in an excessive sentence in a second way due to the relationship of the loss, victim, sophisticated means, and abuse of position of trust enhancements.  A departure may be warranted under U.S.S.G. § 5K2.0 "when the addition of *substantially overlapping enhancements* results in a significant increase in the sentencing range minimum[.]"  *Lauersen*, 362 F.3d at 164 (emphasis in original).  "What is present to a degree not adequately considered by the Commission," *Lauersen* holds, "is the *combined effect* of the aggregation of substantially overlapping enhancements and the large increase in the sentencing range minimum at the higher end of the sentencing table."  *Id.*  (emphasis in original).

This case illustrates the point identified in *Lauersen*.  If the government's guideline calculations were deemed correct, the base offense level would be 7; the loss calculation would result in a 20-level adjustment; and three separate two-level adjustments for more than 10 victims, sophisticated means, and abuse of a position of trust would result in a total adjusted offense level of 33 and a guideline range of 135-168 months.  The last six levels result in a 98-month difference between the bottom of the range at the adjusted offense level (27) and the top of the range at the total adjusted offense level (33).  In contrast, the corresponding analysis at offense levels of, say, 8 and 14 results in a difference of 21 months.  A 77-month differential that is the result of where the calculation happens to occur within the sentencing table is not justified.

B.   A Substantial Variance Under Section 3553(a) Is Appropriate
<u>Regardless of the Otherwise-Applicable Guideline Range</u>

Whatever advisory guideline range the Court may determine applies in this case, we respectfully submit that a substantial variance from the otherwise applicable range is appropriate.

Mr. Welty's history and characteristics, the nature and circumstances of the offense conduct, and the principles of parsimonious sentencing all support that conclusion.

1.   <u>Mr. Welty's History and Characteristics.</u>

After *Booker*, a defendant's history and characteristics are again a crucial part of the sentencing determination under Section 3553(a).   See *Preacely*, 628 F.3d at 84 (Lynch, J., concurring); *United States* v. *Gupta*, No. 11 Cr. 907 (JSR), 2012 WL 5246919, *4-5 (S.D.N.Y. Oct. 24, 2012) (emphasizing centrality of a defendant's history and characteristics in the sentencing determination under Section 3553(a)).





2.   The Nature and Circumstances of the Offense Conduct.

Mr. Welty understands and respects that he will be sentenced in accordance with the jury verdict. As shown in Part II above, however, the general verdict on each of the multiple object conspiracy counts leaves a great deal to the Court's discretion at sentencing. Mr. Welty's role on the municipal reinvestment and derivatives desk was relatively simple. He bid on escrows (Counts 1 and 2) and he acted as a bidding agent on behalf of investment bankers with issuer clients who wanted to invest bond proceeds in GICs (Count 4). The trial evidence shows that he did not conduct swap transactions or hedging transactions. The trial evidence shows that he did not strike corrupt agreements with anyone in 2001. The trial evidence shows that he did not like CDR. If he was not exactly a "grunt," his work was relatively straightforward. He bought and sold securities, bid on escrows, and bid out GICs.

Could the jury have concluded that Mr. Welty joined criminal conduct that he did not initiate in order to keep his job with an employer to whom he had been loyal for 14 years? Perhaps so.   Whatever the explanation may be, the theory that he had a personal financial incentive to commit fraud overstates the evidence.   He made more money in 2003, when his personal performance was 45% of his 2002 performance, than he did in 2002.

If any of the issuers were harmed in this case, it was not the result of a lack of performance.   The issuers in the Count 1 and Count 2 transactions funded their escrows as planned.   There is no evidence that any of the parties to any of those transactions failed to perform.   With respect to Count 4, there was no evidence at trial that either Peter Grimm or the GE entity for which he worked, Trinity, failed to perform.   And, to put the Count 4 bid awards in broader perspective, it is worth noting, as discussed above (at 36-39), that the rates in every one of the Count 4 transactions Mr. Grimm won were more favorable to the issuers than the rates they would have received from every other potential provider who bid on those transactions.

