UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    vs.

PETER GHAVAMI
GARY HEINZ
MICHAEL WELTY,

      Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

:
:
:
:
:  No. 10 Cr. 1217 (KMW)
:
:
:
:
:

**REPLY MEMORANDUM IN AID OF SENTENCING**
**SUBMITTED ON BEHALF OF MICHAEL D. WELTY**

Gregory L. Poe
Preston Burton
Rachel S. Li Wai Suen
Poe & Burton PLLC
The Executive Building
1030 15th Street, N.W., Suite 580 West
Washington, D.C. 20005
(202) 583-2500

*Counsel for Michael D. Welty*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...........................................................................................................1

DISCUSSION ...............................................................................................................2

I.     Mr. Welty's History and Characteristics Support a Lenient Sentence ..................2

II.    The Nature and Circumstances of the Offense
Support a Lenient Sentence for Mr. Welty ...........................................................4

    A.    Overview..........................................................................................................4

    B.    The Government's Guideline Calculations Are Inaccurate ....................10

        1.    Gain (Counts 1 and 2).....................................................................10

        2.    Broker Fees (Counts 2 and 4) .........................................................11

        3.    "Fraudulently Lowered Interest Rates" (Count 4)..........................14

        4.    Swaps/Kickbacks (Counts 2 and 4) ...............................................14

        5.    Overstated Loss/Overlapping Enhancements ...............................15

III.    A Lengthy Prison Sentence Would Create Unwarranted Disparities,
Would Not Promote Respect for the Law or Provide Just
Punishment, and Would Not Advance the Goal of General Deterrence..............16

    A.    Unwarranted Disparities, Respect for the Law, and Just Punishment .......16

    B.    General Deterrence................................................................................18

IV.    The Government's Restitution Argument is Incorrect ..........................................19

CONCLUSION.............................................................................................................20

i

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**                                                                                                    **Page**

*Pepper* v. *United States*, __ U.S. __, 131 S. Ct. 1229 (2011).........................................................4

*United States* v. *Bryson*, 229 F.3d 425 (2d Cir. 2000)...................................................................4

*United States* v. *Canova*, 412 F.3d 331 (2d Cir. 2005),
    *appeal after remand*, 485 F.3d 674 (2d Cir. 2007)...........................................................11, 12

*United States* v. *Della Rose*, 435 F.3d 735 (7th Cir. 2006) .......................................................2, 3

*United States* v. *Lauersen*, 362 F.3d 160 (2d Cir. 2004),
    *vacated on other grounds*, 542 U.S. 1097 (2005)..................................................................15

*United States* v. *Marino*, 654 F.3d 310 (2d Cir. 2011) ..............................................................19

*United States* v. *Nucci*, 364 F.3d 419 (2d Cir. 2004) ................................................................20

*United States* v. *Regensberg*, 635 F. Supp. 2d 306 (S.D.N.Y. 2009) .......................................3, 4

*United States* v. *Stock*, 685 F.3d 621 (6th Cir. 2012) ................................................................17


**Statutes and Guidelines**

18 U.S.C. § 3553(a) ...............................................................................................*passim*

18 U.S.C. § 3664(h) ..................................................................................................19-20

U.S.S.G. § 1B1.3 ......................................................................................................8, 15

U.S.S.G. § 2B1.1.......................................................................................................*passim*

U.S.S.G. § 6A1.3 .........................................................................................................11


**Miscellaneous**

Department of Justice, Antitrust Division,
    Workload Statistics for Fiscal Years 2002-2011, *available at*
    http://www.justice.gov/atr/public/workload-statistics.html
    (site last visited May 14, 2013).................................................................................18

**REPLY MEMORANDUM IN AID OF SENTENCING**
**SUBMITTED ON BEHALF OF MICHAEL D. WELTY**

The government's remarkable assertion that Mr. Welty should be sentenced to at least 135 months in prison is utterly disconnected from the information before the Court.  In two short paragraphs, the government brushes aside Mr. Welty's history and characteristics, which lie at the heart of the sentencing determination, by asserting that Mr. Welty is indistinguishable from the "typical white collar defendant" (Gov't Mem. 79-80).  Mr. Welty's life outside of the offense conduct, the government tells the Court in substance, is nothing more than a fungible commodity.  That claim is both legally wrong (as the government's disfigurement of two cases demonstrates) and factually unsupported.

The government's argument concerning the nature and circumstances of the offense conduct is just as flawed.  The government mischaracterizes some evidence as to Mr. Welty, fails to address his conduct individually at various points in its brief, and ignores important facts that show his circumscribed role in the offense conduct.  And the government does not even *engage* our argument that its flawed loss calculation, even if it were correct, severely overstates Mr. Welty's culpability and is arbitrarily related to Mr. Welty's motives, intent to harm, and relative culpability.

