UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                                    :
UNITED STATES OF AMERICA                            :
                                                    :
              vs.                                   :
                                                    :
PETER GHAVAMI, GARY HEINZ, and                      :      10 Cr. 1217 (KMW)
MICHAEL WELTY,                                      :
                                                    :
              Defendants.                           :
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X


**DEFENDANT PETER GHAVAMI'S MEMORANDUM OF LAW WITH
RESPECT TO THE APPLICATION OF THE SENTENCING GUIDELINES**


STILLMAN & FRIEDMAN, P.C.
425 Park Avenue
New York, NY  10022
(212) 223-0200
*Attorneys for Defendant Peter Ghavami*

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................................................ ii

POINT I.      THE GOVERNMENT'S SENTENCING GUIDELINES
ANALYSIS CANNOT BE SUPPORTED UNDER THE LAW ..................... 1

A. The Government's Loss Analysis Is Fundamentally Flawed ...................... 2

1. The Government Has Not Demonstrated That A Loss
Exists For Counts One, Two Or Three ............................................... 4

a. The Municipalities Paid The Best Price Available
For The Escrows ............................................................................ 4

b. The Broker Fees, Purported "Kickbacks" And Swap Fees
Should Not Be Included In The Loss Calculation ...................... 7

2. The Government's Regression Analysis Must Be
Rejected Entirely ............................................................................... 8

B. No Enhancement Is Warranted For The Number Of Victims .................... 14

C. The Government Misapplies The Aggravating Role Enhancement,
And The Enhancement Should Not Be Applied In Any Event .................. 14

D. The Abuse Of Trust Enhancement Is Inapplicable ..................................... 15

E. A "Sophisticated Means" Enhancement Is Not Warranted ........................ 18

POINT II.     THE "CUMULATIVE EFFECTS" OF SUBSTANTIALLY
OVERLAPPING ENHANCEMENTS WARRANTS A
DOWNWARD DEPARTURE OR VARIANCE ........................................... 20

POINT III.    THE NEED TO AVOID UNWARRANTED SENTENCING
DISPARITIES WARRANTS A VARIANCE ................................................ 22

CONCLUSION .................................................................................................................... 25

i

# TABLE OF AUTHORITIES

**CASES**                                                                 **PAGE**

*United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) ......................................21, 22

*United States v. Beckford*, 2006 WL 1390414 (S.D.N.Y. May 17, 2006) ...........................15

*United States v. Broderson*, 67 F.3d 452 (2d Cir. 1995) .........................................17

*United States v. Caplinger,* 339 F.3d 226 (4th Cir. 2003) .....................................16

*United States v. Cole*, 296 F. App'x 195 (2d Cir. 2008) ........................................19

*United States v. Cusack*, 66 F. Supp. 2d 493 (2d Cir. 1999) ....................................17

*United States v. Fernandez*, 443 F.3d 19 (2d Cir. 2006) ..........................................1

*United States v. Gordon,* 2006 WL 1675921 (S.D.N.Y. Jun. 16, 2006) ...............................22

*United States v. Hirsch,* 239 F.3d 221 (2d Cir. 2001) .........................................17

*United States v. Jackson*, 346 F.3d 22 (2d Cir. 2003) ...........................................21

*United States v. Jolly,* 102 F.3d 46 (2d Cir. 1996) ........................................ 17-18

*United States v. Lauersen*, 362 F.3d 160 (2d Cir. 2004) ........................................20

*United States v. Marino*, 309 F. App'x 523 (2d Cir. Feb. 17, 2009) ...............................22

*United States v Miller*, 588 F3d 560 (8th Cir 2009) ..................................................3

*United States v. Moore*, 29 F.3d 175 (4th Cir. 1994) ...........................................16

*United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008) ...................................22

*United States v. Persaud,* 411 F. App'x 431 (2d Cir. 2011) .....................................19

*United States v. Regensberg,* 381 F. App'x 60 (2d Cir. 2010) ...................................18

*United States v. Thorn*, 317 F.3d 107 (2d Cir. 2003) ...........................................19

*United States v. Uzoefune*, 334 F. App'x 360 (2d Cir. 2009) ....................................19

*United States v Zafar*, 291 F. App'x 425 (2d Cir 2008) ........................................................3, 8

*United States v. Zavala*, 443 F.3d 1165 (9th Cir. 2006) ..........................................................1

## **OTHER AUTHORITIES**

18 U.S.C. § 3553 ........................................................................................................1, 2, 22

U.S.S.G. § 2B1.1 ...................................................................................1n.1, 3, 8, 14, 18

U.S.S.G. § 3B1.1 .....................................................................................................1n.1, 14

U.S.S.G. § 3B1.3 ...................................................................................... 1n.1, 15, 16-17

U.S.S.G. § 6A1.3(a) .....................................................................................................13

U.S.S.G. § 5K2.0 ..........................................................................................................20

## I. THE GOVERNMENT'S SENTENCING GUIDELINES ANALYSIS CANNOT BE SUPPORTED UNDER THE LAW

The government takes the position that the appropriate guidelines offense level for Peter Ghavami is 37, corresponding to an advisory sentencing range of 210 to 262 months (or 17.5 to 21.8 years) which is, we respectfully submit, simply unfathomable. As we discuss below, the government's calculation is built on a fundamentally flawed loss analysis, for which it has provided no foundation and which collapses under scrutiny, as well as the inclusion of multiple sentencing guidelines enhancements that we submit are not appropriate under the law.[1] In addition, this memorandum demonstrates that the cumulative effect of the government's flawed loss calculation in conjunction with these multiple overlapping enhancements warrants a downward departure or variance.[2]

Initially, of course, it must be recognized that, whatever the appropriate guidelines level, under 18 U.S.C. § 3553(a), that level is just one of several factors a court is to consider in fashioning a sentence that is "sufficient but not greater than necessary" to meet the purposes of sentencing. Indeed, a guidelines sentence is not presumptively correct but, rather, is to be considered among the range of § 3553(a) factors. *See United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006) ("We … decline to establish any presumption, rebuttable or otherwise, that a Guidelines sentence is reasonable"); *see also United States v. Zavala*, 443 F.3d 1165, 1171 (9th Cir. 2006) ("Nothing in 18 U.S.C. § 3553, as it stands after *Booker*, indicates that the Guidelines are to be given any greater weight than their fellow sentencing factors").

