UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

       - v. -                                    10 Cr. 1217 (KMW)
                                                                OPINION & ORDER
PETER GHAVAMI, GARY HEINZ, and
MICHAEL WELTY,

                      Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

KIMBA M. WOOD, U.S.D.J.:

       After a month-long trial, Defendants Peter Ghavami ("Ghavami"), Gary Heinz ("Heinz"),

and Michael Welty ("Welty") (collectively, "Defendants") were convicted of conspiracies to

defraud municipal bond issuers, the United States Department of Treasury, and the Internal

Revenue Service, by manipulating the bidding process for municipal bond investment products

and other municipal finance products, in violation of 18 U.S.C. §§ 371 and 1349.  Heinz and

Ghavami were also convicted of substantive wire fraud, in violation of 18 U.S.C. § 1343.

       Welty now moves for a new trial, pursuant to Federal Rule of Criminal Procedure 33

("Rule 33"); Ghavami and Heinz join Welty's motion for a new trial.  In addition, Heinz and

Welty move for release pending appeal, pursuant to 18 U.S.C. § 3143(b).  For the following

reasons, the Court DENIES both motions.

### I.   BACKGROUND

       Defendants worked for UBS Financial Services, Inc. ("UBS") on its municipal bond

reinvestment and derivatives desk, (Tr. 502–03), participating in a market in which financial

institutions provide investment products to the issuers of municipal bonds.  Municipal bonds are

issued by government and quasi-governmental entities to raise money for operations or projects.

1

The money raised is typically spent slowly over time; issuers therefore frequently invest bond proceeds in investment products.  These products are often chosen through a competitive bidding process, run by a financial institution hired by the issuer to act as a "broker."  The broker solicits bids from financial institutions for investment products that are customized to the issuer's needs. The investment product offering the highest rate of return generally wins the bidding, and the financial institution that submits the winning bid is chosen as the investment product "provider." UBS functioned as both a broker and a provider for municipal bond investment products during the relevant time period.  (Tr. 517, 529–30, 3861); *see generally United States v. Grimm*, 738 F.3d 498, 499–500 (2d Cir. 2013) (discussing the investment of municipal bond proceeds); (*see, e.g.*, Tr. 499–590, 2703, 2913–14, 3858–61).

Typically, interest payments on municipal bonds are not subject to federal income tax. *See* I.R.C. § 103(a) (providing that, subject to certain exceptions, "gross income does not include interest on any State or local bond").  As part of the process for maintaining a bond's tax-exempt status when its proceeds are put into an investment product, United States Treasury regulations require issuers to determine the investment product's fair market value, *see Grimm*, 738 F.3d at 500 (citing Treas. Reg. § 1.148–5(d)); under the regulations' "safe harbor" provision, an investment product's purchase price can be "treated as the fair market value of the investment," if certain requirements for a competitive bidding process are satisfied, Treas. Reg. § 1.148–5(d)(6)(iii).  The regulations require, among other things, that at least three bids be received, that a potential provider "not consult with any other potential provider about its bid" or be "given the opportunity to review other bids (i.e., a last look) before providing a bid," that bids be "determined without regard to any other formal or informal agreement that the potential provider has with the issuer or any other person," and that bids not be submitted "solely as a courtesy to

2

the issuer or any other person for purposes of satisfying" the three-bid requirement. *Id.* Brokers and bidders sign "certifications" to the issuer that typically contain representations mirroring the Treasury regulations' requirements, so that the issuer's legal counsel can verify the bond's tax-exempt status. *See generally Grimm*, 738 F.3d at 499–500 (discussing the Treasury regulations); (*see, e.g.*, Tr. 521–94, 1640–47, 1858, 2068, 2473, 2701–10, 2735–46, 2802–09, 2914–16, 3590–91, 3942–56).

The Government charged Defendants with conspiring to manipulate and rig bidding on certain investment products, and then falsely certifying that competitive bidding processes had occurred. The Superseding Indictment contained six counts.

Counts One and Two charged Defendants with conspiracy to commit wire fraud in connection with UBS's role as a potential provider. Count One alleged that Defendants, acting as potential providers, conspired with other potential providers—specifically, individuals at J.P. Morgan Chase ("JPMC") and Bank of America ("BOA")—to reduce competition among the firms by exchanging bid information, such as discussing on which transactions to bid, and submitting intentionally losing bids on each others' behalf, in violation of 18 U.S.C. § 371. Count Two charged that Defendants, acting as potential providers, conspired with a broker—Chambers, Dunhill, Rubin & Co. ("CDR")—to set up bids for UBS to win, in violation of 18 U.S.C. § 1349. Coconspirators at CDR allegedly provided Defendants with the opportunity to change bids after reviewing the bids of others, kept competitive bidders off bid lists, and solicited intentionally losing bids from other potential providers. In return, UBS gave CDR kickbacks and submitted intentionally losing bids when requested. (*See* Superseding Indictment [Dkt. No. 30]).

The Government also alleged, in Counts Three through Five, that Defendants rigged bidding while acting as a broker.  Count Three charged Defendants with substantive wire fraud, for purportedly setting up a transaction for BOA to win in exchange for a kickback, in violation of 18 U.S.C. § 1343.  Count Four charged Heinz and Welty with conspiracy to commit wire fraud.  Count Four alleged that Heinz and Welty conspired with a potential provider—GE Capital ("GE")—to rig bidding in GE's favor by providing coconspirators at GE with "last looks" and by agreeing to keep competitive bidders off bid lists, in return for kickbacks on other transactions, in violation of 18 U.S.C. § 1349.  Count Five charged Heinz with substantive wire fraud for manipulating the bidding process on a transaction to steer it to JPMC, in violation of 18 U.S.C. 1343.  (*See* Superseding Indictment).

Additionally, the Government charged Heinz, in Count Six, with witness tampering, in violation of 18 U.S.C. §§ 1512(b)(1) and (3).  (*See* Superseding Indictment).

At trial, the Government presented substantial evidence to support these charges.  Among numerous witnesses called by the Government who testified against Defendants were alleged coconspirators at UBS, CDR, BOA, JPMC, and GE.  In addition to emails and other documents in furtherance of the conspiracies that were submitted into evidence, the Government played audio recordings of numerous phone calls between Defendants and their alleged coconspirators. The Government also submitted approximately sixty purportedly false certifications signed by Defendants and their alleged coconspirators on over twenty transactions.

The jury found Ghavami guilty on Counts One through Three; Welty guilty on Counts One, Two, and Four; and Heinz guilty on Counts One through Five.  (Tr. 4864–65).  Welty was found not guilty on Count Three, and Heinz was found not guilty on Count Six.  (*Id.*).  Ghavami was sentenced to 18 months of imprisonment, and he was fined $1,000,000.  [Dkt. No. 389].

Welty was sentenced to 16 months of imprisonment and three years of supervised release, and he was fined $300,000. [Dkt. No. 386]. Heinz was sentenced to 27 months of imprisonment and three years of supervised release, and he was fined $400,000. [Dkt. No. 385].

## II.   MOTION FOR A NEW TRIAL

Welty's motion for a new trial contends that the Government failed to disclose material evidence favorable to the defense in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). In the course of discovery in this case, the Government produced the equivalent of approximately 19.5 million records, along with over 600,000 audio files of recorded conversations. (*See* Gov't Opp. to Mot. for New Trial 3 [Dkt. No. 461]). After Defendants were convicted, the prosecutors in this case learned that, due to the fault of a vendor, a subset of files from CDR—an alleged coconspirator broker—had not been reviewed by the prosecutors in this case and thus had not been turned over in discovery. (*See* Letters to the Court [Dkt. Nos. 421, 423, 439–48, 450–51, 455]). Those records (which totaled nearly 400,000 documents) were produced to Defendants post-trial, in late 2013. (*See id.* [Dkt. Nos. 423, 439, 455]). Welty asserts that *one* of the newly-produced documents (the "Goldberg Email") could have changed the outcome of the trial and should have been produced pursuant to the Government's *Brady* obligations. The Court disagrees and thus DENIES Welty's motion for a new trial.

### A.   Legal Standard

Rule 33 provides that a court "may vacate any judgment and grant a new trial if the interest of justice so requires."[1]

---

[1]      Although Rule 33 states that, if "an appeal is pending"—as is the case here—a court "may not grant a motion for a new trial until the appellate court remands the case," Fed. R. Crim. P. 33, a district court nonetheless has "jurisdiction to *deny* a Rule 33 motion during the pendency of an appeal," *United States v. Camacho*, 302 F.3d 35, 36 (2d Cir. 2002) (emphasis added).

Under *Brady*, the Government must "disclose material evidence favorable to a criminal defendant."  *United States v. Mahaffy*, 693 F.3d 113, 127 (2d Cir. 2012); *see also United States v. Bagley*, 473 U.S. 667, 676 (1985) (noting that "[i]mpeachment evidence … as well as exculpatory evidence, falls within the *Brady* rule").  Undisclosed evidence is "material" if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Youngblood v. West Virginia,* 547 U.S. 867, 870 (2006) (quotation marks omitted).  A showing of materiality, though, "'does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal,'" but rather requires only "'a showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'"  *Mahaffy*, 693 F.3d at 127 (quoting *Youngblood*, 547 U.S. at 870).