3.      The Need to Avoid Unwarranted Sentencing Disparities.

Section 3553(a)(6) requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]"  18 U.S.C. § 3553(a)(6).  Although the primary purpose of Section 3553(a)(6) is to reduce unwarranted sentencing disparities nationwide, a sentencing court must be accorded deference in considering similarities and differences among co-defendants in imposing sentence as long as the factors considered by the sentencing court are applied logically to the defendant's circumstances.  See *Wills*, 476 F.3d at 109-110.

a.      Sentencing Disparity as to Other Defendants.      The Antitrust Division's longstanding investigation of the municipal bond industry has resulted in the imposition of seven

49

sentences to date.   In *United States* v. *Carollo, et al.*, No. 1:10-cr-00654-HB, Judge Baer

sentenced Dominic Carollo to a 36-month term of imprisonment, Steve Goldberg to a 48-month

term, and Peter Grimm to a 36-month term.  (Dkts. 265, 274, 275.)  All of those individuals were

convicted after a jury trial.   One of the counts on which Mr. Grimm was convicted was

substantially identical to Count 4 in this case.  On January 3, 2013, Judge Baer sentenced Adrian

Scott-Jones (a cooperating witness who lied on the witness stand and did not receive a

substantial assistance motion) to an 18-month term of imprisonment.   *United States* v. *Scott-

Jones*, No. 1:10-cr-00794-HB, Dkt. 21.   On April 11, 2013, Judge Baer sentenced three more

cooperating witnesses (Evan Zarefsky, Matthew Rothman, and Stewart Wolmark).   Judge Baer

sentenced Mr. Wolmark to an 18-month term of imprisonment and a $500,000 fine.

We respectfully submit that a term of imprisonment substantially lower than the sentence

imposed on Messrs. Carollo and Grimm would advance the goal of avoiding unwarranted

sentencing disparities.  According to the government, Mr. Grimm's conduct resulted in harm to

134 victims.  (*Carollo* Sent. Mem, Dkt. 261, at 11.)  That is nearly four times the number that the

government *itself* attributes to Mr. Welty.  The evidence at the *Carollo* trial (including the subset

of evidence corresponding to Count 4 in Mr. Welty's trial) showed that Mr. Grimm was involved

both in the bidding process for GICs and in swaps and hedging transactions.   Mr. Welty's

relative involvement in swaps and hedging transactions, in contrast, was minimal at best.

Finally, the government maintained at the *Carollo* trial that an audio recording showed Mr.

Grimm urging a counterpart to call him on an unrecorded line.  (*Carollo* 5/7/12 Tr. 2986-87.)

The evidence at trial does not show that Mr. Welty used cell phones to avoid being recorded.  To

the contrary, the evidence at Mr. Welty's trial shows that he conducted his business openly on

the desk, and that other UBS employees, as Mr. Ziglar testified (8/23/12 Tr. 3894), listened in on calls in which Mr. Welty participated.

Although Mr. Wolmark was a cooperator, and in that sense is categorically different from Mr. Welty, the almost astounding pervasiveness of Mr. Wolmark's criminal activity also merits consideration in a Section 3553(a)(6) inquiry. As David Rubin testified, Mr. Wolmark was his right-hand man at CDR from the outset. (8/17/12 Tr. 3191-92, 8/20/12 Tr. 3310.) During the *Carollo* trial, Mr. Wolmark testified that they shared a single office. (*Carollo* 4/20/12 Tr. 1295, 1297.) Mr. Rubin testified that he first started cheating municipalities as far back as the mid-1980s. (8/20/12 Tr. 3319-20.) Mr. Rubin also testified that Mr. Wolmark assisted him in connection with various acts of political corruption and graft. (8/20/12 Tr. 3338-39, 3346-49, 3350-55.) As if that were not enough, Mr. Wolmark testified at the *Carollo* trial that he took approximately $1.5 million worth of improper tax deductions over a period of eight or nine years and that he submitted false documents to the IRS. (4/23/12 *Carollo* Tr. 1307-10, 1442-61, 1465.) Mr. Welty, in contrast, was not shown to have engaged in any criminal activity before the time period charged in the indictment, and Mr. Wolmark himself told the government that Mr. Welty did not *like* CDR. See above at 29.

In certain ways, the sheer scope of Messrs. Rubin and Wolmark's conduct, given their widespread role in the corruption of the municipal bond industry, is analogous to the conduct of Andrew Fastow in the Enron scandal. Mr. Fastow cooperated and was ultimately sentenced to a six-year term of imprisonment after originally agreeing to a 10-year term in a binding plea agreement that was accepted by the court. (*United States* v. *Fastow,* No. 4:02-cr-0665 (S.D. Tex.), Dkts. 129, 203.) Others who went to trial (including Daniel Bayly, the former global head of investment banking at Merrill Lynch whose conviction was eventually reversed), received

sentences of 30-37 months.  See, *e.g.*, *United States* v. *Bayly, et al.*, No. 4:03-cr-00363 (S.D.