The government's unusual sentencing zeal is apparently driven by a desire to use Mr. Welty as a vehicle for an anticorruption message regardless of his humanity and the facts.  What other motive could possibly explain the government's position (Gov't Mem. 81) that Mr. Welty's conduct was "far more egregious" than the defendants' conduct in the *Carollo* case?  According to the government, Steve Goldberg harmed almost nine times more issuers than Mr. Welty did (even taking the government's flawed argument in this case concerning victims as true) and Messrs. Grimm and Carollo each harmed more than five times as many.   The

1

expediency is palpable.  How is it that Mr. Welty has gone from a "grunt" in the government's eyes in December 2007 to a man deserving punishment in 2013 roughly four times as severe as Messrs. Carollo and Grimm received and three times as severe as even *Steve Goldberg* received? Although the government cites the Section 3553(a) factors in a footnote (Gov't Mem. 76 n. 26), *it does not once explain in its 87-page brief* how a sentence of at least 135 months would "promote respect for the law" and "provide just punishment for the offense" or how such a sentence would be "not greater than necessary" to meet those sentencing goals.  That silence, perhaps as much as anything else, exposes the government's contrived sentencing enterprise in this case.

**DISCUSSION**

I.   Mr. Welty's History and Characteristics Support a Lenient Sentence.

As we showed in our opening memorandum, Mr. Welty's life is defined by his love for and loyalty to family and friends, his empathy for strangers, and his extensive charitable works. Mr. Welty's entire professional history at PaineWebber (later UBS) from 1987 to 2001, and after he left UBS from 2005-2010, is entirely consistent with his personal life and stands apart from the time period charged in the indictment.

The government says almost nothing about Mr. Welty's history and characteristics. Instead, it claims that characterizing the period of the offense conduct as isolated from Mr. Welty's otherwise exemplary life is "demonstrably absurd."  Gov't Mem. 79.  That assertion as to Mr. Welty is unsubstantiated and reflects nothing more than the government's failure to treat him as an individual.  To the same effect, the government says that Mr. Welty's "personal attributes, if true, fail to distinguish [him] from the typical white collar defendant."  Gov't Mem. 79.  Whatever that may mean, the cases cited by the government (at 79) – *United States* v. *Della*

*Rose*, 435 F.3d 735, 738 (7th Cir. 2006), and *United States* v. *Regensberg*, 635 F. Supp. 2d 306, 308 (S.D.N.Y. 2009) (Marrero, J.) – actually *contradict* its claim.

In *Della Rose*, the Seventh Circuit held only that a defendant's sentence was reasonable and that no plain error occurred at his sentencing hearing. 435 F.3d at 736. What the court said in reaching its holding, however, is notable because it undermines the government's reliance on the case. The court identified (as we pointed out in our opening memorandum at 2-3, 47) that a defendant's "personal characteristics" and the "nature and circumstances of his offense" have "taken on greater import in the wake of *Booker*." *Id.* More specifically, the court stated that a "sentencing judge surely may elect to treat a defendant's contributions to his community as evidence of his redeeming qualities and as a ground for a less severe sentence[.]" *Id.* at 738. So *Della Rose* stands squarely in opposition to the government's argument.

The government's citation to Judge Victor Marrero's decision in *Regensberg* also fails to support its claim. The defendant in *Regensberg* was found guilty after a jury trial of seven counts of securities fraud and wire fraud. 635 F. Supp. 2d at 312-13. Judge Marrero specifically distinguished Judge Rakoff's decision in *United States* v. *Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) (a case ignored by the government), because Regensberg "acted alone, conceiving of and perpetuating the entire scheme from beginning to end. Further, his victims were not faceless stockholders but the closest of friends and associates who relied on that personal history" in giving him their money. 635 F. Supp. 2d at 313. The court rejected Regensberg's motion for departure based on an asserted pathological gambling addiction, *id.* at 312, and it was in *that* context that Judge Marrero made a comparison to a certain putative class of white collar defendants where a "key aspect of the evidence proffered in mitigation consists of medical records and psychological evaluations attesting that the defendant's criminal conduct, so

3

at odds with an upright character, was driven by some recently diagnosed mental disorder, or ungovernable impulse, or other unknown inner or outer demon he could not conquer that made him do it." *Id.* at 308.  That is far afield from the facts before this Court.

The government's cynical treatment of Mr. Welty's history and characteristics is especially disappointing because it is at odds with the Supreme Court's commands.  As Justice Sotomayor wrote for the Court in *Pepper* v. *United States*, __ U.S. __, 131 S. Ct. 1229, 1239-40 (2011): "'It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue'" (quoting *Koon* v. *United States*, 518 U.S. 81, 113 (1996)).  "Underlying this tradition," the Court continued, "is the principle that 'the punishment should fit the offender and not merely the crime.'"  *Id.* (quoting *Williams* v. *New York*, 337 U.S. 241, 247 (1949)).  See also *United States* v. *Bryson*, 229 F.3d 425, 426 (2d Cir. 2000) ("[A] court's duty is always to sentence the defendant as he stands before the court on the day of sentencing").  The government's effort to erase Mr. Welty's history and characteristics should be rejected.