---

[1] The government seeks the application of a number of sentencing guidelines enhancements, including: (a) 20 levels for a loss of over $7 million (U.S.S.G. § 2B1.1(b)(1)(J)); (b) 2 levels for an offense involving 10 or more victims (U.S.S.G. § 2B1.1(b)(2)(A)); (c) 2 levels for sophisticated means (U.S.S.G. § 2B1.1(b)(10)); (d) 4 levels for aggravating role as a supervisor in an offense involving five or more participants (U.S.S.G. § 3B1.1(a)); and (e) 2 levels for abuse of trust (U.S.S.G. § 3B1.3).

[2] Peter Ghavami joins in the sentencing arguments made by co-defendants Michael Welty and Gary Heinz, to the extent those arguments are applicable.

Among the other considerations identified by Section 3553, two are particularly important here: the history and characteristics of Peter Ghavami, and the need to avoid unwarranted sentence disparities among similarly situated defendants. *See* 18 U.S.C. §§ 3553(a)(1) and (a)(6). Peter's history and characteristics -- as described in our accompanying letter to the Court and in the many letters written by others on his behalf -- are of a person who has led an exemplary life. He is someone who, rather than allowing himself to be destroyed by a terribly painful childhood, overcame those difficulties and grew from them: along the way providing comfort and support to his mother and siblings under circumstances that no young person should have to deal with; creating a successful career through hard work; and being the wonderful husband, father, friend and work colleague reflected in all of the letters written to Your Honor.

With respect to the issue of comparable sentencing, as we discuss below (*see* Section III), this case offers the rare instance in which the Court has the benefit of recent sentences imposed on defendants convicted at an earlier trial of similar conduct, growing out of the very same investigation underlying this case. Furthermore, recent sentences received by government witnesses who pleaded guilty with respect to the same investigation are, we submit, important in informing this Court's determination of an appropriate sentence for Peter Ghavami.

A.      **The Government's Loss Analysis Is Fundamentally Flawed**

With respect to the three Counts as to which Peter Ghavami was convicted (Counts 1, 2 and 3), the government's current position as to the loss calculation under Section 2B1.1(b) is a loss amount of $7,664,620.31.[3]      While the suggested loss is stated to the penny,

---

[3]      In its original letter to defense counsel (dated February 12, 2013) defining its loss position, the government's total loss amount for Peter Ghavami was approximately $6.5 million. By letter dated April 9, 2013, the government changed its position to argue for a loss of $7.6 million as to Mr. Ghavami,

that means nothing as to its accuracy or reliability when one looks behind the number at the government's analysis that resulted in that calculation. Specifically, that number is derived from two basic components: (1) an effort by the government to find, through a regression analysis, the supposedly wrongful gain or profit earned by providers winning the transactions underlying those Counts; and (2) a tallying of broker and swap fees that the government argues relate to certain Count 2 transactions and asserts should be included in the loss figure. For all of the reasons we discuss below, it is respectfully submitted that the government's loss calculation for Counts 1, 2 and 3 is fundamentally and fatally flawed.

There are two basic problems with the government's analysis. First, gain to a defendant cannot be used as a substitute for the calculation of loss unless there has been a showing that a loss actually exists, but is not capable of being reasonably computed. *See, e.g., United States v. Zafar*, 291 F. App'x. 425, 429 (2d Cir 2008) (sentencing guidelines permit courts to consider the "defendant's gains as an alternate measure of loss, albeit only if there is a loss but it reasonably cannot be determined") (internal quotations omitted); *United States v. Miller*, 588 F3d 560, 567 (8th Cir. 2009) ("Where there is no actual loss and no intended loss, the Guidelines do not permit the substitution of the 'gain' measure for loss."); U.S.S.G. § 2B1.1, application n. 3(B)("The court shall use the gain that resulted from the offense as an alternative measure of loss <u>only</u> if there is a loss but it reasonably cannot be determined.") (emphasis added). There has been no loss shown for any of the Count 1, 2 or 3 transactions, and, for the reasons discussed below, it cannot be done. Accordingly, a gain analysis, most respectfully, may not even be considered by the Court.

---

causing an additional two-point enhancement under the loss table in Section 2B1.1(b) of the guidelines to its already astronomical suggested sentencing range.

Second, even if the Court were to consider the use of gain as a substitute for a loss calculation, the gain/regression analysis presented by the government is riddled with errors and cannot be relied on for any mathematical analysis or conclusion. A detailed examination of the government's analysis by an expert statistician makes this point plainly. Any reliance on the government's gain analysis would be particularly troublesome when the government wants to use it to increase, substantially, the length of the Peter Ghavami's advisory sentencing guidelines range.

**1.      The Government Has Not Demonstrated
That A Loss Exists For Counts One, Two Or Three**

**a.      The Municipalities Paid The Best Price Available For The Escrows**

In its loss analysis, the government computes the supposed gain for guidelines purposes from a total of 15 transactions: five from Count 1, nine from Count 2, and the Commonwealth of Massachusetts transaction ("Mass I") underlying Count 3. *See* Exhibits D and E to the Government's February 12, 2013 letter. As the government recognized in the letter (at page 4), although they were described with various terms, each of these was basically an escrow transaction. As such, they all involved a municipality buying an investment agreement by which the proceeds from the bond issuance are used by the winning provider to buy a basket of securities that mature over time, based on a schedule designed to meet the funding needs of the underlying municipal development project.

Each of the escrow transactions included in the government's gain analysis were subject to the IRS arbitrage rules which, in sum, restricted the municipalities from earning more from an escrow agreement than they were obligated to pay out on the bonds issued to fund the project. Earning more would result in "positive arbitrage" and monies that the municipalities could not keep. Accordingly, each escrow transaction had a "perfect cost," representing the cost

to the municipality that resulted in it earning the maximum return possible under the arbitrage rules. Walter St. Onge, a municipal finance attorney called as a witness by the government, who served as bond counsel to Massachusetts, made this point clearly: "[T]he perfect cost represents the maximum. In effect that would represent -- would mean that the Commonwealth was earning the maximum allowable yield on the escrow." Tr. 2733. In other words, the perfect cost (which is typically identified in a transaction's bid specifications) is the lowest price allowed to be paid by the municipality for the escrow under applicable IRS rules.