**B.    Discussion**

The Government acknowledges that it failed to timely disclose the Goldberg Email.  (*See* Gov't Opp. to Mot. for New Trial 10).  The Government argues, however, and the Court agrees, that this failure did not constitute a *Brady* violation, because the Goldberg Email was not "material" evidence; even if it had been disclosed before trial, there is no reason to believe that it would have had any impact on the verdict.[2]

---

[2]      Welty argues that a new trial would be warranted even if the Goldberg Email had not been suppressed and were, instead, from a "neutral source."  (Welty Mem. of Law in Supp. of Mot. for New Trial 19–21 [Dkt. No. 458]).  This point is moot.  The Government concedes that it had possession of the Email and failed to timely disclose it.  Moreover, having failed to satisfy the *Brady* standard for materiality, the Email would not merit a new trial under the standard for non-suppressed newly discovered evidence, given that the "burden on a defendant in supporting a motion for a new trial based on newly discovered evidence from a neutral source is higher than that for undisclosed *Brady* evidence."  *Orena v. United States*, 956 F. Supp. 1071, 1092 (E.D.N.Y. 1997).  Whereas *Brady* mandates a new trial if suppressed evidence creates "a real enough possibility to undermine confidence in the verdict," *Mahaffy*, 693 F.3d at 134, neutral source evidence merits a new trial only if the "admission of the evidence would probably lead to an acquittal," *United States v. Alessi*, 638 F.2d 466, 479 (2d Cir. 1980); *see, e.g.*, *United States v. Basciano*, 03 Cr. 929, 2008 WL 905867, at *2 (E.D.N.Y. Mar. 31, 2008) (explaining that, because the court declined to grant

The Goldberg Email is most directly relevant to Count Four.  As to Count Four, the Government presented evidence that Heinz and Welty, while serving as brokers for certain investment products, manipulated bidding in order to allow Peter Grimm ("Grimm"), an alleged coconspirator at GE, to win deals at reduced prices.  In return, Grimm provided Heinz and Welty with kickbacks on related transactions.

As part of its case on Count Four, the Government submitted audio recordings of phone calls between Welty and Grimm.  The Government argued that some of the calls revealed Grimm informing Welty of his intended bid, which Welty then reduced, to allow Grimm to win the bidding at a lower price.

In these phone conversations, however, Welty and Grimm did not explicitly use the word "bid"; rather, they used the word "indication."  At trial, the Government acknowledged that "indication" has a meaning in general industry practice that is distinct from "bid."  Evidence showed that, in typical practice, brokers and bidders often asked one another for information concerning the levels at which bids would be made in the current (albeit fast moving) market.  These estimated bid levels could change over time, given market fluctuations; the closer to bidding time, the more likely it was that the level given would be the bank's actual bid.  In the parlance of the industry, these bid levels were termed "indications."

One of the Government's witnesses, an alleged coconspirator at UBS named Mark Zaino ("Zaino"), testified that although the word "indication" does not usually mean "bid," (*see* Tr. 698, 1099, 1654–56, 1790), he would sometimes use the word "indication" to signify "bid."  In particular, Zaino testified that the meaning of his use of "indication" changed closer to bidding

---

the defendant a new trial "under the lower standard applicable to such a motion where the Government has suppressed evidence," the defendant "necessarily cannot establish that he should receive a new trial under the more rigorous standard applicable to a motion based upon newly discovered evidence"), *aff'd*, 384 F. App'x 28 (2d Cir. 2010).

time, and he explained that, "[a]s a broker," he would use "indication" to "signal" to the bidder "a bid to submit" and, "as a bidder," he would use it to "signal" to the broker "a bid that I wanted to submit." (Tr. 698–99). Based on his experience in the conspiracies, Zaino testified that, on certain phone calls related to Count Four transactions, Welty and Grimm had similarly used "indication" to signal "bid." (*See, e.g.*, Tr. 1117–19, 1231).

Defendants contended at trial, however, that the word "indication" never meant "bid." Thus, according to Defendants, when the conspirators told one another their "indication," they were speaking about only where they saw the market price and were not signaling what they specifically planned to bid.

Welty claims that the Goldberg Email warrants a new trial because it shows an instance in which the word "indication" was expressly distinguished from "bid." The Email relates to a transaction that CDR brokered. (*See* Welty Mem. in Supp. of Mot. for New Trial ("Welty New Trial Mem."), Attach. 1, Decl. of Jeffrey L. Ziglar ("Ziglar Decl.") [Dkt. No. 458]). Matt Rothman ("Rothman") at CDR sent the bid specifications for the deal to individuals at various potential providers, including Welty at UBS. (*See id.*, Ex. B). On the day bids were due, Welty emailed Rothman, stating that "we are out our indication is not good it is not a good offer." (*Id.*, Ex. C). Shortly thereafter, Jeffrey Ziglar ("Ziglar"), a former colleague of Defendants' at UBS, (*see* Tr. 3850), sent an email to Rothman and another broker at CDR, Doug Goldberg ("Goldberg"), copying Welty and stating that, "[f]or the record no trade has been done with UBS on this deal," (Ziglar Decl., Ex. D). Four minutes later, in the email that Welty now claims merits a new trial, Goldberg replied that, "[f]or the record until I hear a tape using the words indication we are not through with this conversation!," (*id.*, Ex. E), implying that only if he heard the word "indication" from UBS would he consider UBS's number *not* to be a bid. The

8

following day, Welty wrote to Rothman, stating that the relevant phone calls had not been recorded, so no verbatim record could be provided.  (*Id.*, Ex. K).  In the same email, Welty explained that UBS "did not realize you were soliciting an actual bid for securities as opposed to seeking some market color."  (*Id.*).  Ziglar recalls that this "dispute was resolved consistent with [UBS's] position … and that UBS did not participate" in the transaction.  (Ziglar Decl. ¶ 3).

Welty contends that the Goldberg Email corroborates Defendants' categorical distinction between "indications" and "bids," thereby revealing their lack of criminal intent, undermining Zaino's testimony and credibility, and undermining the Government's reliance on Zaino's testimony in its summation.  Because Zaino also testified on matters pertaining to counts other than Count Four, Welty argues that the Government's failure to disclose the Goldberg Email prejudiced the entire trial.  The Email is immaterial, however, for three reasons.  First, it is consistent with the Government's theory at trial and does not support Defendants' position. Second, to the extent the Email could have been used to impeach Zaino, it would have been cumulative.  Third, the substantial evidence presented at trial of Defendants' guilt negates the possibility that the Email could have "put the whole case in such a different light as to undermine confidence in the verdict."  *Mahaffy*, 693 F.3d at 127.

    1.    <u>The Goldberg Email Is Consistent with the Government's Theory at Trial</u>

Goldberg's distinction between bids and indications in the Email is reflective of general industry practice and is consistent with the Government's position and the testimony the Government elicited at trial.  (*See, e.g.*, Tr. 698, 1790 (Zaino acknowledging that "indication" typically means a "price that would transact given the then current market" and was not normally the same as a bid)).  Goldberg was not alleged to be part of the Count Four conspiracy; Ziglar— the direct recipient at UBS of the Email and the author of the message to which Goldberg

replied—was not alleged to be a coconspirator in any of the charged counts; and the transaction discussed in the Goldberg Email was not claimed by the Government to have been rigged.  If anything, the Goldberg Email is just one more example of how the term was used *outside* the conspiracy.  It does not bolster the defense position that, *within* the conspiracy, "indication" was never used to mean "bid."

     2.    Use of the Email to Impeach Zaino Would Have Been Cumulative

Use of the Email to contradict Zaino's testimony would have added little or nothing to the evidence already in Defendants' hands.  "[I]f the information withheld is merely cumulative of equally impeaching evidence introduced at trial, so that it would not have materially increased the jury's likelihood of discrediting the witness, it is not material."  *United States v. Spinelli*, 551 F.3d 159, 165 (2d Cir. 2008).

Zaino was cross-examined heavily on the meaning of the word "indication" and steadfastly maintained his position that although the word had one general meaning, it could also be used to signal the price at which bids would be submitted.  Defendants attempted to impeach Zaino on this point with his prior testimony from a related trial, *United States v. Carollo*, 10 Cr. 654 (S.D.N.Y.).  Welty's counsel read from the transcript of that case, in which Zaino answered affirmatively to the question "[c]an we agree an indication is different from a bid?"  (Tr. 1655–57).  In response to questioning from Welty's counsel in the instant case, Zaino similarly replied that an indication is "[m]ost times not" an executable price.  (*Id.*).  But Zaino insisted that the word "indication" did not always have the same meaning in every context.  (*See, e.g.*, *id.*).

Zaino's credibility was also attacked by cross-examination about his plea agreement, (Tr. 1295–97, 1328), crimes he had committed outside the scope of his plea agreement, (Tr. 1292–93,

1329, 1706–07), and evidence that he disliked Welty, (Tr. 1570–72; *see also* Tr. 3855).

Defendants also called Ziglar, who testified that indications are not bids.  (Tr. 3865–66, 3899).

Zaino had therefore been thoroughly attacked by defense counsel, not only on the exact point for which the Goldberg Email could have been used, but also by additional means of impeachment.  The Goldberg Email, moreover, would have been a far less persuasive means of impeaching Zaino than the myriad approaches utilized by the defense at trial, because Zaino had no involvement in the Goldberg Email conversation.