Tex.), Dkts. 779, 816, 817.  Their conduct in comparison with Mr. Fastow's, like Mr. Welty's in

comparison with Mr. Wolmark's, occurred within a far narrower scope.

For all of these reasons, we ask the Court to impose sentence in a way that avoids

unwarranted disparities with other defendants.  Cf. *United States* v. *Gordon*, No. 03CR1115-03

(RWS), 2006 WL 1675921, *3-4 (S.D.N.Y. June 16, 2006) (imposing 37-month, non-guideline

sentence on defendant in fraud case where a more culpable co-defendant had been sentenced to a

46-month term and a similarly situated defendant had been sentenced to a 37-month term).

b.    Avoiding Unwarranted Nationwide Sentencing Disparities.  From a statistical

perspective, the government's guideline calculations in this case are dramatically out of line with

a decade of sentences secured by the Antitrust Division.  According to the Antitrust Division's

own Workload Statistics for Fiscal Years 2002-2011, 339 persons were sentenced from 2002-

2011.  See http://www.justice.gov/atr/public/workload-statistics.html (site last visited April 22,

2013).   One hundred and ten of those defendants (32%) were not sentenced to terms of

incarceration.  *Id.*  The average sentence for the remaining 229 defendants was 1.97 years.  *Id.*

The Federal Sentencing Commission's 2012 Sourcebook of Federal Sentencing Statistics (at

Table 13) shows a 14-month median sentence in 20 antitrust cases for fiscal year 2012.  See

http://www.ussc.gov/Data_and_Statistics/Annual_Reports_and_Sourcebooks/2012/Table13.pdf

(site last visited April 22, 2013).  We recognize that aggregate statistics do not reflect particular

similarities and differences among defendants in different prosecutions and that they are of

limited utility in a given sentencing proceeding for purposes of a sentencing disparity analysis

under Section 3553(a)(6).  *Wills*, 476 F.3d at 110.  At the same time, however, Section

3553(a)(6) operates independently from Section 3553(a)(4), *id.*, and the statistical information

we have presented properly bears on the sentencing process.  See, *e.g.*, *United States* v. *Stock*, 685 F.3d 621, 629 n. 6 (6th Cir. 2012) (noting relevance of the Sentencing Commission's statistics as a "starting point" for district judges seeking to avoid sentencing disparities under Section 3553(a)(6)).

    4.    The "Parsimony" Provision In Section 3553(a)
           Would Be Well-Served By a Substantial Variance

Section 3553(a) specifically requires that the Court impose the least punitive sentence necessary to comply with specified sentencing goals: deterrence, incapacitation; deterrence; rehabilitation; and the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment.  A substantial variance from the otherwise-applicable guideline range would be fully consistent with all of those goals.

    a.    A Lengthy Prison Sentence Is Unnecessary to Achieve Deterrence

Under Section 3553(a)(2)(B), a sentencing court must consider the goals of specific deterrence and general deterrence.  See, *e.g.*, *United States* v. *Amer*, 110 F. 3d 873, 883 (2d Cir. 1997).  The former concept concerns Mr. Welty in particular.  The latter one concerns the public in general.  A substantial term of incarceration is not necessary to advance either goal.

    (i)    Specific Deterrence.  A term of imprisonment is not necessary to deter Mr. Welty from committing a crime in the future. ███████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ See, *e.g.*, *United States* v. *Hernandez*, No. 03CR1257 (RWS), 2005 WL 1242344, *6 (S.D.N.Y. May 24, 2005)

(imposing non-guideline sentence given low probability of recidivism and need for ongoing medical treatment).

(ii)    General Deterrence.   Similarly, a substantial prison sentence is not necessary to advance the goal of general deterrence.   The government's investigation of the municipal bond industry, including this particular prosecution, has been covered extensively in trade publications, mainstream media, other publications, and blogs.   See, *e.g.*, R. Slavin, "Muni World Comments on Guilty Verdicts in UBS Bid-Rigging Case," *The Bond Buyer*, Aug. 31, 2012, *available at* http://www.bondbuyer.com; "3 Ex-UBS Bankers Found Guilty of Rigging Bids," *The New York Times*, Aug. 31, 2012, *available at* http://www.nytimes.com; M. Braun and B. Van Voris, "Ex-UBS Executives Go To Trial in Bond Bid-Rigging Case*, Bloomberg*, July 30, 2012, *available at* http://www.bloomberg.com; M. Taibbi, "The Scam Wall Street Learned From the Mafia," *Rolling Stone*, June 21, 2012, *available at* http://www.rollingstone.com; R. Verdi, "More UBS Indictments in Muni-Bond Scandal," *The 46 Blog* (Dec. 9, 2010, 8:55 p.m.), *available at* http://www.46in08.blogspot.com.   The actors in the financial industry know what the government has achieved.   The desired general deterrent effect at least in part already has occurred.   Moreover, as other courts have identified, the fact of a prison sentence, not the length of it, creates the core general deterrent effect in the context of financial crimes.   See, e.g., *Adelson*, 441 F. Supp. 2d at 514 ("considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders" (citations omitted)); accord *United States v. Thurston,* 456 F.3d 211, 215 (1st Cir. 2006) (quoting statement by district court that "the most significant decision in sending a message to potential white collar criminals is the decision to send the defendant to prison. It's not so much the amount of time, it's whether you go away."); *United States* v. *Gardellini*, 545 F.3d 1089, 1091, 1095 (D.C. Cir. 2008)