II.    The Nature and Circumstances of the Offense
       Support a Lenient Sentence for Mr. Welty.

We first address various aspects of the government's sentencing memorandum that characterize the nature and circumstances of the offense with respect to Mr. Welty.  We then address the government's guideline calculations in particular.

A.    Overview.  The government does not take issue with how we have described the fundamental aspects of Mr. Welty's role in the offense conduct or the effect of the offense conduct.  As we have shown (Opening Mem. 29), Mr. Welty did not like CDR, and the information before the Court shows that he did not deal directly with CDR personnel before

2002; there is no evidence that he was aware of any illegal agreement with CDR in 2001; he did not participate in meetings with David Rubin and others in 2001 that the government characterizes as essential to the criminal activity; he had no dealings with J.P. Morgan employees such as Alex Wright and Jim Hertz; he was acquitted on Count 3 (Mass I); and the evidence does not show that he had meaningful dealings with Doug Campbell apart from two transactions (Rhode Island Tobacco and Anchorage) involved in Count 1.  Nor does the government contest our points (Opening Mem. 55-56) that the parties to the transactions performed their obligations, the tax-exempt status of the issuers' bonds remains in place, and the public continues to benefit from the projects funded by those bonds.

The government often fails to treat Mr. Welty as an individual in the context of the offense conduct, instead referring repeatedly to "defendants" despite Mr. Welty's absence from a range of conduct emphasized by the government.  Gov't Mem. 81-83.  To the same end, the government states that "almost from the inception of their business, Defendants embraced a culture of corruption."  Gov't Mem. 2.  That inaccurately describes Mr. Welty's conduct.  The inception of *Mr. Welty's* business at PaineWebber was in 1987.  He worked on the municipal reinvestment desk at PaineWebber long before the UBS merger.  The information before the Court, including the many letters from his former PaineWebber colleagues, shows that he performed his job well and honorably in the 14 years before the period of the offense conduct.

The government inaccurately characterizes various evidence with respect to Mr. Welty concerning Counts 1, 2, and 4.  Regarding Count 1, the government repeats its claim that an illegal agreement between UBS and Bank of America (BOA) on the Rhode Island Tobacco transaction in Count 1 resulted in UBS making a $725,000 profit and BOA making a $700,000 profit, and states that "but for the agreement, either BOA or UBS, but not both, would have won

the trade and earned a profit." Gov't Mem. 21. But the securities that BOA sold to UBS on which BOA made its profit had great value for the issuer and were necessary to fund the escrow. The evidence does not show that the issuer paid an inflated price for the securities that UBS bought from BOA to fund to escrow. And if BOA had not sold the securities to UBS, then UBS would have needed to purchase securities from another source such as HSBC to fund the escrow. Opening Mem. 24. The evidence at trial shows that Mr. Campbell's colleague at BOA, Jay Saunders, chose not to bid on the transaction because BOA might lose the opportunity to make any profit at all if it bid and lost and did not act as a source of securities for the escrow. See GX-143553 (6/20/02 call between Campbell and Saunders).

In a similar vein, the government simply assumes without support that the Rhode Island Tobacco transaction was consummated in negative arbitrage because of fraud and that the issuer would have won at the yield cap under the Treasury regulations and made more money if BOA had been a bidder. Gov't Mem. 35-36. That assumption ignores the evidence from the government's own witnesses showing that the interest rate environment in June 2002 and the relatively risky nature of tobacco bonds led to the deals being consummated well below the yield cap. See Tr. 1596 (Zaino), 2063 (Wright), 2820 (Gallogly); see also 3862-63 (Ziglar). The fact that the other bids on the transaction were so close to UBS's bid bears out those points. See GX-24-19 (bid results).

The government also makes serious errors concerning the Anchorage transaction. First, the government asserts that Mr. Welty "obtained [Doug] Campbell's agreement not to bid" on the Anchorage transaction[.]" Gov't Mem. 13. In fact, Mr. Campbell did submit bids on both the Series A and Series B transactions in the Anchorage deal (which he and Mr. Zaino characterized as intentionally losing bids). See GX-22-13 (Campbell bid form for Anchorage,

Series A); GX-22-17 (Campbell bid form for Anchorage, Series B).   Second, and even more important for the loss calculation issue, the government claims that the issuer in the Anchorage transaction was somehow shortchanged by UBS's winning bid above the perfect escrow cost. Gov't Mem. 36.   The government ignores the fact that Series A in the Anchorage transaction *was* won by UBS at the perfect escrow cost.   See GX-22-3 (Series A request for bids, specifying the perfect escrow cost); DX-W-6-11 (Series A bid results).   If the government is referring to Series B, UBS did in fact bid and win the award above the perfect escrow cost.   But the other Series B bids, including bids for which the evidence does not support an allegation of corruption, were even further away from the perfect escrow cost.   See GX-22-6 (request for bids for Series B, specifying the perfect escrow cost); GX-22-21 (Series B bid results).   The difference between the bids and the perfect escrow cost on the Anchorage Series B deal is, again, explained by the interest rate environment in June 2002.   The government proves this point in its *own sentencing memorandum*: "[I]t is not always possible for a provider to bid the perfect cost on an escrow; 'it really depends on where the interest rate markets are relative to one another.'" Gov't Memo. at 35 (quoting testimony on direct examination of Alex Wright (Tr. 2063)).   The government's arguments are speculative under U.S.S.G. §2B1.1 and should be rejected.