Ignored in the government's analysis is the fact that several of the 15 escrows identified by the government involved a bidding process where multiple bidders actually bid the perfect escrow cost. For example**,** the Request for Bid relating to the Mass I deal underlying Count 3 identifies the "Commonwealth's perfect cost" as $638,510,487.24. (*See* GX-11-5).[4] The "summary of bids" for the Mass I transaction (GX-11-35) indicates that five different providers all bid that perfect cost: Bank of America, First Union, Goldman Sachs, Merrill Lynch, and U.S. Bancorp. *See also* GX-25-1, and 25-9 (showing that for the City of Bridgeport transaction the municipality's perfect cost of $79,331,679.32 was bid by four different providers: Bank of America, Bear Stearns, UBS, and Wachovia).[5]

Accordingly, in each of the circumstances where the municipality paid the "perfect escrow" cost for the escrow agreement, the municipality, by definition, paid the lowest price it could have under the IRS arbitrage rules, whether the transaction was corrupted in any way or not. In short, where there is a perfect escrow cost among the bid or bids, the

---

[4]     For the Court's convenience, copies of GX-11-5 and the other exhibits cited in this memorandum are attached in Exhibit B in the order they are referenced.

[5]     In those circumstances where multiple bidders bid the perfect cost, the bid specifications usually state that the winner is the provider who bids the earliest escrow termination date, a factor that has no effect on the municipality. *See, e.g.*, GX-25-1 at ¶ VIII.

municipality, by accepting that bid, is paying the lowest price it is allowed to pay and <u>cannot</u> suffer a loss.

A corollary to this point is that when there were multiple providers bidding the perfect cost -- some purportedly conspirators and others not -- it would make no difference economically to the municipality which bid it accepted. Again, the testimony of Mr. St. Onge (a former president of the National Association of Bond Lawyers) makes this precise point:

> Q.     Would you agree with me sir, that any of the five bids at the perfect cost, if accepted by the State of Massachusetts, Commonwealth of Massachusetts, would have the same economic impact to the municipality?
>
> A.     That's correct. (Tr. 2771)

It is also significant that in each of the escrow transactions included in the government's calculation of loss -- whether bid at the perfect cost or not -- there are one or more providers who bid on the escrow that have never been identified by the government as co-conspirators (*see* Government's List of Co-conspirators, attached as Exh. C). Those providers can only be presumed to have bid the best price they could on an arms-length basis. There has, we submit, been no showing to the contrary.

Thus, even in those escrow transactions identified by the government in its loss/gain analysis where UBS won the bid at a cost above the perfect escrow cost, there was a non-conspirator provider -- if not several -- submitting a bid higher than UBS's bid. As to each of those bidders, they presumably bid the best possible price they could, yet they nevertheless failed to beat the lowest bid submitted by UBS. Had the municipality accepted one of those bids, that award necessarily would have cost the municipality <u>more</u> than UBS's supposedly corrupt bid. Under those circumstances, it is not logical to conclude that the municipality suffered a loss

as a result of accepting the UBS bid.[6]

     **b.**    **The Broker Fees, Purported "Kickbacks" And Swap Fees**
                **Should Not Be Included In The Loss Calculation**

Beyond its effort to include the gain on the 15 escrow transactions in its loss calculation, the government also seeks to add various broker fees, alleged "kickbacks," and supposedly unearned swap fees into the loss number attributable to Peter Ghavami. With respect to him, all of these various fees purportedly relate to escrow transactions found in Count 2 of the indictment. This futile effort should be rejected.

First, whether these fees were appropriate or not (and we submit there was no showing to the contrary), the fact remains that they also relate to escrow transactions. The government apparently argues that these supposedly inflated fees and kickbacks should be part of the loss because, even though they were paid by the provider winning the escrow bid (or obtaining the swap as a hedge), the costs were purportedly passed on to the municipalities in the form of inflated prices charged for the underlying escrow agreement. (*See* Draft PSR ¶¶ 67-71, describing government position). That argument, most respectfully, fails for some of the same reasons discussed above concerning the bidding on the escrows.

The escrow transactions relating to the broker and swap fees are the Count 2 transactions that UBS did not win. However, as with the Count 2 transactions UBS won, each of these transactions included at least one bidder not identified by the government as part of the Count 2 conspiracy. Again, in the absence of evidence to the contrary, it must be presumed that those bidders bid their best price on an arms-length basis. Thus, in each of these transactions,

---

[6]     The government "calculated gain differently" for the Rhode Island Tobacco escrow in Count 1 because it supposedly "presented direct evidence concerning the effect of the conspiracy on the amount of gain in that transaction." Gov't. February 12, 2013 Letter at 4. However, beyond the lack of evidence at trial that there was anything manipulative about the bidding on the transaction, there were several other providers whose bids on the transaction were less favorable to the municipality than UBS, two of whom -- Bear Stearns and Wachovia -- are not on the government's list of co-conspirators for Count 1.

there was an arms-length bid that could have been accepted and which would be unaffected by any purported inflation of bids by members of the conspiracy to "cover" the purportedly inflated broker or swap fees. Moreover, the government has made no showing that the broker or swap fees it seeks to include were improperly inflated.[7] Indeed, the broker fees on escrows are limited under IRS regulations and are typically disclosed in the initial request for bids. And while swap fees are not regulated, there is nothing in the record to demonstrate that the swap fees sought to be included by the government as "inflated" or "kickbacks" were inappropriate.

For all of these reasons, we submit that the government has not, and cannot, demonstrate that a loss exists with respect to Counts 1, 2 and 3. Accordingly, it is inappropriate to even consider using the so-called gain analysis found in its February 12, 2013 letter. *See, e.g., United States v. Zafar*, *supra*, 291 F. App'x. 425, 429 (2d Cir. 2008)(sentencing guidelines permit courts to consider the "defendant's gains as an alternate measure of loss, albeit only if there is a loss but it reasonably cannot be determined") (internal quotes omitted); U.S.S.G. § 2B1.1, application n. 3(B)(same).