3.    The Government Submitted Substantial Evidence, In Addition To Zaino's Testimony

"Where the evidence against the defendant is ample or overwhelming, the withheld *Brady* material is less likely to be material than if the evidence of guilt is thin."  *United States v. Gil*, 297 F.3d 93, 103 (2d Cir. 2002).

The Government's evidence at trial was substantial.  It consisted of considerably more than just Zaino's testimony, and the majority of the evidence had nothing to do with the meaning of "indication," which was an issue only as to Count Four.  As to Count Four, the Government also introduced, for example, (i) recorded phone calls in which Heinz and Grimm appeared to discuss kickbacks in return for rigged bidding, (*see* Gov't Exs. 605607, 605610 (Heinz remarking to Grimm, "I thought there was some profit sharing, if you will")); (ii) recorded phone calls in which Welty, acting as a broker, seemed to manipulate bidding lists in Grimm's favor, (*see* Gov't Ex. 11906(A) (Welty asking Grimm, "who do you wanna, wanna see in this thing?," and Grimm responding, "[w]ell, who don't I wanna see?"); Gov't Ex. 605507 (Welty asking Grimm, "who you wanna go against?"));[3] and (iii) recorded phone calls in which Welty and

---

[3]    Welty argues that the Treasury regulations "do not prohibit the discussion of bid lists between bidding agents and potential providers," citing trial testimony by Ziglar.  (Welty Reply Mem. in Supp. of Mot. for New Trial 6 [Dkt. No. 464]).  Yet Ziglar testified merely that he would not state with a "blanket no" that a broker should not consult with a potential provider about who should be on a bid list, because it might be proper for a broker and

Grimm appeared to discuss sharing profits on rigged transactions, (*see, e.g.*, Gov't Ex. 11954 (Grimm noting to Welty that, "you know, obviously, … the better level I can get the other one at, you know, the more, you know, I could give"); Gov't Ex. 11968 (Grimm explaining to Welty that, "the more, you know, I mean, so this way we could take care of the other, you know, better")).

**C.    The Court Denies Welty's Request for an Evidentiary Hearing**

Welty requests an evidentiary hearing on his motion for a new trial.  (*See* Welty New Trial Mem. 21).  Welty suggests that an evidentiary hearing would permit the Court to hear testimony from two participants in the Goldberg Email.  Whether to hold an evidentiary hearing before deciding a motion for a new trial rests within the district court's discretion.  *See United States v. Sasso*, 59 F.3d 341, 350 (2d Cir. 1995).

The Court finds that an evidentiary hearing is unnecessary and rejects Welty's request. The Court's denial of Welty's motion for a new trial does not rest on choosing between competing interpretations of the Goldberg Email; the Court finds Welty's arguments unavailing, even taking his interpretation of the Email as correct.[4]  *Cf. United States v. Helmsley*, 985 F.2d

---

potential provider to discuss which potential providers could be good for a particular transaction, for the purpose of gathering "market information."  (Tr. 3951–52).  Broker-provider communications about manipulating bid lists in order to make bidding less competitive is entirely distinct from gathering "market information"; as Ziglar acknowledged, issuers asked brokers "to get the most competitive providers on the list," and a broker "would try to foster a competitive bidding process" by getting "the most competitive providers put on the bid list."  (Tr. 3952 (questions asked by the Government on cross, to which Ziglar responded affirmatively)).

[4]       Furthermore, it is unlikely that the testimony of Welty's two proposed witnesses would assist the Court's determination of the Goldberg Email's materiality.  Welty seeks to examine Goldberg and Rothman; Welty "anticipate[s] that both Mr. Goldberg and Mr. Rothman would support [Defendants'] position that an 'indication' is not a 'bid' and contradict Mr. Zaino's testimony on the subject," (Welty Reply in Supp. of Mot. for New Trial 15). But the Court already heard Rothman address the use of "indication" at trial in this case, and his testimony used the term's general meaning, consistent with Defendants' argument.  (*See* Tr. 3479).  Defendants had an opportunity to cross-examine Rothman on this testimony at trial.  Goldberg, by contrast, did not testify about the meaning of "indication" in this case.  Yet he gave substantial testimony in the *Carollo* trial that undermines Defendants' position; Goldberg explained in *Carollo* that he "used guarded language" on recorded phone lines and that he used a different meaning of "indication" in certain contexts to conceal his illegal conduct.  Tr. 369–70, *Carollo*, 10 Cr. 654 (S.D.N.Y. 2012) (Goldberg stating that he "might use language that if heard outside what the understanding is wouldn't seem like anything," and noting that "a word like indication I would use in a manner opposite of its meaning").

1202, 1209–10 (2d Cir. 1993) (explaining that a hearing on a new trial motion is unwarranted where "'[t]he moving papers themselves disclosed the inadequacies of the defendants' case, and the opportunity to present live witnesses would clearly have been unavailing'" (quoting *United States v. Slutsky*, 514 F.2d 1222, 1226 (2d Cir. 1975))).

## III.    MOTION FOR RELEASE PENDING APPEAL

After the Court sentenced Defendants, they each appealed their convictions.  Heinz and Welty now move for release pending appeal, [Dkt. Nos. 404, 406]; Ghavami does not.  For the following reasons, the Court DENIES Heinz's and Welty's motions for release pending appeal.

### A.    Legal Standard

Release pending appeal is warranted when (i) the defendant "is not likely to flee or pose a danger to the safety of any other person or the community if released"; (ii) "the appeal is not for the purpose of delay"; and, most importantly for the present motion, (iii) the appeal "raises a substantial question of law or fact likely to result in," among other things, reversal, a new trial, or a materially reduced sentence.  18 U.S.C. § 3143(b).

The Second Circuit defines a "substantial" question as "one of more substance than would be necessary to a finding that it was not frivolous.  It is a 'close' question or one that very well could be decided the other way."  *United States v. Randell*, 761 F.2d 122, 125 (2d Cir. 1985) (internal citations omitted).  The defendant has the burden of persuasion on whether the questions raised on appeal are "substantial" and are likely to result in a reversal, new trial, or materially reduced sentence.  *Id.*

**B.    Discussion**

Heinz and Welty together raise four issues that they contend constitute substantial questions of law or fact.[5]  First, they both contend that the Court incorrectly held that 18 U.S.C. § 3293(2), which extends the limitations period for a wire fraud offense if the offense "affects a financial institution," is applicable if the offense exposes the institution to a new or increased risk of loss.  Second, Heinz argues that the Government's contention that Defendants' conduct affected a financial institution under 18 U.S.C. § 3293(2), when it did not make the same assertion in related plea agreements with Defendants' coconspirators, violated due process.  Third, Welty asserts that a portion of the Court's jury instructions was erroneous.  Fourth, Welty states that Zaino's trial testimony violated Federal Rule of Evidence 701.

The Court concludes that none of these issues presents sufficiently close, substantial questions to permit release pending appeal.

1.    Statute of Limitations

Under 18 U.S.C. § 3293(2), the statute of limitations for wire fraud and conspiracies to commit wire fraud, which is typically five years, *see* 18 U.S.C. § 3282(a), is extended to ten years if "the offense affects a financial institution."  Before trial, Defendants moved to dismiss Counts One through Five of the Superseding Indictment as untimely.  In denying their motion, the Court concluded that a financial institution is "affect[ed]" under 18 U.S.C. § 3293(2) if the offense "exposes such institution to a new or increased risk of loss, even if there is no actual or net loss."  *United States v. Ghavami*, 10 Cr. 1217, 2012 WL 2878126, at *6 (S.D.N.Y. July 13, 2012) (Wood, J.).  The Court found that the Government had alleged sufficient evidence—in the

---

[5]    Although Heinz and Welty do not each brief all four arguments in their respective memoranda, they both expressly join in and adopt one other's arguments.  (*See* Heinz Mem. of Law in Supp. of Mot. for Release Pending Appeal 1 n.2 [Dkt. No. 407]; Welty Mem. of Law in Supp. of Mot. for Release Pending Appeal 2 n.1 [Dkt. No. 405]).

form of enormous settlement payments made by financial institutions, including UBS,[6] as a result of Defendants' conduct and in return for non-prosecution agreements—to demonstrate a new or increased risk of loss to financial institutions. *See id.* at *9–10. Heinz and Welty contend, instead, that for an offense to "affect[]" a financial institution, the offense must at least cause the institution to suffer an *actual* loss, not just a *risk* of loss. They argue that the Government's evidence does not show actual loss.