54

(affirming downward variance and noting district court's determination that tax evaders, along with adverse media coverage, are "really deter[rred]" by the "efforts of prosecutors . . . in vigorously enforcing the laws").

      b.       <u>Incapacitation of Mr. Welty Is Not Necessary to Protect the Public</u>

Under Section 3553(a)(2)(C), a sentencing court must determine the need to "protect the public from further crimes of the defendant[.]"   See *Wills*, 476 F.3d at 107-08.   Section 3553(a)(2)(C) implements the penological concept of "incapacitation (physically preventing the defendant from committing crimes on 'the outside,' by imprisoning him)[.]"   See *United States* v. *Kubeczko*, 660 F.3d 260, 262 (7th Cir. 2011); accord *United States* v. *Pugh*, 515 F.3d 1179, 1201 (11th Cir. 2008); see also *Rita*, 551 U.S. at 347-48.   There is no information before the Court to suggest that Mr. Welty will commit crimes in the future or that incapacitation is necessary to protect the public.

      c.       <u>Seriousness of the Offense; Promoting Respect</u>
                   <u>for the Law; and Just Punishment for the Offense</u>

The remaining portion of the congressional command is the provision in Section 3553(a)(2)(A) that requires to Court to impose the most parsimonious possible sentence consistent with the seriousness of the offense, the need to promote respect for the law, and the need to provide just punishment.

In an absolute sense, the offenses of conviction are serious.   We respect the government's enforcement goal of eradicating corruption.   At the same time, it is important to consider the offenses of conviction relative to other types of financial fraud that have resulted in harm.   The parties to the transactions performed their obligations.   The tax-exempt status of the issuers' bonds remains in place.   And the public continues to benefit from the many projects that the bonds have funded.

We recognize fully that the Court must impose a sentence that promotes respect for the law. Especially given the nature of the government's ongoing investigation of the municipal bond industry, and the sentences that Judge Baer already has imposed, this is an unusual case. We do not presume to suggest how the Court should promote respect for the law. That having been said, we respectfully submit that a sentence substantially below the otherwise applicable guideline range would promote respect for the law under all the circumstances of this case.

The need to provide just punishment is the final factor. In a sense, this factor is a restatement and an encapsulation of the other sentencing factors we have discussed above. ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Before imposing sentence, we ask the Court to consider that information along with the many other factors that we have discussed in this sentencing memorandum.

## CONCLUSION

For the reasons stated above, and for any other reason that the Court may deem just and proper, defendant Michael D. Welty respectfully requests that the Court impose the least punitive sentence that the Court deems is "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)" of 18 U.S.C. § 3553(a).

Respectfully submitted,

Gregory L. Poe (admitted *pro hac vice*)
Preston Burton (admitted *pro hac vice*)
Rachel S. Li Wai Suen (RS-1145)
Poe & Burton PLLC
The Executive Building
1030 15th Street, N.W., Suite 580 West
Washington, D.C. 20005
(202) 583-2500

*Counsel for Michael D. Welty*

Dated: April 24, 2013

## CERTIFICATE OF SERVICE

I hereby certify that, on April 24, 2013, I caused true and correct copies of the foregoing Sentencing Memorandum on Behalf of Michael D. Welty and Addendum to be served via electronic mail and hand delivery on counsel for the government as follows:

Kalina M. Tulley
John W. Van Lonkhuyzen
Jennifer M. Dixton
United States Department of Justice
Antitrust Division
26 Federal Plaza, Suite 3630
New York, NY 10278

Rachel S. Li Wai Suen
Poe & Burton PLLC
The Executive Building
1030 15th Street, N.W., Suite 580 West
Washington, D.C. 20005
(202) 583-2500

*Counsel for Michael D. Welty*