   With respect to Count 2, the government asserts that CDR became a broker for deals on which Mr. Welty bid in return for "intentionally losing bids" (Gov't Mem. 13-14) and "in exchange for kickbacks" *Id*.   There is no information before the Court, and the government presented no evidence at trial, that Mr. Welty submitted an intentionally losing bid to anyone. Nor is there any information before the Court showing that Mr. Welty participated in any kickback arrangements with CDR.

Reaching for ways to claim that Mr. Welty is responsible for "total losses in each count" (Gov't Mem. 15), the government misstates the evidence concerning Mr. Welty's knowledge of swap transactions relating to Counts 2 and 4. As we have pointed out (Opening Mem. 27-28, 39), the government has not identified evidence showing that Mr. Welty was even *aware* of the swap transaction relating to the October 2001 Commonwealth of Puerto Rico deal (or the associated $200,000 payment that the government claims is related to Count 2). That remains the case. Instead, the government inaccurately attempts to hold Mr. Welty responsible for those Commonwealth of Puerto Rico-related payments (totaling $1.135 million) based on Mr. Welty's *later* knowledge (in 2002) of other Count 4-related swaps. Gov't Mem. 50-51. Of course, the reasonable foreseeability standard under U.S.S.G. §§ 1B1.3 and 2B1.1 does not work in retrospect.

With respect to the FSA swaps that the government states are related to Count 2, the government concedes that Mr. Welty was not involved in them (see, *e.g.*, Tr. 4374), but asserts (Gov't Mem. 14, 52, 62) that Mr. Welty should be held responsible for them because he "was told about the payments to CDR on the FSA-UBS swaps and was told that the payments were for CDR steering the deals to FSA." *Id.* at 14. For that proposition, the government relies on highly generalized testimony by Mr. Zaino (Tr. 1027-31) that he told Mr. Welty about the payments in a late 2001-2003 time frame. Mr. Zaino was not able to recall any specific conversation with Mr. Welty. Tr. 1026-27.

Finally, with respect to Count 4, the government characterizes the Corona-Norco transaction as corrupt and goes so far as to assert that our argument to the contrary is "frivolous." Gov't Mem. 48. But the evidence shows that the Corona-Norco transaction complied with the three-disinterested-bidder requirement of the Treasury regulations, and there is nothing to

suggest that any of those three bidders, including the winner, was involved in corrupt activity in the transaction.  To be sure, Mr. Grimm submitted an intentionally losing fourth bid, but the government has not shown how that conduct by itself constitutes wrongdoing in the context of the transaction.

Although financial motive is an important factor in assessing the nature and circumstances of the offense and a defendant's culpability, the government simply ignores the information showing that Mr. Welty's financial motive to engage in the offense conduct was (at most) highly attenuated.   See Opening Mem. 28 (describing Jeffrey Ziglar's testimony concerning compensation factors and the fact Mr. Welty's compensation in 2003 exceeded his compensation in 2002 despite his personal performance decreasing by 45%).   Instead, the government asserts without citation that the "common link among [the offenses of conviction] was their purpose – to increase profits on their desk and, consequently, their own profits.  Simply put, Defendants' crimes were the product of greed and arrogance."  Gov't Mem. 2.  To the same effect, the government's claim (at 7) that defendants "corrupted the bidding process indiscriminately" is in tension with the government's financial motive argument because many of the transactions that the government claims were corrupt involved small dollar amounts.  (That assertion also shows why the government's loss calculation is arbitrarily related to Mr. Welty's intent to harm, his motives, and his relative culpability.   Opening Mem. 45-46; see below at 15.)  The government's attempt to ascribe an acute financial motive to Mr. Welty does not square with the information before the Court.

Despite Mr. Welty's acquittal on Count 3 (the Mass I transaction), the government continues to attempt to tarnish Mr. Welty with the conversation that occurred in November 2006 at the so-called Thanksgiving lunch.  Gov't Mem. 83.  According to the government, "Welty