## 2. The Government's Regression Analysis Must Be Rejected Entirely

As demonstrated above, the premise for the government's use of a gain analysis -- that there is a loss that cannot be reasonably calculated -- is unsupported by the evidence of the underlying bidding. Nevertheless, even if the Court were inclined to consider the government's analysis of gain, that analysis, most respectfully, is valueless.

In its February 12, 2013 letter, the government presented a regression analysis purportedly designed to determine, for 13 "rigged" transactions in Counts 1 and 2, the amount of

---

[7]     Furthermore, there is <u>no</u> evidence in the trial record for any of the Count 2 escrow transactions for which the government seeks to include broker fees: Okmulgee Public Works Authority, Oxnard Union High School District, North Carolina Educational Facilities Authority, Massachusetts Development Finance Agency/Mount Holyoke, City of Clearwater, and State of Hawaii.

extra profit attributable to the supposedly corrupt nature of the bidding on the transaction. The February 12 Letter goes on to assert that the government's regression analysis showed average "increased profits of $295,151 per rigged transaction," when compared against "benchmark" transactions that were not corrupted. When that number was applied to the 13 transactions at issue, it resulted in $3.8 million being added to the government's loss calculation. *See* Ex. E to Gov't. February 12, 2013 Letter.

Given that the government's analysis was, on its surface, based on the supposed statistically significant analysis of the relationship between a transaction being "rigged" and excess profits, defense counsel retained a statistician, Dr. Alan J. Salzberg, to review the government's work. Dr. Salzberg has a Ph.D. in statistics from the University of Pennsylvania's Wharton School, as well as an undergraduate degree in Economics from Wharton. He has taught statistics at the University of Pennsylvania and American University, is well-published, and extraordinarily well-credentialed. As his resume indicates, over his career, he has been retained to do statistical analyses for numerous federal agencies, including the Department of Justice.

Dr. Salzberg's conclusions concerning the government's regression analysis are stark and without reservation. In short, based on his review, the regression should, we submit, be accorded no weight whatsoever. One need read no further than Dr. Salzberg's "Summary of Findings" to appreciate the extent of the problems that he finds with the government's gain analysis (which he terms the "DOJ Model"):

> I find the DOJ Model is a flawed model for estimating all profits … and, in particular, the DOJ Model results in severe errors when estimating profits for high-profit transactions. Because of this flaw, <u>the estimate of the coefficient for rigging [the $295,151 increase in profits supposedly due to rigging] is unreliable, and its purported statistical significance in demonstrating a relationship between increased profits and the "rigged" nature of a transaction is spurious.</u> In the detailed discussion below, I provide the statistical analysis that demonstrates this

fundamental flaw. In addition to this over-arching problem, I find a number of other fundamental problems in the DOJ Model, which I discuss below.

"Statistical Review of Regression Analysis in *United States v. Ghavami, et al.* (the "Salzberg Report"), attached as Exh A., at 1 (emphasis added).

In presenting its regression analysis, the government suggests that the Court accept the notion that a single characteristic -- whether or not a trade was rigged[8] -- is sufficient to estimate a level of excess profit -- a gain -- caused by the rigging. That approach, however, is premised on the assumption that all of the other characteristics (*i.e.*, variables) included in the model accurately capture all of the factors that have an effect on the profit in a "non-rigged" transaction. Dr. Salzberg's analysis demonstrates that the other characteristics included in the DOJ Model do not even come close to capturing all of the other factors. Furthermore, he shows that these characteristics are so poorly chosen that the model severely underestimates the level of profit that non-rigged transactions should have earned. The underestimation of non-rigged profit automatically means that profit due to "rigging" -- if there even was any -- would be overestimated.

The DOJ Model estimated that each rigged trade had approximately $295,000 in excess profit. But when that number is considered in conjunction with the actual profit data from the MRED database, its flaws are obvious. Four of the supposed 13 "rigged" trades actually have a total profit level far below $295,000, meaning, as Dr. Salzberg points out (Salzberg Report at 8), that for those four transactions, the "non-rigged" profits would be estimated at significantly below zero -- a loss -- when, in fact, the entire MRED database of 1553 transactions shows only one transaction that had any loss at all. To take but one example, the entire profit

---

[8] In presenting its model, the government terms the 13 transactions at issue as "rigged." For purposes of the discussion of the regression analysis in this Memorandum, we use the same terminology without conceding the government's view of the corrupt nature of the transactions.

identified for the supposedly "rigged" San Gabriel Unified School District escrow is only $40,000 (*see* Exhibit D to Gov't. February 12, 2013 Letter). Removing the $295,000 estimated excess profit due to "rigging" would thus result in an entirely illogical "non-rigged" profit on the transaction of <u>negative</u> $255,000.

The government apparently seeks to remedy this fundamental problem with its analysis by taking the $295,000 number and dividing it into the average total profit on the 13 "rigged" transactions ($446,000) and concluding that the result -- .662 or 62% -- can then simply be multiplied by the "[total] profit on each rigged deal … to get an estimated conspiracy effect for each transaction." *See* Gov't. February 12, 2013 Letter at.4. The problem with that, as Dr. Salzberg points out (Salzberg Report at 8), is that the government's regression model is an additive one resulting in a constant dollar number, and making that number a percentage (66.2%) is a multiplicative process that was never the subject of the regression in the first place. Thus use of the percentage "is incorrect and has unknown and inestimable bias in general." *Id.* In other words, it is contrary to the laws of statistics.

Part 1 of Dr. Salzberg's analysis (Salzberg Report at 3-6) details the testing he undertook to demonstrate the flaws in the government's regression. As he explains in his report, Dr. Salzberg ran the government's regression model against just the "benchmark" or "non-rigged" trades to see how well it predicted the actual profit on those trades. Those results, shown in the first graph in the report, demonstrate that the model severely underestimated the "non-rigged" profit, including, but not limited to, high-profit trades. Dr. Salzberg, in the same graph, then applied the model to the "rigged" trades to show the error in the application by presuming those trades were actually not rigged. If the model actually worked, the error for the "rigged" trades should have exceeded the error for "non-rigged" trades of the same total profit level by

$295,000. In fact, the straight line on the first graph shows that the model's underestimation of "non-rigged" profits is similar whether you look at "rigged" trades or "non-rigged" trades. To Dr. Salzberg, the import of this result is clear and unequivocal: "**this means that the DOJ's conclusion, that approximately $300,000 of excess profits (per transaction) resulted from rigging, is wrong**." (Salzberg Report at 4)(emphasis supplied).[9] In short, the very basis for the government's suggested use of the regression model is undercut entirely by Dr. Salzberg's analysis.