Heinz and Welty have little support for their position. The Court's interpretation is consistent with § 3293(2)'s plain meaning and purpose. Moreover, authority from other courts, both within and outside the Second Circuit, is overwhelmingly in accord with the Court's ruling. And even if the Second Circuit were to hold that an actual loss must be shown to satisfy § 3293(2), the Government should nonetheless prevail, because the settlements suffice to demonstrate actual losses. Heinz and Welty's statute of limitations argument is not, therefore, a substantial question likely to result in a reversal, new trial, or materially reduced sentence.[7]

---

[6]     UBS's settlement with the SEC included disgorgement of $9,606,543, prejudgment interest of $5,100,637, and a civil penalty in the amount of $32,500,000. (*See* Gov't Mem. of Law in Opp. to Mot. to Dismiss, Ex. B [Dkt. No. 110]). The Government asserts that UBS's settlement agreements with the SEC, IRS, and twenty-five state attorneys general required UBS to pay a total of $160 million. (*See id.* at 11). JPMC's settlement with the SEC similarly included disgorgement of $11,065,969, prejudgment interest of $7,620,380, and a civil penalty in the amount of $32,500,000. (*See id.*, Ex. D). The Government asserts that JPMC's settlements with various federal regulators and state attorney generals totaled $228 million. (*See id.* at 12). BOA's SEC settlement provided for disgorgement of $24,926,375 and prejudgment interest of $11,170,067. (*See id.*, Ex. F). The Government asserts that BOA's settlements with various federal regulators and state attorney generals totaled $137.3 million. (*See id.* at 13).

[7]     Congress amended 18 U.S.C. § 3293, to add the "affects a financial institution" language, in Section 961 of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"). *See* P.L. 101-73, 103 Stat. 183 (Aug. 9, 1989). FIRREA simultaneously amended and enacted other sections of the United States Code using almost identical language. *See id.* § 951 (enacting 12 U.S.C. § 1833); *id.* § 961 (amending 18 U.S.C. §§ 1341 and 1343); *id.* § 963 (amending 18 U.S.C. § 982). The Government, Heinz, and Welty cite decisions applying these various statutes, as have other courts discussing what conduct affects a financial institution. *See, e.g.*, *United States v. Stargell*, 738 F.3d 1018, 1022–23 (9th Cir. 2013) (interpreting the phrase "affected a financial institution" in 18 U.S.C. § 1343, and citing to cases applying 18 U.S.C. § 3293); *United States v. Wells Fargo Bank, N.A.*, 12 Civ. 7527, 2013 WL 5312564, at *28–29 (S.D.N.Y. Sept. 24, 2013) (Furman, J.) (discussing the phrase "affecting a federally insured financial institution" in 12 U.S.C. § 1833, and citing to cases applying 18 U.S.C. § 3293). This Court will therefore similarly cite to decisions interpreting those portions of FIRREA that use language nearly identical to that in § 3293.

a.      *The Court's Prior Interpretation and Application of 18 U.S.C. § 3293(2)*

The Court's prior opinion explained that, although the Second Circuit Court of Appeals had not addressed the issue, other courts have concluded that a financial institution is "affected" for purposes of § 3293(2) where it is exposed to a new or increased risk of loss; the Court found this interpretation compelling "in light of the plain meaning and purpose of § 3293(2)." *Ghavami*, 2012 WL 2878126, at *5.  The Court noted that "[t]he most common meaning of the verb 'affect' is 'to produce an effect upon,'" *id.* (quoting Webster's Third New International Dictionary 35), and that creating a new or increased risk of loss for a financial institution "'is plainly a material, detrimental effect'" on that institution, *id.* (quoting *United States v. Mullins*, 613 F.3d 1273, 1278–79 (10th Cir. 2010)).  Moreover, "interpreting § 3293(2) to cover conduct that exposes a financial institution to a new or increased risk of loss is also consistent with the statute's legislative purpose, which is 'to protect financial institutions, a goal it tries to accomplish in large part by deterring would-be criminals from including financial institutions in their schemes.'"  *Id.* at *6 (quoting *United States v. Serpico*, 320 F.3d 691, 694 (7th Cir. 2003)); *see also Serpico*, 320 F.3d at 694–95 ("Just as society punishes someone who recklessly fires a gun, whether or not he hits anyone, protection for financial institutions is much more effective if there's a cost to putting those institutions at risk, whether or not there is actual harm."); *Mullins*, 613 F.3d at 1278 (noting that, although "Congress certainly could have extended the limitations period only when wire fraud 'causes a loss' to a financial institution, it chose instead to use the considerably broader term 'affects'").

The Court concluded that the Government had "sufficient evidence to permit a jury to find that Defendants' conduct 'affect[ed] a financial institution' within the meaning of 18 U.S.C. § 3293(2)."  *Ghavami*, 2012 WL 2878126, at *10.  The Government's evidence included

settlement agreements that various financial institutions, including UBS, had entered into with

the Securities and Exchange Commission (the "SEC") and other regulators, and non-prosecution

agreements that some of those financial institutions, again including UBS, had entered into with

the Department of Justice (the "DOJ"), both relating to Defendants' charged conduct. *Id.* at *7–

8. The Court found that the settlements, which were for hundreds of millions of dollars, and the

non-prosecution agreements, which admitted responsibility for employees' unlawful conduct,

"illustrate[d] that the alleged conduct created an increased risk of loss." *Id.* at *9 (noting that it

was "a risk that was ultimately realized").

  b. *Other Courts Are in Accord with the Court's Interpretation of 18 U.S.C. § 3293(2)*

   i. Second Circuit

Although the Second Circuit Court of Appeals has not addressed whether a financial

institution's risk of loss constitutes a sufficient effect under § 3293(2), the decision closest to

being on point—*United States v. Bouyea*, 152 F.3d 192 (2d Cir. 1998)—is more supportive of

the Court's interpretation than Defendants'. Moreover, district courts within this Circuit that

have considered the issue have agreed with this Court's interpretation; the one Southern District

decision that Heinz and Welty have identified as arguably to the contrary is not to the contrary.

Defendants are unpersuasive in claiming that *Bouyea* supports their argument. In

*Bouyea*, the defendants were charged with defrauding an entity that, albeit not a financial

institution itself, was a wholly-owned subsidiary of one. *See* 152 F.3d at 195 (noting testimony

that the subsidiary had borrowed money from its parent in connection with the fraudulent

transaction). *Bouyea* found the connection to a financial institution "sufficiently direct" to

support § 3293(2)'s application, but it did not suggest that the circumstances in that case were

the furthest reach of what might "affect" a financial institution. *See id.* Rather, *Bouyea* endorsed

the Third Circuit's statement that the statute "broadly applies" to "any act of wire fraud that affects a financial institution."  *Id.* (quoting *United States v. Pelullo*, 964 F.2d 193, 215–16 (3d Cir. 1992)) (internal quotation marks omitted); *see also id.* ("easily reject[ing]" the defendant's argument that the statute was inapplicable, and repeating the Third Circuit's explanation that the defendant's position "would have more force if the statute provided for an extended limitations period where the financial institution is the *object* of fraud," and that, "[c]learly, however, Congress chose to extend the statute of limitations to a broader class of crimes" (emphasis added) (quoting *Pelullo*, 964 F.2d at 215–16)).

District courts within this Circuit that have addressed the issue of whether an increased risk of loss can "affect[]" a financial institution have explicitly cited and agreed with this Court's holding in *Ghavami*.  *See United States v. Wells Fargo Bank, N.A.*, 12 Civ. 7527, 2013 WL 5312564, at *29 (S.D.N.Y. Sept. 24, 2013) (Furman, J.) ("Courts have repeatedly held that in order to allege such an effect [on a financial institution], the Government need not allege actual harm, but only facts that would demonstrate that the bank suffered an increased risk of loss due to its conduct."  (citing *Ghavami*, 2012 WL 2878126, at *5) (internal citation omitted)); *United States v. Bank of New York Mellon*, 11 Civ. 6969, 2013 WL 1749418, at *12 (S.D.N.Y. Apr. 24, 2013) (Kaplan, J.) ("Courts regularly have concluded that a fraud affects an institution by embroiling it in costly litigation, whether because the fraud causes actual losses to the institution through settlements and attorney's fees or because it exposes the institution to realistic potential legal liability."  (footnotes omitted) (citing *Ghavami*, 2012 WL 2878126 at *9)); *see also United States v. Countrywide Fin. Corp.*, 12 Civ. 1422, 2014 WL 587364, at *3 (S.D.N.Y. Feb. 17, 2014) (Rakoff, J.) ("[E]ven the threat of criminal liability … is bound to affect any federally insured entity in material fashion."  (citing *Ghavami*, 2012 WL 2878126 at *5)).