informed Heinz and Zaino how he had told the lawyers in the earlier investigation that he couldn't remember anything – remarking that 'they can't make you recall'" (Gov't Mem. 83, citing Tr. 1273 (Zaino)), and that the comment shows Mr. Welty's "intent and consciousness of guilt" in committing the offense conduct. *Id.* Mr. Zaino, however, *did not testify* that Mr. Welty stated "he couldn't remember anything." He testified that Mr. Welty "told some stories about that [yield-burning] investigation [in the mid-1990s] and what had occurred, and that he said many times he had responded that he couldn't recall to the questions asked." Tr. 1273-74. The government ignores the fact that Mr. Welty was never accused of wrongdoing by the Department of Justice, the SEC, or any other agency in connection with the yield-burning investigation. The government's claim is also flatly inconsistent with the letters from Mr. Welty's PaineWebber co-workers in the 1990s such as Fred Bailey (who was Mr. Welty's supervisor at the time) and Stacey Mitchell Kane concerning Mr. Welty's conduct at the time. But the government ignores that information too. What is more, the government fails to mention that Mr. Zaino's personal anxiety drove the November 2006 conversation (Tr. 1665 (Zaino)) and that Mr. Welty informed him that Mr. Zaino did not need to worry unless Mr. Zaino's interests diverged from UBS's interests. *Id.* at 1666 (Zaino). A comment concerning divergence of interests between UBS and Mr. Zaino would make no sense if Mr. Welty had the criminal mental state in November 2006 that the government wrongly persists in attempting to impute to him.

B.  The Government's Guideline Calculations Are Inaccurate.  The government's sentencing memorandum fails to support its assertion that the loss amount attributable to Mr. Welty for purposes of Section 2B1.1 is $7,664,620.31 and that an adjustment for more than 10 victims is appropriate under Section 2B1.1. We have acknowledged the argument in favor of the abuse of private trust and sophisticated means adjustments. Opening Mem. 40-42. But the fact

that the government devotes 13 pages of its memorandum to those issues itself shows that the answer is not simple.  And the government's lengthy treatment of those two issues, even if it is correct, underscores why a substantial variance under Section 3553(a) is justified for the reasons we have discussed in our opening memorandum and in Part II(A) above.

1.   <u>Gain (Counts 1 and 2)</u>.  The government now asserts for the first time (at 1, 17, 34, 53) that the United States Treasury suffered an (undetermined) economic loss on perfect escrow transactions and that the ostensible gain in those transactions with *issuers* based on a regression analysis should be substituted in the loss calculation.  The argument that the Treasury Department suffered loss is speculative.   What is more, the injection of a triangular theory involving the Treasury Department at this late stage simply highlights the shifting nature of the government's effort to make the loss numbers as high as possible.  And even if the government's loss argument were not speculative, gain is not a proper substitute in the loss calculation because the government's regression analysis fails to meet the proof standard in U.S.S.G. §6A1.3 for the reasons stated in the memoranda submitted by counsel for Mr. Ghavami.  (Mr. Welty adopts all sentencing arguments made on behalf of Messrs. Ghavami and Heinz to the extent that they apply to him.)

2.   <u>Broker Fees (Counts 2 and 4)</u>.  The government's argument concerning broker fees is that they constitute loss within the meaning of the guidelines because issuers did not receive the *bona fide* bidding process they bargained for.  Gov't Mem. 26, 37, 44-47.   The government does not contend that the issuers failed to fund their escrows or failed to receive payments on their guaranteed investment contracts (GICs). To the contrary, the government has not pointed to any performance-related defects in the transactions that implicate the payment of

broker (or bidding agent) fees.  The government concedes that issuers received services.  *Id.* at 45.

In arguing that broker fees constitute loss because the issuers did not get the benefit of the bargain (*i.e.*, a *bona fide* bidding process), the government relies on *United States* v. *Canova*, 412 F.3d 331 (2d Cir. 2005), *appeal after remand*, 485 F.3d 674 (2d Cir. 2007).  Gov't Mem. 26, 44-45.  Far from supporting the government's argument, however, the decision in *Canova* shows why the government is wrong.  In *Canova*, an officer of a medical company that conducted pacemaker testing requirements was convicted of defrauding the United States because the company submitted documents in connection with payment requests falsely stating that it had complied with certain testing requirements under a contract between Medicare and the company. 412 F.3d at 335-37.  The court concluded that an *intended loss* had been shown within the meaning of Section 2B1.1 because the government was entitled to recoup from defendant's company the "full payment for any pacemaker tests not performed according to Medicare specifications." *Id.* at 354-55.  The court of appeals recognized that the government suffered no clinical loss and the defendant produced evidence that the tests that actually had been conducted were as clinically sound as the tests required by Medicare.  412 F.3d at 352; see 485 F.3d at 677-78 & n.3.

For several reasons, *Canova* cuts against the government's position.  First, the intended loss analysis in *Canova* does not even *apply* here because the government contends only that the payment of broker fees constitutes actual loss.  The government has never made an intended loss argument concerning broker fees in this case (nor could it).  Second, *Canova* shows why the broker fees do not constitute actual loss.  Citing Application Note 8(c) to Section 2B1.1, the court of appeals recognized that a "victim's loss in a substitute goods or services case" does not

12

"necessarily equal[] the full contract price paid."   412 F.3d at 353; see 485 F.3d at 679 n.3.   The

government (perhaps unwittingly) concedes that point: "While the municipalities may have

received some services, the only way to get what they bargained for – a *bona fide* competitive

bidding process to assure compliance with the Treasury regulations and preserve the tax exempt

status of the underlying bonds – would be to re-bid the whole investment agreement. And to do

so, they would have to pay another broker fee." Gov't Mem. 45.   The government has made no

effort to account for the value of broker or bidding agent services actually received in

transactions deemed corrupt.