Although the conclusions about the predictive value of the model are more than enough to doom its useful value, Dr. Salzberg goes on to discuss a number of other serious problems in the government's regression (*see* Salzberg Report at 7-8) Chief among those flaws are the following:

- The incorrect assumption made by the government that the model contains all variables relevant to predicting profit. For example, Dr. Salzberg points out that the state in which a "rigged" transaction occurred "is a factor related to profit," but is not found in the government's model.

- The government identified specific criteria that it used to select the "benchmark" or "non-rigged" trades for its analysis, purportedly so those trades would be comparable to the 13 "rigged" trades. However, the "set of 'non-rigged' transactions … starkly differed in a number of ways from the 'rigged' transactions, subjecting the DOJ Model to the risk of bias." In addition, although the criteria established by the government were to define the characteristics of the 13 "rigged" transactions, in fact, Dr. Salzberg notes that five of the 'rigged' trades fail to meet those criteria – what he termed a "serious flaw" in the government's analysis.

- Three of the variables in the DOJ model (product, year and term) are "highly correlated" with whether a transaction was rigged: an issue known as "multicollinearity." This makes the claim of a relationship between "rigging" and profit "unreliable" because those profits "may instead result from differences in "product, terms and years."

---

[9]    Dr. Salzberg demonstrated the same point in graph 2 when he ran the model against only benchmark trades with profit less than $150,000. He found "no discernible difference between rigged and non-rigged trades": rather than a graph showing the error for the rigged trades being $295,000 higher than "non-rigged" trades of the same overall profit, the graph is a straight line with no "statistically significant" difference (Salzberg Report at 4-5).

In sum, our expert in statistical analysis concludes that the government's attempt to show some relationship between excess or increased profit and the rigged nature of a transaction fails completely. Indeed, Dr. Salzberg's conclusions with respect to the government's gain analysis are not surprising when one considers the discussion above (pp. 4-8) concerning the absence of a showing of a loss to municipalities from the conduct involved in this case. It is simply not logical that the provider of a winning bid on an escrow transaction could, on average, obtain an additional $295,000 of excess profit when the bidding on those escrows is often won at the perfect cost (or slightly higher) and, in every instance, a provider not identified as part of the conspiracy was among the losing bidders. For example, if there were multiple bidders at the perfect cost -- some of whom were part of the conspiracy and others who were not -- accepting the government's analysis would mean that, if UBS won the bid at the price of X, $295,000 of that price would, on average, be tainted profit to UBS, but if another bidder not involved in the conspiracy won the bid at the very same price of X, that provider would not have obtained any tainted profit on the transaction. That makes no sense.

Under Section 6A1.3(a) of the guidelines, a Court "may consider" information relating to a disputed sentencing factor "provided that the information has <u>sufficient indicia of reliability to support its probable accuracy</u>" (emphasis supplied). Respectfully, as Dr. Salzberg's analysis makes plain, the government's regression/gain analysis does not even come close to meeting that standard.

For all of the foregoing reasons, it is respectfully submitted that the Court should reject entirely the government's loss analysis with respect to Counts 1, 2 and 3. The government has the burden of demonstrating the existence of a loss, and it has not done so.

**B.      No Enhancement Is Warranted For The Number Of Victims**

          The government has taken the position that a 2 point enhancement is warranted under Section 2B1.1(b)(2)(A) because the conduct at issue in Counts 1, 2 and 3 purportedly had over 10 victims.  Under Section 2B1.1(b)(2) (Application Note 1) of the sentencing guidelines, a "victim" is defined as a person who has sustained some part of an actual loss.  However, as demonstrated above (*see* I(A), *supra*), the government has not shown that a loss existed with respect to the offense conduct.  Simply put, without a showing of loss, there is no person who can be called a victim and, therefore, no enhancement is warranted.[10]

**C.      The Government Misapplies The Aggravating Role Enhancement, And The Enhancement Should Not Be Applied In Any Event**

          The government includes in its guidelines calculation a four-level increase under Section 3B1.1 for Peter Ghavami's purported role as a supervisor in the offense.  The application of this enhancement -- especially as characterized by the government -- is unwarranted for several reasons.  As an initial matter, the government appears to assign the wrong number to the aggravating role it suggests is appropriate.  Exhibit A-1 to the government's February 12, 2013 letter identifies Peter Ghavami as a "Supervisor/5 or more participants," yet calls for a 4-level increase and cites the guidelines provision for a 4-level enhancement.  A manager or supervisor enhancement is three levels, not four.  *See* U.S.S.G. § 3B1.1(b)("[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels").

          Moreover, the government has never argued that Peter was an "organizer or leader" and there was no such evidence adduced at trial.   Rather, the evidence at trial showed that, to the degree anyone could be cast in the role of organizer/leader, it was CDR principal

---

[10]     Furthermore, the absence of any showing that a loss exists means that an order of restitution is not warranted, as such an order is premised on the existence of economic harm to a victim.

David Rubin who, by his own testimony, acknowledged his role in organizing the purported corruption of the bidding process underlying this case.

In any case, the government has not presented sufficient evidence to justify even the application of the 3-point manager/supervisor enhancement. While Peter (along with Rhahime Bell) did serve as co-head of the MRED desk beginning in 2001, as discussed in our principal sentencing letter to the Court, that position was not something he wanted or sought out in any way. Indeed, Peter only took on the role as titular supervisor when his boss agreed that he and Rhahime Bell could hire others to actually manage the day to day operation of the MRED desk. Peter, in turn, continued his focus on large municipal swap transactions. In short, Peter's position *vis a vis* the MRED desk within UBS's corporate structure was, we submit, insufficient to warrant a role enhancement. *See e.g., United States v. Beckford*, No. 05-CR-944 (RWS) 2006 WL 1390414 (S.D.N.Y. May 17, 2006) (court rejected supervisor enhancement where government failed to show that defendant was a supervisor or manager of the illegal activity; merely showing that defendant had a supervisory role as bank branch manager was insufficient).