United States v. Carollo is not to the contrary. See 10 Cr. 654, 2011 WL 3875322 (S.D.N.Y. Aug. 25, 2011) (Baer, J.). Although in Carollo Judge Baer denied the Government's attempt to apply § 3293(2), there the Government had "not alleged that the financial institutions suffered any actual loss or at most the risk of loss is de minimis." Id. at *2 (noting that the Government "merely argues that the kickback arrangements exposed [financial institutions] to a risk of loss without providing much explanation as to what that risk is other than the expenses associated with litigation"). Judge Baer's reconsideration opinion emphasized that his holding was prompted by "the absence of any actual loss or a non-de minimis risk of loss by a financial institution." 2011 WL 5023241, at *1, *3 (noting that, "had the Government made the proffer of evidence at the motion to dismiss phase that it has made in this motion for reconsideration, [that a financial institution had entered into a multi-million dollar settlement for its participation in the alleged offenses,] the outcome may have been different"). Thus, Carollo suggests merely that a financial institution is not "affect[ed]" by an increased risk of loss, where no more than a de minimis risk of loss has been shown. In fact, Judge Baer explicitly stated that he was not addressing the statute's applicability to a greater than de minimis risk of loss. See id. at *4 ("[B]ased on the record at the time of my decision on the motion to dismiss, and even if on that record it was appropriate to consider whether an increased risk of loss alone was sufficient to trigger § 3293, this case would be the wrong case in which to take such a leap.").[8]

---

[8]    After rejecting the Government's use of § 3293(2), Judge Baer nonetheless declined to dismiss the conspiracy charges in Carollo, holding that the "payment of artificially depressed interest payments constitutes overt acts in furtherance of the conspiracies." 2011 WL 3875322, at *3. The Second Circuit reversed, holding that the interest payments did not constitute overt acts. See United States v. Grimm, 738 F.3d 498 (2d Cir. 2013). The Second Circuit's decision did not discuss the scope of § 3293(2). See id.

ii.     Other Circuits

Opinions from other circuits support the Court's interpretation of § 3293(2).  Three Courts of Appeals have held that an increased risk of loss "affects" a financial institution.  The Seventh Circuit, in *United States v. Serpico*, upheld a jury instruction stating that, under § 3293(2), the defendants "affected the banks if they 'exposed the financial institution[s] to a new or increased risk of loss,'" and "'[a] financial institution need not have actually suffered a loss in order to have been affected by the scheme.'"  320 F.3d 691, 694 (7th Cir. 2003).  The Tenth Circuit has similarly concluded that a "'new or increased risk of loss' is plainly a material, detrimental effect on a financial institution, and falls squarely within the proper scope of [§ 3293(2)]."  *Mullins*, 613 F.3d at 1278–79 (10th Cir. 2010).  Recently, the Ninth Circuit "join[ed] [its] sister circuits" in defining "affects" a financial institution "to include new or increased risk of loss to financial institutions."  *United States v. Stargell*, 738 F.3d 1018, 1022–23 (9th Cir. 2013) (interpreting 18 U.S.C. § 1343, and citing *Serpico* and *Mullins*).

Heinz and Welty cite four decisions from other circuits that, they contend, support their argument on appeal.  But these authorities are inapposite.  Contrary to Heinz and Welty's assertions, *United States v. Agne*, 214 F.3d 47 (1st Cir. 2000), *United States v. Ubakanma*, 215 F.3d 421 (4th Cir. 2000), *United States v. Grass*, 274 F. Supp. 2d 648 (M.D. Pa. 2003), and *United States v. Esterman*, 135 F. Supp. 2d 917 (N.D. Ill. 2001), do not provide support for their position.

In *Agne*, the First Circuit found that the bank at issue "experienced no realistic prospect of loss," and thus did not reach the question of whether § 3293(2) requires actual loss.  *See* 214 F.3d at 51–53.  Similarly, *Ubakanma*, *Grass*, and *Esterman* involved frauds that merely utilized a financial institution to transfer funds for the scheme; hence, the institutions in those cases never

20

faced a meaningful risk of loss or potential liability such as that created by Defendants' conduct in this case.  *See Ubakanma*, 215 F.3d at 426 (noting that "the funds involved in the fraud scheme were transferred into and out of accounts at various financial institutions" but "there are no facts indicating that the financial institutions themselves were harmed or victimized in any way")[9]; *Grass*, 274 F. Supp. 2d at 656 (explaining that two financial institutions "were merely used as a conduit to transfer funds procured through a wire fraud," and thus the "losses that these institutions suffered … [we]re nothing more than routine transaction fees and lost income"—had the defendants "procured these transactions legally, the listed financial institutions would have lost this same income and incurred these same expenses"); *Esterman*, 135 F. Supp. 2d at 920 (stating that the scheme "did not have any cognizable impact" on the financial institution, which "was called upon to do nothing more than to honor the authorizations that were wholly regular from the bank's perspective").[10]

    c.    *Even If the Second Circuit Were To Hold That § 3293(2) Requires Actual Loss, the Government Would Still Prevail*

If Heinz and Welty were able to persuade the Second Circuit Court of Appeals to hold that actual loss is required under § 3293(2), their convictions would still be upheld.  The settlement agreements entered into by UBS and other financial institutions with the SEC and other regulators, and the non-prosecution agreements entered into by some of those institutions with the DOJ, were more than sufficient to show that the alleged conduct caused those financial institutions actual losses.

---

[9]    *Ubakanma*'s irrelevance to Heinz and Welty's position is reinforced by *United States v. Murphy*, a decision from a district court within the Fourth Circuit that addressed facts substantially similar to those of *Ghavami*.  *See* 12 Cr. 235, 2013 WL 5636710 (W.D.N.C. Oct. 16, 2013).  *Murphy* explicitly distinguished *Ubakanma* in finding § 3293(2) applicable.  *See id.* at *1–2; *see also id.* at *2 (noting that "the effect first occurred when the financial institution was exposed to risk of loss").

[10]    Even if *Esterman* stood for the position that Heinz and Welty state that it does, the Seventh Circuit's decision in *Serpico* would have abrogated it.

Heinz and Welty argue that corporations enter settlements for any number of reasons and there is no evidence that the settlements and non-prosecution agreements were "anything more than the end product of a business judgment." (Welty Mem. of Law in Supp. of Mot. for Release Pending Appeal ("Welty Release Mem.") 10 [Dkt. No. 405]). Yet, regardless of the precise reasons they were entered into, the settlement and non-prosecution agreements were direct consequences of Defendants' charged conduct. UBS's non-prosecution agreement, in fact, specifically stated that UBS "admits, acknowledges and accepts responsibility for the conduct of its former employees," who "entered into unlawful agreements to manipulate the bidding process and rig bids on certain relevant municipal contracts." *See Ghavami*, 2012 WL 2878126, at *8 (quoting Gov't Mem. of Law in Opp. to Mot. to Dismiss, Ex. A [Dkt. No. 110]).

Other courts have similarly found that a financial institution's settlement payment constitutes an actual loss. In *United States v. Ohle*, for example, a bank employee was charged with implementing a tax fraud scheme that earned his employer substantial income. *See* 678 F. Supp. 2d 215, 218–19 (S.D.N.Y. 2010) (Sand, J.). Judge Sand rejected the defendant's argument that the institution was not "affected" under § 3293(2), finding that the bank "was not only exposed to substantial risk but experienced actual losses," because it "paid over $24,000,000 in settlements" and "over $4,200,000 in attorneys' fees." *Id.* at 228–29; *cf. also United States v. Countrywide Fin. Corp.*, 961 F. Supp. 2d 598, 605 (S.D.N.Y. 2013) (Rakoff, J.) (ruling that the defendant financial institution was affected by the fraud, because the amended complaint "itself alleges" that the financial institution "has paid billions of dollars to settle" claims made as "a result of the fraud here alleged").

Moreover, in this case, the Government intended to have representatives of the financial institutions "testify that those entities entered into the [a]greements in part because of the

conduct alleged in the Indictment." *Ghavami*, 2012 WL 2878126, at *9.  The Government did

not, however, present this testimony—or any evidence of the settlements or non-prosecution

agreements—because Defendants, having argued unsuccessfully pretrial that § 3293(2) could not

apply in this case, stipulated that the alleged fraud affected financial institutions and thus

satisfied § 3293(2).  *See* Stipulation S-4.

    2.   Due Process and Judicial Estoppel

Heinz argues that his due process rights were violated because the Government charged

coconspirators who pled guilty with the lesser crime of ordinary wire fraud, which is subject to a

twenty-year statutory maximum and a five-year statute of limitations, but alleged that *his*

criminal conduct (and that of his codefendants) "affect[ed] a financial institution," which

increases the statutory maximum to thirty years and the statute of limitations to ten years.  18

U.S.C. §§ 1343, 3293(2).  Heinz contends that the Government should have been "judicially

estopped from using an incompatible theory" to charge him under the ten-year statute of

limitations.  (Heinz Mem. of Law in Supp. of Mot. for Release Pending Appeal 9 [Dkt. No.

407]).  The Court previously rejected this argument in a footnote.  *See Ghavami*, 2012 WL

2878126, at *10 n.10.  It does not constitute a substantial question.

Those courts that have held that inconsistent prosecutions violated due process have done

so where the prosecution pursued, to its advantage, factually *contradictory* theories against

different defendants.  *See United States v. Urso*, 369 F. Supp. 2d 254, 264 (E.D.N.Y. 2005)

("[J]udicial estoppel may be applied to prevent a due process violation, if ever, only where there

is a clear and categorical repugnance between the government's two theories of the case.").[11]  In

---

[11]    Only a handful of courts have held that due process is violated by inconsistent prosecutions.  "There is no
clear consensus in the federal courts on whether a prosecutor may be precluded from raising an argument at a
criminal trial because the government has asserted a factually incompatible argument in pursuing a conviction
against another defendant at another trial."  *Urso*, 369 F. Supp. 2d at 263 (collecting cases); *see also Bradshaw v.*

*Stumpf v. Mitchell*, for example, the prosecution argued, in two different proceedings, that each of two different defendants was "the one to pull the trigger, resulting in the fatal shots" to the same murder victim.  367 F.3d 594, 613 (6th Cir. 2004), *judgment rev'd in part on other grounds*, *Bradshaw v. Stumpf*, 545 U.S. 175 (2005).  Likewise, in *Smith v. Groose*, the prosecution used two different, conflicting statements to convict separate defendants of murder. 205 F.3d 1045 (8th Cir. 2000).  The statements were inherently contradictory; each inculpated one of the defendants but exculpated the other.  *See id.* at 1050 ("In short, what the State claimed to be true in [one] case it rejected in [the other] case, and vice versa."); *see also Thompson v. Calderon*, 120 F.3d 1045, 1057–59 (9th Cir. 1997) (en banc plurality) (holding that a defendant's due process rights were violated where the prosecution argued at his trial that he alone committed a murder, but argued at a subsequent trial that another defendant actually committed the same murder and, in doing so, "discredited the very evidence" it had offered in the first trial), *rev'd on other grounds*, 523 U.S. 538 (1998).