Even more fundamentally, however, the government's contention depends on an

incorrect premise that an issuer would be required to "pay another broker fee" to receive the

benefit of the bargain by "re-bid[ding] the whole investment agreement." Gov't Mem. 45.   That

argument amounts to double-counting.   Mechanically, a bidding agent fee, which potential

providers factor into their bid, is paid at closing by the provider, not the issuer.  Tr. 567 (Zaino).

Documents in evidence at trial contain detailed language protecting the issuer from transaction-

related losses and making clear that issuers bear no responsibility for fees in transactions that are

unwound.  The Commonwealth of Puerto Rico request for bids, for instance, states:

> None of the GDB [the issuer, Government Development Bank of Puerto Rico],
> bond counsel, UBS/PaineWebber, or any other party to the issue shall be liable
> for any fees, costs, expenses, loss of bargain, costs incurred in liquidating,
> terminating, obtaining, or reestablishing any hedge or trading position or any
> other damages in the event that for any reason the transaction shall fail to close
> and there are no, implicit or otherwise, rights of set-off against those parties in
> such an event.

See GX-8-1 at 1.  That language in itself shows that an issuer would not pay two bidding agent

fees.  The same document contains other language showing that issuers insisted on sophisticated

language protecting them from transaction-related losses.   A "make whole" provision states that

13

if the provider loses its rating, then the issuer has the right to terminate the investment agreement, and that if termination occurs:

> the Provider agrees to pay the GDB the present value of the difference between (x) the interest earnings which would have accrued under the Agreement and (y) the interest earnings which will accrue at the rate borne by the new investment agreement entered into with another provider at that time.

*Id.* at 3. The document also contains a provision stating that the provider "will have no recourse" against the issuer, UBS, bond counsel, and others, "should the transaction not close." *Id.*

Because broker or bidding agent fees do not constitute "loss" within the meaning of U.S.S.G. §2B1.1, the government's effort to include such fees in a loss calculation should be rejected.

3. "Fraudulently Lowered Interest Rates" (Count 4). The government's loss calculation concerning fraudulently lowered interest rates is speculative. We have explained in detail that the government's calculations concerning the Count 4 transactions that Mr. Grimm won are faulty because the evidence shows that indications are different from bids and that rate changes in the bond markets occur within seconds. The government does not engage our argument or address the evidence that we have cited. Opening Mem. 36-39. The government does not even acknowledge the testimony of its own witness, Mark Zaino, supporting the point that indications are not bids. *Id.* Instead, without acknowledging a contradiction or even a tension, the government cites only Mr. Zaino's testimony concerning audiotapes of conversations between Messrs. Grimm and Welty (where Mr. Zaino did not participate in either the telephone conversation or the GIC transaction itself) in which Mr. Zaino, without foundation, characterized Mr. Grimm as providing a bid. Gov't Mem. 23-25. With respect to Application Note 3(D)(i) to Section 2B1.1, the government does not adequately explain the text of the note

because its argument assumes that "similar costs" may be viewed only from the perspective of the issuer.  Gov't Mem. 43-44.

    4.    <u>Swap Fees/Kickbacks (Counts 2 and 4).</u>    The Court should reject the government's argument that swap fees and kickbacks constitute loss for the reasons stated in the memoranda of counsel for all defendants.  Moreover, even if the government's argument were correct, the payments relating to the Commonwealth of Puerto Rico transaction ($935,000 in Count 4 and $200,000 in Count 2) are not attributable to Mr. Welty because the government has failed to show that they were reasonably foreseeable to him within the meaning of U.S.S.G. §§ 1B1.3, 2B1.1.  See above at 8.  Similarly, the payments relating to FSA swaps that the government relates to Count 2 should not be applied to Mr. Welty even if they are otherwise included in the loss calculation.  *Id.*

    5.    <u>Overstated Loss/Overlapping Enhancements.</u>    The government *does not once* engage the argument that its loss calculation, even if it were deemed correct, would severely overstate culpability.  See Opening Mem. 45-46.  Even now, the government contends (at 7) that "Defendants corrupted the bidding process indiscriminately" without addressing our point (Opening Mem. 45-46) that indiscriminate corruption means that the government's loss calculation is arbitrarily related to Mr. Welty's motives, intent to harm, and relative culpability.  To the extent that the Court does not resolve the loss issues in favor of Mr. Welty on the pleadings and any argument that the Court may entertain, we respectfully request that the Court conduct an evidentiary hearing.

    The government also claims that *United States* v. *Lauersen*, 362 F.3d 160 (2d Cir. 2004), *vacated on other grounds*, 542 U.S. 1097 (2005), which held that overlapping enhancements may warrant a departure, "has no place in the analysis here" because it was decided when the

guidelines were mandatory. Gov't Mem. 73-74. But the holding in *Lauersen* is not a function of whether the guidelines are mandatory or advisory. And the Supreme Court vacated the decision for reconsideration in light of *Booker*, not on the merits of the overlapping enhancement holding. 542 U.S. 1097. Accordingly, the government's assertion (at 74) that *Lauersen* "is not good law" has no foundation.