**D.      The Abuse of Trust Enhancement Is Inapplicable**

The government seeks a two-level increase for "abuse of trust" under Section 3B1.3 of the guidelines. That provision reads, in pertinent part: "If the defendant abused a position of public or private trust … in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels." With respect to Peter Ghavami, the government apparently bases this enhancement solely on the notion that UBS acted as the broker for the Mass. I transaction in Count 3. (*See* Draft PSR ¶ 92) The case law examining the "abuse of trust" enhancement demonstrates that the government's position is unsupportable.

First, the abuse of trust enhancement requires that the defendant himself had a relationship of trust with the victim; a co-defendant's relationship of trust does not extend to other defendants who did not themselves have any such relationship. Section 3B1.3 requires an individualized assessment of the defendant's relationship with the victim. *See e.g., United States v. Caplinger,* 339 F.3d 226 (4th Cir. 2003) (whether or not co-defendants breached a trust relationship with victim/clients by misleading them in an effort to have them invest in a fraudulent pharmaceutical venture was not relevant to defendant, who posed as a physician but did not himself have a physician-patient or trust relationship with the victims); *United States v. Moore*, 29 F.3d 175, 178 (4th Cir. 1994) (the "defendant-specific language [of § 3B1.3] invites a finding that the *defendant being sentenced* [not his co-conspirators] abused a position of trust") (emphasis added).

There was no evidence at trial that Peter ever interacted personally with representatives of Massachusetts, the municipality at issue in Count 3 (or, for that matter, with any of the municipalities involved in the transactions underlying Counts 1 and 2). Thus Peter did not have a fiduciary-type relationship with the municipality. Whether or not the government takes the position that other participants in the purported offense abused positions of trust with respect to the municipalities, such relationships cannot be extended to Peter Ghavami.[11]

Second, even as to UBS, the actual broker or bidding agent on the Massachusetts transaction, the enhancement can apply "only where the defendant has abused discretionary authority entrusted to the defendant by the victim." *United States v. Jolly,* 102 F.3d 46, 48 (2d Cir. 1996), *citing United States v. Broderson*, 67 F.3d 452, 456 (2d Cir. 1995). The examples of abuse of trust in the Application Notes to U.S.S.G. §3B1.3 illustrate this point. *See* U.S.S.G.

---

[11]     Indeed, it is noteworthy that, consistent with the evidence at trial, municipalities that used UBS's services as a broker or bidding agent interacted almost exclusively with UBS's bankers, who were responsible for the municipality as clients of the bank.

§3B1.3 (examples include attorney embezzling client's funds, bank executive executing fraudulent loan scheme, physician sexually abusing a patient during examination). While the defendant/victim relationship is not required to be a fiduciary one, courts typically require that it be imbued with trust or be "fiduciary-like" in nature. *See Jolly*, 102 F.3d at 49 (defendant must be in a position with respect to victim that "is in the nature of a fiduciary relationship"); *United States v. Cusack*, 66 F. Supp. 2d 493 (S.D.N.Y. 1999), *aff'd* 229 F.3d 344 (2d Cir. 2000) (abuse of trust requires that defendant misused discretionary authority entrusted to him by the victim or on the victim's behalf).

The case law is clear that an arms-length business relationship -- such as one arising out of a contractual or even a <u>statutory</u> obligation -- is not a relationship of trust sufficient to serve as the basis of a Section 3B1.3 enhancement. For example, in *United States v. Broderson*, 67 F.3d 452 (2d Cir. 1995), the Second Circuit found that the abuse of trust enhancement did not apply where the defendant was convicted in connection with a fraud involving a contract with NASA that he negotiated for his employer. Under certain statutes that apply to government contracts, the defendant was required, but failed, to disclose to NASA certain updated cost and pricing data relevant to the contract. Broderson signed and submitted two certificates to NASA which falsely stated that the data he had provided was accurate and current. The Court found that the defendant did not occupy a position of trust with respect to the government: the applicable statutes imposed certain legal obligations on the defendant that he failed to fulfill. "[W]hatever 'trust' NASA placed in Broderson was based strictly on the explicit commands of [the applicable statutes]." *Id.* at 456. *See also United States v. Hirsch,* 239 F.3d 221, 227-28 (2d Cir. 2001) (distinguishing cases in which defendants and victims had personal or fiduciary relationship from those in which they had arms-length contractual relationships); *Jolly,*

*supra,* 102 F.3d 46 (2d Cir. 1996) (no "abuse of trust" where defendant was in arms-length business relationship with victims; fraud involved procuring loans by falsifying reports regarding ongoing business of fake company).

The relationships between UBS (as broker/bidding agent) and the municipalities were grounded in either statutory or contractual obligations -- or maybe both -- but not, we submit, in trust relationships. As the evidence at trial made clear, it was the statutory requirements found in the IRS "safe harbor" regulations (as well as any contractual agreements to abide by such regulations), that provided how the bidding process was to be conducted and the reason for the submission of bid certifications. Indeed, the very notion that certifications were used to confirm compliance with applicable rules and regulations cuts against the existence of a trust relationship between UBS and the municipalities. *See United States v. Thorn,* 313 F.3d 107, 122 (2d Cir. 2003). Moreover, as the language of the bid specifications makes clear, the municipalities did not confer "absolute discretion" on bidding agents but, rather, maintained the right to reject any bid at any time and to waive any irregularities in the bid process. *See, e.g.,* GX-25-1 at ¶ VIII ("The City [Bridgeport] reserves the right, at its sole discretion, to reject any and all proposals."). In short, the municipalities operated at arms-length and had relationships with the bidding agents that were governed by contract. For these reasons, application of the abuse of trust enhancement is not warranted with respect to Peter Ghavami.