The Government's well-settled discretion to charge lesser crimes against those who plead guilty is entirely distinct from the use of inherently conflicting theories to "pursue as many convictions as possible without regard to fairness and the search for truth."  *Groose*, 205 F.3d at 1051–52 (stating that, "[t]o violate due process, an inconsistency must exist at the core of the prosecutor's cases against defendants for the same crime").  Charging coconspirators who plead guilty with lesser crimes than those who go to trial is common, and does not reflect inconsistency.  As this Court noted in its prior decision rejecting Heinz's argument, "Federal

---

*Stumpf*, 545 U.S. 175, 190 (2005) (Thomas, J., concurring) ("This Court has never hinted, much less held, that the Due Process Clause prevents a State from prosecuting defendants based on inconsistent theories."); *United States v. Boyle*, 283 F. App'x 825, 826 (2d Cir. 2007), *aff'd*, 556 U.S. 938 (2009) (noting that "other circuits have found that the use of inherently factually contradictory theories violates the principles of due process," but stating that the case did not "present the opportunity for us to consider the issue" (internal quotation omitted)).

Rule of Criminal Procedure 11(c)(1)(A) specifically contemplates plea agreements in which defendants plead guilty to lesser or fewer charges than they might have faced had they proceeded to trial." *Ghavami*, 2012 WL 2878126, at *10 n.10.  Here, the primary difference between the charges against those who pled guilty and the charges in this case is that, in the former cases, the Government did not pursue the enhancement for conduct affecting a financial institution, whereas in this case, the Government did; this was within its discretion to do.  Any purported inconsistency was not inherently contradictory and, in contrast to *Stumpf*, *Groose*, and *Calderon*, was not the result of the Government seeking to "win a case" instead of ensuring that "justice shall be done."  *Groose*, 205 F.3d at 1049 (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)).[12]

3.  <u>Jury Instructions Concerning Intentionally Losing Bids</u>

Welty asserts that the last paragraph of the Court's jury instruction on the relevant Treasury regulations was erroneous and tainted the jury's deliberations.  The Second Circuit "review[s] challenged jury instructions *de novo* but will reverse only if all of the instructions, taken as a whole, caused a defendant prejudice."  *United States v. Bok*, 156 F.3d 157, 160 (2d Cir. 1998).  "A 'jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law.'"  *United States v. Applins*, 637 F.3d 59, 72 (2d Cir. 2011) (quoting *Bok*, 156 F.3d at 160).  Where a defendant objected to erroneous

---

[12]        Heinz also notes that the Superseding Indictment in this case alleged that Defendants' fraud affected a financial institution, whereas the original indictment did not.  None of the cases cited by Heinz suggests that this constituted a violation of his due process rights, regardless of whether the Government's purpose for adding that Defendants' fraud affected a financial institution was to enhance available penalties at sentencing or to extend the statute of limitations.  *Cf. United States v. Stewart*, 590 F.3d 93, 122 (2d Cir. 2009) ("'[A] prosecutor's pretrial charging decision is presumed legitimate.'" (quoting *United States v. Sanders*, 211 F.3d 711, 716 (2d Cir. 2000))).
            To the extent that Heinz raises a distinct argument under judicial estoppel, it falls flat for the same reasons discussed above.  *Cf. United States v. Christian*, 342 F.3d 744, 747–49 (7th Cir. 2003) (rejecting the argument that the Government's plea agreements for misdemeanor charges with certain defendants should judicially estop the Government from bringing a felony charge arising out of the same conduct against a different defendant).

instructions, the instructions are reviewed for harmless error and will be upheld if it is "'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" *United States v. Quattrone*, 441 F.3d 153, 179 (2d Cir. 2006) (quoting *Neder v. United States*, 527 U.S. 1, 18 (1999)); *see also United States v. Lung Fong Chen*, 393 F.3d 139, 147 (2d Cir. 2004) ("An error is deemed harmless if we are convinced that the error did not influence the jury's verdict." (quoting *United States v. Masotto*, 73 F.3d 1233, 1239 (2d Cir. 1996))).

To place Welty's argument in context, the Court reproduces relevant portions of the Treasury regulations instruction here. The instruction, of which Welty challenges only the last paragraph, began by explaining that:

> [T]he government has alleged that the defendants falsely certified or caused others to falsely certify that certain bidding procedures in certain transactions satisfied the 'safe harbor' provision in the United States Treasury regulations that govern the municipal bond industry. Certification that a bidding procedure satisfied the safe harbor provision of the treasury regulations is part of the process by which municipalities and other bond issuers can achieve tax-free treatment of the interest paid on those bonds.

(Tr. 4767–68). With respect to potential providers, the instruction stated:

> Under the safe harbor provision, a potential provider submitting a bid is required to represent that (1) it did not consult with any other potential provider about its bid; (2) its bid was determined without regard to any other formal or informal agreement that the potential provider has with the issuer or any other person, whether or not in connection with the bond issue; and (3) its bid is not being submitted solely as a courtesy to the issuer or any other person for purposes of satisfying the safe harbor's "three bid" requirement. To meet the three-bid requirement, an issuer is required to receive at least three bids from potential providers who do not have a material financial interest in the bond issue, and at least one of those bids must be from a "reasonably competitive" provider.

(Tr. 4768). With respect to brokers, the instruction stated:

> A broker is required under the safe harbor provision to make a bona fide solicitation on behalf of an issuer for the purchase of the investment at issue. That requires the broker [No. 1] to provide

> written notification to potential providers of their obligations under the safe harbor provision; No. 2, to provide all potential providers with an equal opportunity to bid (in other words, no potential provider may be given the opportunity to review other bids, i.e., a last look before providing a bid); No. 3, to solicit bids from at least three reasonably competitive providers; and, No. 4, to receive bids from at least three potential providers, one of which must be a reasonably competitive provider.

(Tr. 4769).  And the final paragraph of the instruction, which Welty challenges, stated:

> The government contends that many certifications were false because the bids included intentionally losing bids.  You may not consider a certification to be false if you find that an intentionally losing bid was submitted only for a legitimate business purpose (for example, to keep the potential provider's name visible).

(Tr. 4769).

Welty argues that this last paragraph improperly "gave the force of law to a principle that is not contained in the regulations."  (Welty Release Mem. 15).  Welty (i) asserts that "an intentionally losing bid doesn't have any meaning within the context of the treasury regulations unless it is submitted solely as a courtesy for purposes of satisfying the three-bid requirement," (Tr. 4113; Welty Reply Mem. in Supp. of Mot. for Release Pending Appeal 11 [Dkt. No. 418]); and (ii) contends that the instruction improperly "permitted the jury to speculate concerning whether a bid," submitted either by Welty or a coconspirator, "had a 'legitimate business purpose,'" (Welty Release Mem. 15–16).  Welty has not demonstrated that this argument raises a substantial question likely to result in reversal, a new trial, or a materially reduced sentence, for three reasons.

First, Welty's initial contention, which appears to be that an intentionally losing bid is improper only if submitted as a courtesy to satisfy the three-bid requirement, is unduly narrow. A bidder submitting an intentionally losing bid violates the regulations (and any certification mirroring the regulations) if his or her bid is offered after a consultation with another potential

provider about bids, or is determined with regard to a formal or informal agreement with another person, regardless of whether the bid is submitted solely as a courtesy to satisfy the three-bid requirement.  *See* Treas. Reg. § 1.148–5(d)(6)(iii).  Because the Government's evidence showed that the purportedly intentionally losing bids in this case were submitted pursuant to conspiratorial agreements with brokers and potential providers,[13] a jury crediting this evidence would have found that the certifications for those intentionally losing bids were false, even if the losing bids were not necessarily submitted to satisfy the three-bid requirement.