III.   A Lengthy Prison Sentence Would Create Unwarranted Disparities,
       Would Not Promote Respect for the Law or Provide Just
       <u>Punishment, and Would Not Advance the Goal of General Deterrence.</u>

Perhaps the most striking aspect of the government's brief is its claim that the Court must sentence Mr. Welty to a term of imprisonment approximately three to four times higher than the sentences received by the *Carollo* defendants in order to avoid unwarranted sentencing disparities. That is nothing more than an effort to turn Section 3553(a)(6) on its head and lacks factual support. The government's general deterrence argument is unavailing as well.

A.   <u>Unwarranted Disparities, Respect for the Law, and Just Punishment.</u>

According to the government, a sentence of not less than 135 months is necessary to avoid unwarranted disparities with the *Carollo* defendants. Such a sentence would neither promote respect for the law nor provide just punishment – two fundamental sentencing considerations that the government does not address. An ultimate desire for the Court to treat the *Carollo* sentences as a "floor, not a ceiling" (Gov't Mem. 83) – and to use Mr. Welty as a vehicle to "send a strong message" to the financial industry (*id.* at 78) in a way that is disconnected from the facts – appears to underlie the government's tactic.

The government's upside-down disparity claim is belied by its victim arguments alone. In *Carollo*, the government stated that Steve Goldberg harmed 219 victims, Peter Grimm harmed 134, and Dominic Carollo harmed 125. *Carollo* Sent. Mem. at 9-11. Here, the government

16

argues that Mr. Welty harmed 25 victims (a point that we dispute for the reasons stated in our opening memorandum). Gov't Mem. 54. In other words, although the government believes that the *Carollo* defendants individually harmed anywhere from *five to almost nine times* as many issuers as Mr. Welty, it asks the Court to conclude that Welty's conduct was "far more egregious." Gov't Mem. 83. The government's turnabout is a naked effort to inflate Mr. Welty's sentence as much as possible.

As the government itself comes close to stating (at 84), Mr. Welty's offense conduct is largely defined by the Rhode Island Tobacco and Anchorage transactions (Count 1), the escrow transactions brokered by CDR that he won as a provider in 2002 and 2004 well after UBS had established a relationship with CDR in 2001 (Count 2), and the transactions in which he engaged with Peter Grimm (Count 4). That conduct is of a scope and caliber different from, for instance, the creation of "phony letters to paper up GE and FSA's files" (*Carollo* Sent. Tr. 43) that the government asserts occurred in the *Carollo* case. In short, the government's position in both cases does not square with its claim that the sentences in *Carollo* should act as a "floor, not a ceiling" (Gov't Mem. 83).

With respect to the sentence imposed on Stewart Wolmark from CDR, the government correctly states (at 83-84), as we have recognized (Opening Mem. 51), that Mr. Wolmark is in a position categorically different from Mr. Welty. Our contention, however, is that the scope and duration of Mr. Wolmark's criminal conduct is so vast in comparison with Mr. Welty's conduct that Mr. Wolmark's sentence is a material consideration despite his status as a cooperator. Opening Mem. 51-52. The government does not address that point at all.

The government also denigrates its own statistical evidence of a decade's worth of sentences in Antitrust Division cases as "virtually meaningless." Gov't Mem. 84. Far from

meaningless, however, such statistical evidence – as the Sixth Circuit recognized in *United States* v. *Stock*, 685 F.3d 621, 629 n.6 (6th Cir. 2012), which we cited in our opening memorandum at 54 and which the government ignores – is a "starting point" in a Section 3553(a)(6) analysis. We have explicitly recognized the limited utility of the evidence (Opening Mem. 52-53) but the government's attempt to make it invisible goes too far. The government also attempts (at 84) to nullify the statistical information by arguing that this is a fraud case and that different guidelines apply to antitrust offenses (§2R1.1) and fraud offenses (§2B1.1). The Antitrust Division's own statistics (see http://www.justice.gov/atr/public/workload-statistics.html (site last visited May 14, 2013)), however, refer to fraud cases. And not least important, while the government charged this case under a wire fraud theory, it has consistently presented the case under an antitrust rubric (characterizing conduct as a "horizontal collusion" or "bid-rigging," (see, *e.g.*, Tr. 396 (Gov't Opening) and 3/21/12 Gov't Opp. to Multiplicity Motion (filed under seal) at 2, 7-9)), and cooperators pleaded guilty to Sherman Act violations. See, *e.g.*, DX-H-4300 (Zaino plea agreement); DX-H-4303 (Campbell plea agreement); DX-H-6199 (Doug Goldberg plea agreement); DX-W-3503-138 (Rothman plea agreement). Although the government's own statistics are just a "starting point," the government's effort to characterize them as "virtually meaningless" is unfounded.