**E.      A "Sophisticated Means" Enhancement Is Not Warranted**

The government's argument for a 2-level enhancement for "sophisticated means" under Section 2B1.1(b)(10) is similarly misplaced. Application Note 8 to that Section states that "'sophisticated means' means *especially complex or especially intricate* offense conduct pertaining to the execution or concealment of an offense." (emphasis supplied). The Note also

18

provides as examples "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts." *See e.g., United States v. Persaud,* 411 F. App'x. 431 (2d Cir. 2011); *United States v. Regensberg,* 381 F. App'x. 60 (2d Cir. 2010) (sophisticated means enhancement applied where defendant created fraudulent loan documents, detailed reports of fake earnings, used Ponzi scheme payments to lull investors, altered an account statement to mislead investors, etc.); *United States v. Uzoefune,* 334 F. App'x. 360 (2d Cir. 2009) (sophisticated means enhancement applied where defendant used shell companies to further his criminal activity); *United States v. Cole*, 296 F. App'x. 195 (2d Cir. 2008) (sophisticated means enhancement applied where defendant incorporated an entity in a foreign jurisdiction and used that shell company to make scheme appear legitimate, fabricated financial statements, used mail forwarding service to dupe victims, etc.).

As these examples point out, the foundation of any "sophisticated means" enhancement is the type of complex effort to conceal wrongful conduct that does not fit with the case at hand. As with the abuse of trust discussion above, the government cannot rely on the false bid certifications to claim the existence of "sophisticated means." Even under the government's theory of the case, those documents were not created by the defendants to conceal their actions; they were specifically created by the municipalities to confirm compliance with the safe harbor provisions. And even if that were the case, there was no evidence that Peter Ghavami -- other than signing a single form -- had any role in the creation of those records. Similarly, that the government chooses to call swap fees "kickbacks" doesn't mean there was sufficient evidence presented to make it so, or to support the notion that the payments were undisclosed costs to the issuer. Moreover, as discussed above, there was no evidence that municipalities suffered a loss or somehow overpaid for the investment agreements at issue in

Counts 1, 2 or 3. Given that, it seems even more implausible that anyone would need to disguise a kickback as a swap fee that was not even being paid by the municipality in the first place. Finally, as with the bid certifications, even if the government's theory were correct, there is no real evidence that Peter Ghavami had a role arranging for the payment of kickbacks in the form of swap fees.

For all of these reasons, a "sophisticated means" enhancement is not appropriate.

## II. THE "CUMULATIVE EFFECTS" OF SUBSTANTIALLY OVERLAPPING ENHANCEMENTS WARRANTS A DOWNWARD DEPARTURE OR VARIANCE

For the reasons discussed above, the sentencing guidelines enhancements sought by the government are unwarranted. Moreover, application of those enhancements would have a cumulative effect on the guidelines level sufficient to merit a departure or variance from the resulting elevated sentencing range. Such a departure (or variance) is warranted "when the addition of substantially overlapping enhancements results in a significant increase in the sentencing range minimum (as it does at the higher end of the sentencing table)." *United States v. Lauersen*, 362 F.3d 160, 164 (2d Cir. 2004). Grounded in Section 5K2.0 of the guidelines, the "cumulative effects" departure recognizes that "[w]hat is present to a degree not adequately considered by the Commission is the *combined effect* of the aggregation of substantially overlapping enhancements and the large increase in the sentencing range minimum at the higher end of the sentencing table." *Id.*

In order to reach an offense level of 37, the Government applies five enhancements to Mr. Ghavami's base offense level of 7: (a) 20 levels for a loss of more than $7 million; (b) 2 levels for the use of sophisticated means; (c) 4 levels for his role as an organizer or leader of five or more participants; (d) 2-levels for an offense involving more than ten victims;

and (e) 2 levels for conduct involving an abuse of trust. The Second Circuit has decided that the first three of these enhancements -- loss amount, sophisticated means and leadership role -- are "little more than different ways of characterizing closely related aspects of … [the] fraudulent scheme … ." *United States v. Jackson*, 346 F.3d 22, 26 (2d Cir. 2003), *aff'd Lauersen*, 362 F.3d at 161. While *Jackson* and *Lauersen* did not expressly contemplate the cumulative effect of the five specific enhancements at issue here, we submit that, given the nature of these transactions, application of enhancements for multiple victims and abuse of trust would similarly constitute substantially overlapping enhancements in combination with the first three.

The piling-on of five substantially overlapping sentencing enhancements increases Mr. Ghavami's minimum sentencing range dramatically and, we respectfully submit, in a manner that the Sentencing Commission could not have considered adequately in formulating the guidelines. *See United States v. Adelson*, 441 F. Supp. 2d 506, 510 (S.D.N.Y. 2006) (Commission gives no explanation for why some crime characteristics carry sentencing enhancements and others do not). For example, just considering Peter Ghavami's base offense level (7) plus the enhancement for the loss amount suggested by the government (20) would alone result in an advisory sentencing range of 70 to 87 months. Addition of the government's multiple overlapping enhancements soars that offense level up to 37 and the advisory range of 210 to 262 months. Thus, including these overlapping enhancements -- all of which are, we respectfully submit, already contemplated in the increased severity of punishment corresponding to the incremental increases in the U.S.S.G. § 2B1.1 loss table -- leads to *tripling* the low end of the suggested guideline range. In these circumstances, where the piling-on effect of multiple overlapping enhancements at the higher end of the sentencing table exponentially increases the

applicable range, *Lauersen* and its progeny support, indeed advocate for, the Court to exercise its discretion and substantially depart or grant a variance from that draconian sentencing range.

## III.   THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITIES SUPPORTS A VARIANCE

Among the factors set forth in 18 U.S.C. § 3553, a sentencing court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  *See United States v. Parris*, 573 F. Supp. 2d 744, 751 (E.D.N.Y. 2008) ("primary purpose" of 3553(a)(6) was to reduce unwarranted sentencing disparities nationwide); *United States v. Gordon*, 2006 WL 1675921 (S.D.N.Y. Jun. 16, 2006) (non-guidelines sentence of 37 months was warranted where a more culpable co-defendant had received a sentence of 46 months and the instant defendant's role was closer to another co-defendant who had received a 37 month sentence).