Welty cites two transactions in his memorandum that he incorrectly contends support his argument—the Georgia Baptist transaction, and the City of Chicago transaction; instead, these transactions are useful illustrations of why Welty's argument fails.  In the Georgia Baptist transaction, the deal's broker, Goldberg, an alleged coconspirator at CDR, testified that he "set [the transaction] up for UBS to win," "[b]y getting intentionally losing bids other than UBS's," (Tr. 2973), in return for Welty getting CDR hired as broker, (Tr. 2976–77).  Goldberg remarked that Welty's bid certification was false because he and Welty "had an informal agreement that … CDR would set up the bid for UBS to win."  (Tr. 2977).  Hence, if the jury believed Goldberg's testimony, it would have found Welty's and his coconspirators' certifications false because their bids were determined pursuant to an unlawful agreement that the bidders had with CDR. Similarly, on the City of Chicago deal, UBS, BOA, and JPMC were potential providers; Zaino testified that, on the deal, he "knew [he] could call Doug Campbell [at BOA] to solicit an

---

[13]        *See, e.g.*, Tr. 2423–24, 2430–31, 2435 (Campbell testifying that either Welty or Zaino obtained Campbell's agreement to submit an intentionally losing bid on the Anchorage transaction); Tr. 757–60, 764–67 (Zaino testifying about same, and stating that Welty had informed him that the transaction "was being set up for UBS" and that he should tell Campbell to submit an intentionally losing bid); Tr. 1962–66 (Wright testifying that he put in intentionally losing bids on the City of Detroit transaction based on an agreement with Heinz); Tr. 2018–19 (same for the City of Chicago transaction); Tr. 2052–55 (same for the Fresno County transaction); Tr. 2064–67 (same for the City of Anchorage transaction); Tr. 3616–23 (Hertz testifying that he put in a losing bid on the Rhode Island Tobacco transaction based on an agreement with Heinz).

intentionally losing bid," and that Heinz "could solicit an intentionally losing bid from Alex Wright at J.P. Morgan." (Tr. 791–94; *see also* Tr. 2018–19, 2320–21 (Wright testifying that Heinz asked him to put in an intentionally losing bid on the City of Chicago transaction, which he did)). If the jury found that Zaino, Heinz, Campbell, and Wright had consulted each other about their bids or determined their bids based on agreements with each other, that finding would have sufficed to conclude that the related bid certifications were false.

Second, Welty's concern that he was prejudiced because the jury might have speculated about whether a bid had a "legitimate business purpose" is unfounded. The instruction was tailored to allow the jury to accept Defendants' contentions that intentionally losing bids may have been submitted for legitimate business purposes; the instruction's plain language *restricts* when the jury can find that a certification is false because of an intentionally losing bid. (*See* Tr. 4769 ("You may *not* consider a certification to be false if you find that an intentionally losing bid was submitted only for a legitimate business purpose ...." (emphasis added))). Whereas the Government alleged that the conspirators submitted losing bids for obviously illegitimate purposes, such as to satisfy the three-bid requirement or pursuant to agreements with brokers or other potential providers, Defendants maintained that intentionally losing bids were actually submitted for different, legitimate business reasons. (*See, e.g.*, Tr. 4496–98 (Heinz summation) (noting that "[alleged coconspirator] Alex [Wright] said there were tons of reasons to put in a bid even if you weren't so psyched up to win," and arguing that Wright's bids "were put in for other legitimate business reasons"); Tr. 4614 (Welty summation) (stating that "it's clear from the first call that [alleged coconspirator] Mr. Grimm stuck around so that he could learn the bid results," and that Grimm "wanted information and he wanted marketplace visibility," which were "completely legitimate business reasons ... even under the government's approach to this case,

for a provider to put in a number that he doesn't actually want to win at")).  The Government did

not argue that Defendants' *claimed* alternate reasons for submitting intentionally losing bids

were not legitimate; instead, the Government contended that those reasons were not the bidders'

*actual* motivations.  See, for example, the Government's rebuttal summation:

> [Heinz's counsel] pointed out to you that during his testimony, Alex
> Wright offered or agreed that there could be a lot of reasons why
> you might submit a losing bid.  *There could be legitimate business
> reasons for that*.  And he told you that sometimes you'd want to get
> market color back.  And sometimes you might want to stay on bid
> lists.  *And those were legitimate reasons to submit a bid that you
> didn't think that you would win*.  But what [Heinz's counsel] didn't
> remind you is that on redirect examination Mr. Wright told you that
> *in none of the cases where Gary Heinz asked him to submit a losing
> bid were those his motivations*.  And he told you that on the Detroit
> transaction, on the Anchorage transaction, on the Chicago water
> transaction, on the Fresno transaction, in none of those cases was he
> submitting a bid to try to get color back or to try to stay on a bid list;
> that, in fact, he was submitting those bids because Mr. Heinz asked
> him to submit losing bids.

(Tr. 4678–79 (emphasis added).)[14]  The jury was thus left to consider simply whether it thought

an intentionally losing bid was submitted for reason *A* or reason *B*, where reason *A* was

legitimate and reason *B* was not.

　　　　Third, even if the instruction was erroneous—and although the Court finds that Welty

properly objected to the instruction[15]—any error was harmless.  The evidence against Welty and

---

[14]　　Welty's argument that the instruction prejudiced him on the jury's consideration of the Corona-Norca deal is unpersuasive.  On that transaction, the Government introduced two audio recordings of conversations between Welty and Grimm that suggest that Welty and Grimm had agreed that Grimm would submit an intentionally losing bid.  On one of the calls, for instance, Welty directed that Grimm's bid should be lowered, because it "might win." (Gov't Ex. 186724; *see also id.* (Grimm asking Welty if his bid is "low enough?" and if a lower bid would also "be too high?"); Gov't Ex. 186715 (Grimm asking Welty "Do you want me to throw in a bid?  Do you guys need a bid?")).  Welty nonetheless contends that there is language on the tapes suggesting that Grimm intended to submit a losing bid without regard to any agreement with Welty.  (*See* Welty Release Mem. 17–18 (noting that, on the first of the two calls, Grimm remarked that he "just want[s] to know if [he] should be around for it" (quoting Gov't Ex. 186715))).  Welty does not state that the Government argued that "be[ing] around" for the bid would be an illegitimate purpose or make a certification false, and nothing in the jury instructions would have caused the jury to reach that conclusion.

[15]　　The Government challenges Welty's assertion that he objected to the instruction at trial, (*see* Gov't Resp. to Mot. for Release Pending Appeal 13–14 [Dkt. No. 417]), but the Court finds support in the transcript for Welty's

his codefendants was substantial, and much of it had nothing to do with submitting intentionally losing bids. For example, the Government presented evidence that the conspirators (i) discussed on which transactions to bid, to reduce competition and increase profits, (*see, e.g.*, Tr. 2439–45, 2450–51, 2465–72 (Campbell testifying that Welty asked him not to bid on the Rhode Island Tobacco transaction but instead to sell securities to UBS so that both UBS and BOA could profit); Tr. 1922–27 (Wright testifying that Ghavami and Heinz met with members of JPMC to find ways to reduce competition)); (ii) rigged bidding, provided each other with "last looks," and otherwise permitted bids to be lowered but still win the bidding, in exchange for kickbacks, (*see, e.g.*, Tr. 2932, 2963–66, 2973–77 (Goldberg testifying that CDR "set up bids" for Heinz, Welty, and Zaino in exchange for kickbacks); Tr. 863–64, 884–88, 914–19 (Zaino testifying about same); Tr. 3453, 3481–84, 3489–90 (Rothman testifying about same); Tr. 1039–49, 1117–29, 1158–66, 1191–97, 1231–33 (Zaino testifying that, on multiple transactions, Heinz, Welty, and he provided Grimm "last looks" and allowed Grimm to reduce his bid and still win); Tr. 1061–68, 1083–84, 1156–57, 1177–78, (Zaino testifying that, in exchange for UBS's assistance on deals, Grimm provided kickbacks)); and (iii) manipulated bid lists in each other's favor, (*see, e.g.*, Gov't Exs. 11906(A), 605507 (phone calls in which Grimm and Welty appear to set up bid lists)).[16]

---

position. Although it appears that Ghavami suggested the language that was ultimately used, (*see* Tr. 4103–04), which Welty remarked "would be a correct statement," (Tr. 4107), Welty also repeatedly argued that an "intentionally losing bid" could violate the regulations only if it were submitted as a courtesy bid to satisfy the three-bidder requirement. *See, e.g.*, Tr. 4099 ("I think my initial, and main concern, your Honor, is de-linking intentionally losing bids from the courtesy bid requirement, the three-bidder requirement."); Tr. 4106 ("[A]n intentionally losing bid doesn't have any meaning within the context of the treasury regulations unless it is submitted solely as a courtesy for purposes of satisfying the three-bid requirement."); Tr. 4113–14 ("[O]ur position is that an intentionally losing bid is inconsistent with the treasury regulations only if it violates the specified language that already exists in the treasury regulations. And I understand the Court's ruled the Court is going to give the instruction, and I just want to make sure that that position on our behalf is clear.").

[16]     As explained in Section II, the Goldberg Email, which is the basis for Welty's motion for a new trial, does not undermine the substantial evidence against Defendants.

4.  <u>Zaino's Rule 701 Testimony</u>

Welty argues that portions of Zaino's testimony at trial impermissibly exceeded the scope of Federal Rule of Evidence 701 ("Rule 701").  Specifically, Welty objects to Zaino's testimony concerning audio recordings of phone calls between Welty and alleged coconspirator Grimm on Count Four transactions.