B.     General Deterrence.

Citing this Court's decision in *United States* v. *Milken*, No. (S) 89-cr-41, 1990 WL 264699 (S.D.N.Y. 1990), the government claims that a sentence of at least 135 months for Mr. Welty is necessary to "send a strong message to all those working in the financial and other professional industries[.]" Gov't Mem. 78. The Court does not need us to compare Mr. Welty's case to *Milken* or parse the Court's decision in *Milken* concerning general deterrence. Tellingly,

18

the government says nothing about why the *length* of its extraordinary proposed sentence for Mr. Welty is necessary to achieve the general deterrent effect it seeks.  The government does not even engage the points we have made in our opening memorandum (at 54-55) with respect to the relationship between general deterrence and sentence length.  In the end, the government's general deterrence argument is purely abstract.  It is untethered to the facts of this case, the sentences that have preceded this case, and the extensive publicity surrounding and public knowledge concerning the government's larger investigation of the municipal bond industry.

IV.     The Government's Restitution Argument is Incorrect.

According to the government, "[e]ach Defendant is jointly and severally liable with the other two" for restitution in the amount of $674,298.75.  Gov't Mem. 33.  That figure is made up of four components: $60,000 (North Carolina Educational Facilities Finance Authority); $343,655.01 (Hospital Authority of Forsyth County (Georgia Baptist Healthcare System, Inc.); $252,878.62 (City of Stamford); and $17,765.12 (Centinela Valley Unified School District).  The government's restitution claim is both legally and factually wrong.

First, the government inaccurately states the legal framework that governs restitution orders.  Although the government does not mention it, the statute provides that "restitution may not be imposed if the determination of complex issues of fact relating to causation would unduly 'complicate or prolong the sentencing process.'  [18 U.S.C.] § 3663A(c)(3)(B)."  *United States* v. *Marino*, 654 F.3d 310, 317 (2d Cir. 2011).  As *Marino* states, Congress intended that "sentencing courts not become embroiled in intricate issues of proof," and that the "process of determining an appropriate order of restitution be streamlined."  *Id.* (quoting *United States* v. *Reifler*, 446 F.3d 65, 136 (2d Cir. 2006)).  On another point, the government's assertion that "[e]ach Defendant is jointly and severally liable with the other two" (Gov't Mem. 33) ignores the Court's discretion to

allocate restitution.  The statute provides: "If the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant."  18 U.S.C. § 3664(h); see *United States* v. *Nucci*, 364 F.3d 419, 422 (2d Cir. 2004) ("As a threshold matter, the pertinent statutory provisions establish that the decision whether to apportion restitution among defendants is a discretionary one.")

For the reasons we have stated (Opening Mem. at 42-43), a sufficient factual basis for a restitution order is lacking.  Even now, for example, despite the three binders of materials provided to the Court on May 9, the government has failed to substantiate its claim, under relevant conduct principles or otherwise, that the North Carolina transaction was corrupt or even that Mr. Welty had anything to do with it.  What is more, even if the government's restitution argument were factually correct, Exhibit G to the government's memorandum shows that at least 31 issuers were overpaid by more than $35 million in connection with 31 transactions as a result of institutional settlements.  The government offers no explanation for why those entities should receive a windfall because of a misallocation of settlement proceeds instead of ensuring that excess payments are reallocated to entities that claim a shortfall.  We also understand that institutional settlement and allocation issues are still being resolved.  The government's request for a restitution order in this case, especially in light of disputed factual issues, the institutional settlement questions, and the allocation issues, is in tension with the principles governing restitution.  Accordingly, we submit that the Court should decline to enter a restitution order.

## CONCLUSION

For the reasons stated above, and for any other reason that the Court may deem just and proper, defendant Michael D. Welty respectfully requests that the Court reject the government's sentencing position and impose the least punitive sentence that the Court deems is "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)" of 18 U.S.C. § 3553(a).

Respectfully submitted,

Gregory L. Poe (admitted *pro hac vice*)
Preston Burton (admitted *pro hac vice*)
Rachel S. Li Wai Suen (RS-1145)
Poe & Burton PLLC
The Executive Building
1030 15th Street, N.W., Suite 580 West
Washington, D.C. 20005
(202) 583-2500

*Counsel for Michael D. Welty*

Dated: May 15, 2013

## CERTIFICATE OF SERVICE

I hereby certify that, on May 15, 2013, I caused true and correct copies of the foregoing

Reply Memorandum in Aid of Sentencing Submitted on Behalf of Michael D. Welty to be served

via electronic mail and hand delivery on counsel for the government as follows:

Kalina M. Tulley
John W. Van Lonkhuyzen
Jennifer M. Dixton
United States Department of Justice
Antitrust Division
26 Federal Plaza
New York, NY 10278

Gregory L. Poe
Poe & Burton PLLC
The Executive Building
1030 15th Street, N.W., Suite 580 West
Washington, D.C. 20005
(202) 583-2500

*Counsel for Michael D. Welty*