In applying this factor, the key is "similar records" and "similar conduct."  Thus, the court need not consider the sentences of others who are not similarly situated.  *See e.g., United States v. Marino*, 309 F. App'x. 523 (2d. Cir. Feb. 17, 2009) (defendant failed to establish that proffered examples of other CFOs convicted of financial fraud were defendants with "similar records" found guilty of "similar conduct").  On the other hand, perhaps because it is often difficult to find similarly situated defendants, sentencing courts have sometimes opted to draw comparisons with dissimilar cases in order to arrive at a just sentence.  *See e.g., United States v. Adelson*, 441 F. Supp. 2d. 506, 515 (S.D.N.Y. 2006) (piling on of enhancements resulted in guidelines calculation of life imprisonment, which court found was "wildly off-base").

In the instant case, the Court is in the rare position of knowing of a case arising out of the exact same investigation and predicated on the same type of offense conduct which

proceeded just ahead of this case. In *United States v. Carollo,* 10 Cr. 654 (HB), which went to trial in early 2012, the defendants were convicted of conspiracy charges stemming from alleged corrupt bidding practices with respect to reinvestment products in the municipal bond industry. Those defendants were sentenced in October 2012 to terms of incarceration of: 36 months (Peter Grimm); 48 months (Steve Goldberg); and 36 months (Dominic Carollo). It is worth noting that there are further parallels between Dominic Carollo and Peter Ghavami. Both were the supervisors of their two other co-defendants, and as to both, the evidence demonstrated a lack of involvement in the day-to-day transactions underlying the cases.

Furthermore, while there are multiple parallels between the two cases (and Messrs. Ghavami and Carollo in particular), there are factors that significantly differentiate Peter in a way that should lead this Court to conclude that a sentence below the one received by Dominic Carollo is warranted. Those factors include, for example, that Peter Ghavami's role in supervising the MRED desk was, as we described earlier, attenuated at best. Indeed, he and Rhahime Bell only agreed to take over supervising the MRED desk if they were able to hire others to run its day-to-day operation. Again, the evidence at trial proved that Peter actually spent almost all of his time working on the municipal swap transactions unrelated to the case at hand. Moreover, as discussed in our principal sentencing letter to the Court, given his compensation plan at UBS, Peter had no financial motivation and obtained no personal benefit from the transactions at issue. As such, we respectfully submit that, in fairness, Peter's sentence should fall well below that of Mr. Carollo.

The sentences recently received by several of the government witnesses in the *Carollo* trial are, we submit, also relevant considerations with respect to a fair sentence for Peter Ghavami. For example, Adrian Scott-Jones pleaded guilty to engaging in corrupt bidding

transactions and testified for the government in the *Carollo* trial until he perjured himself at the trial. At that point the government disavowed reliance on his testimony, decided to withdraw from prosecuting one of the counts against the *Carollo* defendants relating to their transactions with Mr. Scott-Jones, and ultimately voided his cooperation agreement. Notwithstanding Scott-Jones's admitted involvement in corrupt bidding transactions, his inability to tell the truth under oath at the *Carollo* trial, and his entirely failed effort at cooperation that damaged the government's case, he received a sentence of 18 months.

As for the recent sentences of CDR cooperating witnesses, we recognize, of course, that cooperation with the government provides a basis for distinguishing defendants who were convicted at trial. Nevertheless, there are countervailing considerations that make those sentences relevant here. Even accepting that the jury found Peter Ghavami participated in the conspiratorial conduct alleged in Count 2 of the indictment, the fact remains that CDR and its employees were the admitted creators and long-time motivating force behind that conspiracy. As CDR president David Rubin testified, of his work force of approximately eight to 10 individuals in the reinvest business, *seven* have pleaded guilty to crimes involving the municipal bond business. Tr. 3310-14. As Rubin's testimony made clear, for 20 years CDR and its employees regularly, indeed routinely, cheated its municipal customers and the IRS. Tr. 3314-20.

For example, Rubin's right-hand man for two decades, Stewart Wolmark, engaged in widespread and lengthy corruption in the reinvest business while at CDR. Tr. 3310. Indeed, Wolmark's "work" at CDR entailed not only defrauding municipalities but also multiple acts of political corruption and graft, including handing over thousands of dollars to the governor of New Mexico in connection with CDR's securing reinvestment business with the state, an act of such brazenness that even Rubin admitted that it was "not a smart thing to do." Tr. 3348.

That Wolmark chose, on the eve of trial, to plead guilty and cooperate with the government, does not automatically mean that his extraordinary level of culpability as compared to evidence at trial about Peter Ghavami can be ignored. Wolmark received a sentence of 18 months. Other CDR cooperating witnesses Evan Zarefsky and Matthew Rothman (who testified in this case), both of whom were involved extensively in that company's long-running and widespread misconduct, received sentences of 8 months and 6 months.

## IV.    CONCLUSION

This Memorandum of Law has focused on the application, or more accurately, the misapplication of the guidelines enhancements sought by the government. Chief among those issues is the loss calculation, which significantly drives the astronomical guidelines level sought by the government. The government's effort to use a gain analysis for its guidelines loss number is not appropriate both because there has been no showing that a loss even exists, and because the government's gain/regression analysis is so fundamentally flawed that it is valueless. The remainder of the guidelines enhancements sought by the government are not supported by the law. Beyond that, even if the Court were to apply all of the enhancements sought by the government, they are substantively overlapping and result in a cumulative "piling-on" effect on the guidelines never intended by the Sentencing Commission, and warrant a downward departure or variance. Finally, we examined the need to avoid sentencing disparities among similarly situated defendants, and how the parallels, as well as differences, between Peter Ghavami and both the *Carollo* defendants and the cooperating witnesses who have been sentenced warrant a sentence well below any given in the *Carollo* case.

██████████████████████████████████

██████████████████████████████████

██████████  ████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████

Your Honor must, of course, accept the jury's verdict in sentencing Peter Ghavami, but all of the considerations discussed in this Memorandum and our principal sentencing letter lead, we most respectfully submit, to a single conclusion: leniency for Peter Ghavami.

Dated: New York, New York
April 22, 2013

Respectfully submitted,

STILLMAN & FRIEDMAN, P.C.

By _____

Charles A. Stillman
James A. Mitchell
Erik Zissu
Mary Margulis-Ohnuma

425 Park Avenue
New York, NY 10022
(212) 223-0200
*Attorneys for Defendant Peter Ghavami*