Rule 701 limits opinion testimony by a lay witness to testimony that is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702 [governing testimony by expert witnesses]."  Fed. R. Evid. 701.  Welty's contention that Zaino's testimony violated each of these three requirements is unpersuasive and does not raise a substantial question.  Additionally, even if portions of Zaino's testimony were improper under Rule 701, the error was harmless.

a.  *Background*

Before trial, Defendants and the Government moved *in limine* for a ruling on whether opinion testimony could be elicited from cooperating witnesses about recorded phone conversations.  [Dkt. Nos. 146, 156].  The Court ruled that coconspirator witnesses could provide lay opinion testimony that would "consist of identification of speakers on recordings, provide background and context for ambiguous conversations, identify the subjects discussed, and interpret coded language used by the alleged co-conspirators."  [Dkt. No. 218].  At trial, the Court reiterated its pretrial ruling, (Tr. 1098), and sustained many of Defendants' objections during Zaino's testimony, (*see, e.g.*, Tr. 1090, 1112, 1120–21, 1124, 1133, 1193–98, 1213).

      *b.*     *Zaino's Testimony Was Based on His Personal Perception*

Zaino's testimony about audio recordings of phone calls between Welty and Grimm on Count Four transactions was properly based on his personal perceptions.  As explained in the Court's prior Order, under Second Circuit precedent, Zaino was permitted to testify about these recordings, even though he did not necessarily participate personally in the communications or the specific transactions they concerned.  "[D]irect participation in the … activities of the charged enterprise" may sufficiently "afford[] [a witness] particular perceptions of its methods of operation [such that he or she] may offer helpful lay opinion testimony under Rule 701 even as to coconspirators' actions that he did not witness directly."  *United States v. Yannotti*, 541 F.3d 112, 125–26 & n.8 (2d Cir. 2008) (finding that a coconspirator's testimony concerning a phone conversation in which he did not participate "easily" satisfied Rule 701(a), and explaining that the testimony was "rationally based on his own perception because it derived from his direct participation in the loansharking activities of the charged enterprise, not on participation in the loansharking activities of some unrelated criminal scheme").  Zaino was able to decode Welty and Grimm's conversations based on his experience in the conspiracies, in which he was an active member, who participated personally in many of the transactions, (*see, e.g.*, Tr. 509–11, 529–33, 537, 543, 573, 775, 805, 983, 990, 1003, 1078–79, 1223), worked in close proximity with his codefendants for many years, (*see, e.g.*, Tr. 502–07, 534–36, 565–66, 1070, 3852–53), and regularly communicated with them and with other alleged coconspirators about their deals, (*see, e.g.*, Tr. 533, 536, 1025, 1036–49, 1080–81, 1223–26).

Hence, Welty's contention that Zaino lacked sufficient personal perception to testify about phone conversations related to the Rhode Island Housing ("RIH") and Catholic Health Initiatives ("CHI") transactions is mistaken.  Zaino acknowledged that he did not participate in

the calls or deals.  (*See* Tr. 1080, 1167–68).  Yet, in addition to his general experience in the

conspiracies, Zaino affirmed that he knew of the RIH and CHI deals when he worked at UBS,

(*see id.*), stated that he was the primary broker for a transaction that "was tied to the Rhode

Island [Housing] transaction via swap," (Tr. 1078–79), testified about a call in which he

participated with Welty and Grimm concerning the CHI transaction, (*see* Tr. 1176–78), and

explained that he spoke with Heinz and Welty about the transactions when they occurred, (*see*

Tr. 1080–83, 1087–88, 1168–69).

      *c.*    *Zaino's Testimony Was Helpful to the Jury*

"[I]ndividuals engaging in illicit activities rarely describe their transactions in an open or

transparent manner and the government may call witnesses to provide insight into coded

language through lay opinion testimony."  *Yannotti*, 541 F.3d at 126.  Zaino's decoding

testimony was helpful to the jury, who could not have been expected to appreciate the meaning

of ambiguous terms and phrases without context.  (*See generally* Tr. 1033–1248; *see, e.g.*, Tr.

1118 (Zaino explaining "give me your best indication," in phone call's context); Tr. 1124–25

(same for "confirm these levels," "five beeps in for each one," "note account was a 405," and

"[f]loat fund was a 490"); Tr. 1211–12 (same for "baking in," "juicier," and "add in a couple of

bips")).  In *Yannotti*, the Second Circuit similarly found that a coconspirator's testimony about a

"cryptic" recorded conversation was helpful to the jury, "because the 'language on the tape [was]

… punctuated with ambiguous references to events that are clear only to the conversants.'"  541

F.3d at 126 (quoting *United States v. Aiello*, 864 F.2d 257, 265 (2d Cir. 1988)).

      *d.*    *Zaino's Testimony Was Not Improperly Based on Specialized Knowledge*

Zaino's testimony (concerning the complex financial transactions that were the subject of

the conspiracies) was proper, in that it was based on his participation in the conspiracies.  *See*

*Yannotti*, 541 F.3d at 126 ("[W]here a witness derives his opinion solely from insider perceptions of a conspiracy of which he was a member, he may share his perspective as to aspects of the scheme about which he has gained knowledge as a lay witness subject to Rule 701, not as an expert subject to Rule 702."); *see also United States v. Cuti*, 720 F.3d 453, 460 (2d Cir. 2013) (lay opinion testimony was proper, because the "witnesses testified based only on their experiences with matters pertinent to this case, and their reasoning was evident to the jury"); *cf. United States v. Haynes*, 729 F.3d 178, 194–95 (2d Cir. 2013) (ruling that an officer's lay testimony that was based on his "experience as a border agent inspecting vehicles" was improper); *United States v. Garcia*, 413 F.3d 201, 210–17 (2d Cir. 2005) (holding that an undercover law enforcement agent could not testify that, based on his experience in other drug cases, the defendant was a partner in the alleged drug conspiracy). Indeed, Zaino's testimony was meaningful precisely because it provided an insider's perspective into the conspiracies.

Welty claims that parts of Zaino's testimony were based on specialized knowledge and not on the reasoning process of the average person: "Zaino's (1) characterization of 'indications' as 'bids;' (2) opinions as to what Messrs. Welty and Grimm meant; (3) comparison of transactions based solely on trial preparation; (4) opinion as to the falsity of a bidding agent's certificate; [and] (5) testimony that a municipality was harmed by Mr. Welty's conduct." (Welty Release Mem. at 29).

Welty's argument is unpersuasive. As to the first and second, as noted above, Zaino's decoding of "indication" to mean "bid," and his testimony generally about what Welty and Grimm meant when they used ambiguous phrases, were based on his day-to-day participation in the conspiracies, not on specialized knowledge. Indeed, Zaino's testimony that, in certain instances, "indication" was not used as it typically is in the industry underscores this point. As to

the third, it is neither surprising nor improper that Zaino reviewed transaction documents and call transcripts during pretrial preparation; after all, like the witness testifying in *Yannotti*, Zaino had not necessarily participated in each call or deal that he testified about.  There was more than sufficient basis to conclude that Zaino's opinions on such documents were based on his experience in the conspiracies, and not on specialized knowledge or "solely" trial preparation. As to the fourth, Zaino concluded that Welty's certification was false based on calls about which Zaino had just testified.  (*See* Tr. 1127–29).  Zaino stated that those calls evidenced Welty allowing Grimm to "adjust his bid lower."  (*Id.*).  Zaino's reasoning for then remarking that the certification was false was evident to the jury.  *Cf. Cuti*, 720 F.3d at 460.  As to the fifth, Zaino's observation that the municipality was earning a lower interest rate merely showed the difference in the transaction's interest rate with and without the fraud—an observation that involved simply comparing numbers, which was not rooted in specialized knowledge.  *See United States v. Rigas*, 490 F.3d 208, 224–25 (2d Cir. 2007) (holding that lay opinion testimony by an accountant was permissible when it was offered to show what the amount of the debt would have been had the fraud not occurred); *cf. Cuti*, 720 F.3d at 460 ("When the issue for the fact-finder's determination is reduced to impact—whether a witness would have acted differently if he had been aware of additional information—the witness so testifying is engaged in a process of reasoning familiar in everyday life."  (internal quotation omitted)).

  *e.* *Even If Admitting the Testimony Was Improper, Any Error Was Harmless*

   Even if the Court improperly admitted portions of Zaino's testimony, the error was harmless.  *See United States v. Dukagjini*, 326 F.3d 45, 61–62 (2d Cir. 2003) ("Reversal is necessary only if the error had a 'substantial and injurious effect or influence in determining the jury's verdict.'" (quoting *United States v. Castro*, 813 F.2d 571, 577 (2d Cir. 1987))).  The

Government presented substantial evidence at trial of Defendants' guilt, and it is highly probable that the jury would have found Defendants guilty had the Court sustained the handful of objections to portions of testimony that Welty contends violated Rule 701. *See, e.g.*, *supra* Sections II.B.3 and III.B.3 (listing examples of evidence presented at trial). The Court is confident that, if any error was made, it "did not influence the jury, or had but very slight effect." *Dukagjini*, 326 F.3d at 62 (citation omitted).

## IV.    CONCLUSION

For the foregoing reasons, Welty's motion for a new trial and Heinz's and Welty's motions for release pending appeal are DENIED. [Dkt. Nos. 404, 406, 457, 459].

Heinz and Welty shall surrender to the facility[ies] designated for them by the Bureau of Prisons by 10:00 a.m. on July 17, 2014.

SO ORDERED.

Dated: New York, New York
        May 15, 2014

_____/s/_____
KIMBA M. WOOD
United States District Judge